FILED

11 FEB 11 AM 11: 38

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:_____

1  DONALD W. SEARLES, Cal. Bar No. 135705
   *E-mail: searlesd@sec.gov*
2  NICHOLAS S. CHUNG, Cal. Bar No. 192784
   *E-mail: chungni@sec.gov*
3
   Attorneys for Plaintiff
4  Securities and Exchange Commission
   Rosalind R. Tyson, Regional Director
5  John M. McCoy III, Associate Regional Director
   5670 Wilshire Boulevard, 11th Floor
6  Los Angeles, California 90036
   Telephone:   (323) 965-3998
7  Facsimile:   (323) 965-3908

8

9                    UNITED STATES DISTRICT COURT

10                   CENTRAL DISTRICT OF CALIFORNIA

11                                    CV11   01309 GHK  (JCx)
   SECURITIES AND EXCHANGE
12 COMMISSION,                        Case No.

13         Plaintiff,                 **COMPLAINT**

14      vs.

15 MICHAEL W. PERRY and A. SCOTT
   KEYS,
16
           Defendants.
17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

### JURISDICTION AND VENUE

1.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), 20(e), and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1), 77t(e), and 77v(a), and Sections 21(d)(1), 21(d)(2), 21(d)(3)(A), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(2), 78u(d)(3)(A), 78u(e) & 78aa. Defendants have directly or indirectly made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

2.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because Defendants reside and transact business within this district and certain of the transactions, acts, practices, and courses of conduct constituting violations of the federal securities laws alleged in this Complaint occurred within this district.

### SUMMARY

3.     This action involves securities offering fraud and reporting violations committed by Michael W. Perry ("Perry"), the former Chief Executive Officer and Chairman of the Board of IndyMac Bancorp, Inc. ("IndyMac"), and A. Scott Keys ("Keys"), the former Executive Vice President and Chief Financial Officer of IndyMac.  Perry and Keys are collectively referred to herein as "Defendants."

4.     IndyMac through its main subsidiary – IndyMac Bank, F.S.B. ("IndyMac Bank" or "the Bank") – primarily made, purchased, and sold residential mortgage loans.  In July 2008, IndyMac Bank was placed under Federal Deposit

///

1  Insurance Corporation ("FDIC") receivership and IndyMac filed for bankruptcy

2  protection.

3      5.    In 2008, Defendants knowingly or recklessly participated in

4  IndyMac's filing of false and misleading disclosures of its financial condition in

5  Forms 10-K, 10-Q, and/or 8-K, as well as in offering documents for $100 million

6  in stock sales.  During that time period, Defendants regularly received information

7  regarding IndyMac's rapidly deteriorating financial condition.  Despite receiving

8  this information, Defendants participated in the filing of IndyMac's periodic

9  reports and stock offering disclosures that made false and materially misleading

10  statements and omissions regarding:  (1) IndyMac's liquidity; (2) IndyMac's

11  capital raising needs and activities; and (3) IndyMac Bank's capital ratio, a key

12  regulatory metric of a bank's safety and soundness.  Among other things, as

13  discussed below, Defendants signed a false and misleading Form 10-K issued on

14  February 29, 2008 and authorized the filing of one or more false and misleading

15  prospectuses.  In addition, Perry signed false and misleading Forms 10-Q and 8-K

16  and made a false and misleading statement during an earnings call relating to

17  IndyMac's Q1 2008 results.  Shortly after IndyMac partially disclosed its dire

18  liquidity problems in reports for its first quarter 2008 filed on May 12, 2008,

19  IndyMac Bank was put into FDIC receivership and IndyMac declared bankruptcy.

20      6.    Based on their conduct, Defendants violated and/or aided and abetted

21  violations of the antifraud and reporting provisions of the federal securities laws.

22  The Commission seeks an order enjoining Defendants from future violations of the

23  securities laws, requiring Defendants to disgorge their ill-gotten gains with

24  prejudgment interest, ordering Defendants to pay civil monetary penalties, barring

25  Defendants from serving as an officer or director of a public company, and

26  providing other appropriate relief.

27  ///

28  ///

2

**THE DEFENDANTS**

7.     Michael W. Perry is a resident of San Marino, California.  He was IndyMac's Chief Executive Officer since 1998 and Chairman of the Board of Directors since 2003.  Perry was licensed as a CPA in California until his license was cancelled in 1997.

8.     A. Scott Keys is a resident of La Cañada Flintridge, California.  He was IndyMac's Executive Vice President and Chief Financial Officer from March 2002 until April 25, 2008, when he took a medical leave of absence.  Keys is licensed as a CPA in California.

**RELATED PARTIES**

9.     IndyMac was a Delaware corporation with principal executive offices in Pasadena, California.  Its common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NYSE until August 18, 2008, when it was delisted and withdrawn from registration pursuant to Rule 12d2-2(b) of the Exchange Act.  Its common stock is currently quoted on the Pink Sheets operated by OTC Markets Group, Inc.  IndyMac filed for Chapter 7 bankruptcy on July 31, 2008.

10.     IndyMac Bank was a federally-chartered thrift institution regulated by the Office of Thrift Supervision ("OTS") and headquartered in Pasadena, California.  On July 11, 2008, the OTS closed IndyMac Bank and placed it under FDIC receivership.

**FACTS**

**A.     Background**

11.     At the end of 2007, IndyMac was a publicly-traded company whose primary operating subsidiary was IndyMac Bank.  As a thrift, IndyMac Bank was subject to regulatory capital requirements that measure a bank's safety and soundness.  One such measurement, the total risk-based capital ratio (the "capital ratio"), is calculated by dividing a thrift's total risk-based capital (*e.g.*, shareholder

1  equity) by total risk-weighted assets (*i.e.*, the greater the presumed risk of an asset,
2  the greater the risk weighting and the reserved capital needed to support the asset).
3      12.     Under the OTS's regulations and 2000 order approving IndyMac's
4  acquisition of IndyMac Bank, IndyMac Bank was required to maintain a capital
5  ratio of 10% or more to be considered "well-capitalized." IndyMac Bank would
6  suffer significant regulatory consequences if its capital ratio fell below the 10%
7  well-capitalized threshold, including:

8      a.   An inability to accept (without a waiver from the FDIC)
9           brokered deposits (*i.e.*, funds deposited by brokers for third
10          parties that receive higher interest rates), which would likely
11          curtail IndyMac Bank's lending business;
12     b.   Potentially increased costs, including borrowing costs from the
13          Federal Home Loan Bank, insurance premiums to the FDIC,
14          and payments to the OTS; and
15     c.   The OTS and FDIC could impose various restrictions or
16          remedial requirements.

17     13.     As the CFO, Keys supervised the two IndyMac departments that
18  forecasted IndyMac's financial results, including IndyMac Bank's capital ratio.
19  Perry and Keys received frequent and, by March 2008, daily forecasts of the
20  Bank's capital ratio by e-mail and in meetings. Keys also supervised IndyMac's
21  investor relations department, which managed IndyMac's Direct Stock Purchase
22  Plan ("DSPP"). Under the DSPP, investors could purchase $10,000 or more of
23  IndyMac's common stock at a 1% to 2.5% discount to market price. Perry and
24  Keys received regular reports on capital raising through the DSPP.
25  ///
26  ///
27  ///
28  ///

**B.** **Material Omissions and Misstatements in IndyMac's 2007 Annual**
   **Report and 2008 Stock Sales**

   **1.** **IndyMac's Negative 2007 Results and Positive 2008 Forecast**

   14.    On February 12, 2008, IndyMac reported its 2007 results of
operations and financial condition in a Form 8-K ("2007 Earnings 8-K"), which
included as exhibits an earnings press release (the "2007 Press Release"), a
shareholder letter (the "2007 Shareholder Letter") and a presentation entitled
"IndyMac Bancorp, Inc. Fourth Quarter Review" (the "2007 Presentation").  Perry
and Keys signed IndyMac's 2007 Earnings 8-K, and Perry signed the 2007
Shareholder Letter.  Although IndyMac acknowledged in the 2007 Earnings 8-K
that IndyMac had a "terrible" 2007 and had lost $509 million in the fourth quarter
and $615 million during fiscal 2007, the 2007 Press Release assured investors that
IndyMac had finished the quarter in a "solid overall financial position" and had a
"game plan" that gave it a "realistic shot" at a $13 million profit in 2008.  IndyMac
further assured investors that even if its 2008 forecast was wrong, "we have the
capital … to absorb nearly triple our presently forecasted 2008 credit costs and
fight our way through until the housing and mortgage markets do stabilize."

   15.    The 2007 Earnings 8-K also made positive statements and forecasts
regarding IndyMac's Bank's capital ratio.  In the 2007 Earnings 8-K, IndyMac
stated that IndyMac Bank's capital ratio was 10.50% at the end of 2007, and was
thus above the 10% well-capitalized threshold.  IndyMac went on to state that
"[w]e believe that, under current regulations, the bank will continue to meet its
'well-capitalized' minimum capital requirements in the foreseeable future," and
that "[w]e are currently forecasting that our balance sheet size will decline and our
capital ratios will increase over the course of 2008 as we execute our revised
business model of primarily GSE ["Government Sponsored Enterprise"] lending."
IndyMac's 2007 Presentation similarly had positive forecasts for IndyMac Bank's
capital ratio, including a projected 10.59% capital ratio at March 31, 2008.

16.   In addition, the 2007 Shareholder Letter stated that the "only good news" is that, even with its significant annual and quarterly losses, IndyMac remained in a "fundamentally sound financial position" and that IndyMac Bank's "capital levels continue to exceed the levels defined as 'well capitalized' by our regulators." The 2007 Shareholder Letter assured IndyMac's investors that "based on our new business model … we are forecasting a small profit in 2008 … as we believe we can maintain our 'well-capitalized' capital ratios even under worsening industry conditions."

17.   IndyMac's 2007 Earnings 8-K also informed investors that given its strong levels of capital and liquidity, IndyMac did not intend to raise capital in 2008. IndyMac's 2007 Shareholder Letter stated that "we want to try and avoid raising capital externally right now given our current stock price relative to book value per share, as any capital raised would be highly dilutive to existing shareholders." Similarly, IndyMac's 2007 Presentation stated that "due to our low stock price to book value per share, our 2008 plan does not rely on the capital markets for raising capital; instead we plan to eliminate the dividend [on common shares] and shrink the balance sheet," thereby improving IndyMac's capital position by $318 million. The 2007 Presentation also forecasted that the number of diluted shares outstanding would not increase, thereby further emphasizing that IndyMac did not expect to raise capital through stock sales.

18.   The 2007 Earnings 8-K also touted IndyMac's liquidity, including its cash position, stating in the 2007 Presentation that IndyMac had:

      a.   $64 million in cash at year end 2007 to pay future preferred dividends of $7.3 million per quarter;

      b.   "enough cash to pay [preferred dividends] for over 2 years without any dividends from the Bank or additional debt or equity raised"; and

///

6

c.    "the right to defer dividend payments on [preferred securities]
      for up to five years; [but it did] not expect to have to exercise
      this right."

2.    **IndyMac's Fraudulent DSPP Sales to Protect IndyMac Bank's
      Capital Ratio and Pay Preferred Dividends**

19.    IndyMac's capital and liquidity levels and its "realistic" plan to return
to profitability in 2008 began to unravel just one week after it filed its 2007
Earnings 8-K. On or about February 19, 2008, Keys informed Perry and other
IndyMac executives that a significant one-day rise in interest rates caused IndyMac
Bank's forecasted capital ratio at March 31 to be right at or slightly under 10%. In
response, Perry sent Keys and other IndyMac executives an e-mail stating that
IndyMac would raise up to $50 million by selling stock through the DSPP. In his
e-mail, Perry wrote that IndyMac would use DSPP sales proceeds to (1) keep the
Bank's capital ratio above 10% by contributing $25 to $50 million to IndyMac
Bank and (2) pay future preferred dividends.

a)    **IndyMac's False and Misleading DSPP Sales through the
      October 11, 2007 Prospectus**

20.    On February 26, 2008, IndyMac began selling its common shares
through the DSPP pursuant to a June 30, 2006 Form S-3 automatic shelf
registration statement and an October 11, 2007 prospectus. Perry and Keys signed
IndyMac's June 30, 2006 Form S-3. As a member of IndyMac's board of
directors, Perry had authorized the offer and sale of stock through the October 11
DSPP prospectus, while Keys authorized the filing of that prospectus. In those
offering documents, IndyMac represented that it "intend[ed] to use the net
proceeds from sales of common stock ... for general corporate purposes, including
investment in [its] subsidiaries." Pursuant to Item 504 of Regulation S-K of the
Securities Act, 17 C.F.R. § 229.504, the DSPP prospectus was required to disclose
"the principal purposes for which the net proceeds to the registrant from the

7

1  securities to be offered are intended to be used and the approximate amount
2  intended to be used for each such purpose." IndyMac's DSPP prospectus did not
3  disclose that it planned to use $25 to $50 million of net offering proceeds for a
4  capital contribution to IndyMac Bank and to use the remaining proceeds to pay
5  future preferred dividends.

6        21.    IndyMac's June 30, 2006 Form S-3 registration statement and each
7  prospectus filed pursuant to that registration statement incorporated by reference,
8  among other things, all of IndyMac's future filings with the Commission until the
9  offering terminated. As such, IndyMac's registration statement and October 11,
10 2007 prospectus incorporated by reference its 2007 Earnings 8-K, which, as
11 alleged above, contained representations regarding IndyMac's strong capital and
12 liquidity positions.

13       22.    Perry and Keys knowingly or recklessly failed to disclose (either
14 through a new prospectus, an amendment to the October 11, 2007 prospectus, or a
15 Form 8-K) that, contrary to the 2007 Earnings 8-K, IndyMac's capital and liquidity
16 levels were rapidly deteriorating and that IndyMac was selling stock to raise
17 capital for the purpose of protecting IndyMac Bank's capital ratio and paying
18 preferred dividends. Such information would have been material to reasonable
19 investors, who would have viewed the precarious state of IndyMac's capital and
20 liquidity levels and the true reasons for IndyMac's stock sales as important to their
21 assessment of their risk of loss and the price they would be willing to pay for
22 IndyMac's common stock.

23       23.    From February 26 through 29, 2008, when it filed its 2007
24 Form 10-K, IndyMac raised approximately $11.3 million through the DSPP.

25       **b)    IndyMac's False and Misleading 2007 Form 10-K and**
26             **Resulting Fraudulent DSPP Sales**

27       24.    On February 29, 2008, IndyMac filed its 2007 Form 10-K, which was
28 signed by Perry and Keys. IndyMac's 2007 Form 10-K repeated many of the

1    positive statements in its 2007 Earnings 8-K, including:  "We have a solid and a
2    realistic plan that we believe will return IndyMac to profitability in 2008."  The
3    2007 Form 10-K also made positive disclosures regarding IndyMac's current
4    liquidity and capital needs:

5              a.    "We currently believe our liquidity level is sufficient to satisfy
6                    our operating requirements and meet our obligations and
7                    commitments in a timely and cost effective manner";

8              b.    "As a result of our ... strong capital and liquidity positions, we
9                    were not forced to sell assets at liquidation prices and our [loan]
10                   funding capacity was not materially impacted";

11             c.    While the Bank "currently [has] regulatory capital ratios in
12                   excess of the 'well capitalized' requirement and [has]
13                   implemented a plan to ... increase our capital ratios, there can
14                   be no assurance that [the Bank] will not suffer material losses
15                   or that [IndyMac's] plans ... will succeed.  In those
16                   circumstances, [IndyMac] may be required to seek additional
17                   regulatory capital to maintain our capital ratios at the 'well
18                   capitalized' level"; and

19             d.    IndyMac "may be required to raise capital at terms that are
20                   materially adverse to shareholders."

21        25.    These statements about IndyMac's capital raising activity were false
22    and misleading when IndyMac filed its 2007 Form 10-K.  As Perry and Keys
23    knew, IndyMac's capital position was not "strong" because IndyMac Bank's
24    capital ratio was projected to be right at or slightly below 10%.  In addition,
25    Defendants knew that the statement in IndyMac's Form 10-K that it "*may*" raise
26    capital at terms that are materially adverse to shareholders was false and
27    misleading, as IndyMac already had begun raising new capital on February 26,
28    2008 at a price (average $6.93 per share) that was highly dilutive relative to book

                                        9

value ($16 per share) as a result of IndyMac's plan to raise up to $50 million through the DSPP. Furthermore, Defendants knew that IndyMac's liquidity position was weakening and it needed to raise new capital to protect its well-capitalized regulatory status and to pay preferred dividends in future quarters.

26. Pursuant to the terms of IndyMac's June 30, 2006 Form S-3 registration statement and October 11, 2007 prospectus, the above false and misleading statements in the 2007 Form 10-K were also incorporated by reference into the DSPP prospectus dated October 11, 2007.

27. Perry and Keys knowingly or recklessly failed to disclose (either through a new prospectus, an amendment to the October 11, 2007 prospectus, or a Form 8-K) that, contrary to the 2007 Form 10-K, IndyMac's capital and liquidity levels were rapidly deteriorating and that IndyMac was in fact selling stock to raise capital for the purpose of protecting IndyMac Bank's capital ratio and paying preferred dividends. The omitted information would have been material to reasonable investors, as they would have viewed IndyMac's declining capital and liquidity levels and the true reasons for IndyMac's stock sales as important to their assessment of their risk of loss and the price they would be willing to pay for IndyMac's common stock.

28. From March 10 through April 3, 2008, when it filed a new DSPP prospectus, IndyMac raised approximately $36.3 million through the DSPP.

**c)   IndyMac's False and Misleading April 3, 2008 Prospectus**

29. On March 20, 2008, Keys recommended to Perry that IndyMac contribute $75 million to IndyMac Bank on March 31, 2008 for the principal purpose of protecting IndyMac Bank's capital ratio. Keys believed that $75 million was the most that could be contributed to IndyMac Bank while leaving IndyMac with enough money to meet its cash flow needs. Based on a $75 million contribution at March 31, Perry and Keys knew that IndyMac would be left with only $16 million in cash, which was enough to pay only two quarters of future

1   preferred dividends.  Perry and Keys agreed to reduce IndyMac's capital
2   contribution from $75 million to $70 million after IndyMac's treasurer raised
3   concerns about IndyMac's dwindling cash.

4        30.    After the $70 million capital contribution on March 31, 2008, Perry
5   and Keys knew that IndyMac was left with about $21 million in cash, which was
6   enough to pay only three quarters of preferred dividends without raising additional
7   capital or receiving dividends from IndyMac Bank.

8        31.    On April 3, 2008, IndyMac filed a prospectus registering the offer of
9   an additional ten million common shares through the DSPP.  As a member of
10  IndyMac's board of directors, Perry authorized the offer and sale of additional
11  stock through the DSPP.  Keys authorized the filing of the April 3 prospectus,
12  which was the first public disclosure that IndyMac was raising capital in 2008.
13  The prospectus contained the same generic disclosure that IndyMac "intend[ed] to
14  use the net proceeds from [the offering] for general corporate purposes, including
15  investment in our subsidiaries" and incorporated disclosures in the 2007 Earnings
16  8-K and 2007 Form 10-K regarding IndyMac's strong capital and liquidity
17  positions.

18       32.    As Perry and Keys knew, or were reckless in not knowing, the generic
19  disclosures in IndyMac's April 3, 2008 prospectus were false and misleading.  By
20  incorporating IndyMac's 2007 Earnings 8-K and 2007 Form 10-K, the prospectus
21  repeated the false and misleading disclosures regarding IndyMac's strong capital
22  and liquidity positions that were contained in those earlier filings.  Indeed, by the
23  time IndyMac filed its April 3 prospectus, its liquidity position had deteriorated
24  even further as a result of having contributed $70 million of its $91 million in cash
25  to IndyMac Bank to protect the Bank's capital ratio.  Defendants also knew, or
26  were reckless in not knowing, that IndyMac's generic disclosure concerning the
27  use of proceeds from DSSP sales was false and misleading, as IndyMac failed to
28  disclose that it was forced to raise new cash for the purpose of protecting IndyMac

1   Bank's capital ratio and paying future preferred dividends.  As alleged above,
2   reasonable investors would have found the above information material in that it
3   would have been important to their investment decision.

4         33.     From April 4 through April 24, IndyMac raised approximately $30.5
5   million through the DSPP.

6              **d)     IndyMac Bond Rating Downgrades and Keys' Departure**
7                       **from IndyMac**

8         34.     IndyMac's capital and liquidity positions deteriorated even further in
9   late April 2008, when Moody's Investors Service downgraded 165 mortgage-
10  backed securities ("MBS") sponsored by IndyMac Bank on April 23, and Standard
11  & Poor's downgraded 251 IndyMac Bank-sponsored MBS on April 28.  IndyMac
12  Bank held on its balance sheet $160 million in downgraded bonds as of March 31,
13  2008 and recorded a $9.5 million write-down expense during the quarter ended
14  March 31, thereby lowering IndyMac Bank's first quarter 2008 capital ratio.  Perry
15  and Keys knew, or were reckless in not knowing, that the bond downgrades would
16  negatively impact IndyMac Bank's capital ratio in future quarters because
17  additional capital would be required to support the downgraded, and hence riskier,
18  MBS.

19        35.     On April 24, 2008, the day after Moody's ratings downgrade, Keys
20  left IndyMac on medical leave.  By that date, IndyMac had raised a total of $78.1
21  million through the DSPP since sales began on February 26, 2008.

22             **e)     IndyMac's False and Misleading DSPP Sales through the**
23                      **April 3, 2008 Prospectus after Bond Downgrades**

24        36.     After the bond downgrades, Perry knew, or was reckless in not
25  knowing, that IndyMac had no choice but to suspend preferred dividends as a way
26  to conserve cash.  It was also clear that the downgrades could drive IndyMac
27  Bank's capital ratio below 10% at March 31, and that IndyMac would not have
28  ///

1  sufficient cash to both keep IndyMac Bank's capital ratio above 10% and pay

2  future preferred dividends.

3      37.   Perry knowingly or recklessly failed to disclose (either through a new

4  prospectus, an amendment to the April 3, 2008 prospectus, or a Form 8-K) that the

5  April bond rating downgrades jeopardized IndyMac Bank's "well-capitalized"

6  status such that IndyMac would need to conserve cash by suspending future

7  preferred dividends.  The impact of the bond rating downgrades to IndyMac's

8  capital and liquidity would have been material information to reasonable investors'

9  assessment of their risk of loss and the price they would be willing to pay for

10  IndyMac's common stock through the DSPP.

11      38.   From April 24 through May 2, 2008, when it filed a new DSPP

12  prospectus, IndyMac raised approximately $15 million through the DSPP.

13          **f)   IndyMac's False and Misleading May 2, 2008 Prospectus**

14      39.   By no later than May 2, 2008, Perry knew, or was reckless in not

15  knowing, that based on internal forecasts, IndyMac would have to suspend future

16  preferred dividend payments as a result of the continuing decline in IndyMac's

17  liquidity and capital positions.

18      40.   On May 2, 2008, IndyMac filed with the Commission a new

19  prospectus registering the offer of another ten million common shares.  As a

20  member of IndyMac's board of directors, Perry authorized the offer and sale of

21  additional stock through the DSPP.  This prospectus again stated that IndyMac

22  "intend[ed] to use the net proceeds from [the offering] for general corporate

23  purposes, including investment in our subsidiaries."  By incorporating by reference

24  the 2007 Earnings 8-K and 2007 Form 10-K, the May 2 prospectus repeated those

25  earlier filings' statements regarding IndyMac's strong capital and liquidity

26  positions, its cash holdings being sufficient to pay future preferred dividends for

27  over two years, and its positive forecasts for the Bank's capital ratio.  From May 3

28  through May 9, 2008, IndyMac raised $9.4 million through the DSPP.  May 9 was

1    the last trading day before May 12, when IndyMac filed its Form 10-Q for the

2    quarter ended March 31, 2008 and all DSPP sales ended.

3        41.    The May 2 prospectus failed to disclose that the DSPP offering's

4    specific purpose was to raise capital to protect IndyMac Bank's capital ratio.

5    IndyMac needed the additional capital to protect IndyMac Bank's capital ratio,

6    which was close to the 10% "well-capitalized" threshold as a result of the April

7    bond rating downgrades.  In addition, contrary to the disclosures in the 2007

8    Earnings 8-K and 2007 Form 10-K, which were incorporated by reference in the

9    May 2 prospectus, IndyMac's liquidity position had deteriorated as a result of

10   IndyMac's $70 million cash contribution to the Bank on March 31, such that

11   IndyMac would have to suspend future preferred dividend payments.

12       42.    Perry knowingly or recklessly failed to disclose (either through a new

13   prospectus, an amendment to the April 3, 2008 prospectus, or a Form 8-K) this

14   information to investors until May 12, 2008, when IndyMac's Form 10-Q and 8-K

15   disclosed, among other things, the suspension of future preferred dividends and

16   that IndyMac Bank's capital ratio would have been 9.27% if the risk-weighting

17   impact of the April bond downgrades had been required to have been recorded as

18   of March 31.  Such information would have been material to investors, as they

19   would have viewed the true reasons for IndyMac's stock sales and its declining

20   capital and liquidity levels as important to their assessment of their risk of loss and

21   the price they would be willing to pay for IndyMac's common stock.  When

22   IndyMac partially disclosed its deteriorating capital and liquidity positions on May

23   12, 2008, IndyMac's common stock price closed at $3.06, an 11% drop from its

24   prior close of $3.43, on volume of 4.8 million shares.  On May 13, IndyMac's

25   stock price fell an additional 24%, closing at $2.32 on volume of 14.9 million

26   shares.

27   ///

28   ///

C.   **IndyMac's False and Misleading Q1 2008 Forms 10-Q and 8-K and Earnings Call**

43.   Before the market opened on May 12, 2008, IndyMac filed its Form 10-Q for the quarter ended March 31, 2008 ("Q1 Form 10-Q") and a Form 8-K with the quarter's earnings release and presentation and shareholder letter ("Q1 Earnings 8-K").  These filings disclosed:

   a.   IndyMac's suspension of future preferred dividends;

   b.   IndyMac Bank's capital ratio was 10.26% at March 31, exceeding "the levels defined as 'well capitalized' by [IndyMac Bank's] regulators";

   c.   IndyMac Bank's capital ratio would have been 9.27% if IndyMac Bank had recorded the risk-weighting impact of the April 2008 bond downgrades at March 31 (Q1 Form 10-Q only);

   d.   IndyMac Bank's capital ratio would have been 11.36% but for two regulations relating to the risk-weighting of mortgage servicing rights and allowance for loan losses; and

   e.   IndyMac "contributed $88 million to ... Bank during Q1 08" (Q1 Earnings 8-K only).

44.   During IndyMac's Q1 2008 earnings conference call on May 12, 2008, Perry stated that IndyMac "contribute[d] $88 million ... to [IndyMac B]ank during the first quarter to remain well capitalized."

45.   IndyMac's statements regarding IndyMac Bank's capital ratio and capital contributions in the May 12 filings and earnings conference call were materially false and misleading.  As discussed below, IndyMac Bank's capital ratio would have been 9.86%, below the 10% the well-capitalized threshold, but for the fact that IndyMac had:

///

15

     a.    changed how it calculated IndyMac Bank's risk-based capital ratio so that IndyMac Bank needed less capital to support its subprime loan holdings; and

     b.    backdated an $18 million capital contribution to IndyMac Bank made on May 9 (over five weeks after quarter end) to March 31 (quarter end).

**1.    The Change in the Calculation of IndyMac Bank's Capital Ratio**

46.    In a February 19, 2008 e-mail, Perry informed Keys and other IndyMac executives that to keep IndyMac Bank's capital ratio above 10% at March 31, he planned to request relief from three OTS requirements for the calculation of IndyMac Bank's capital ratio, which Perry calculated would collectively add an additional 1.48% to the Bank's capital ratio. One of the regulatory requirements from which Perry wanted relief was the requirement that subprime loans be double risk-weighted as compared to non-subprime loans. In calculating IndyMac Bank's capital ratio, subprime loans required $1 of capital for every $1 of subprime loan, compared to only $.50 of capital required for every $1 of non-subprime loan. Perry wrote that relief from the subprime double risk-weighting requirement would improve IndyMac Bank's capital ratio by 0.31%.

47.    Perry and Keys purportedly obtained relief from the requirement to double risk-weight subprime loans during a telephone call with an OTS official on February 26, 2008. The effect of this relief was to reduce the amount of capital that IndyMac Bank needed to meet the 10% well-capitalized threshold. With the benefit of this relief, Perry and Keys expected IndyMac Bank's capital ratio to stay at or above 10% at March 31, 2008. Indeed, had IndyMac not made this undisclosed change, IndyMac Bank's risk-based capital ratio at March 31 would have been below the 10% well-capitalized threshold at 9.86% (or 9.96% with the $18 million backdated capital contribution discussed below).

///

16

1    48.    Perry knew, or was reckless in not knowing, that IndyMac's Q1 Form

2   10-Q, and Q1 Earnings 8-K were false and misleading in that they failed to

3   disclose that IndyMac Bank's well-capitalized status was based, in part, on the

4   change in the method by which IndyMac calculated its capital ratio, so that it was

5   no longer based on the double risk-weighting of subprime loan assets.

6    **2.    IndyMac's Backdated Capital Contribution**

7    49.    In early May 2008, Perry learned that $15.7 million in unrecorded

8   profit and loss review differences compiled by IndyMac's outside auditing firm

9   (the "Auditors") were material because, if booked, they would have caused

10   IndyMac Bank's capital ratio to fall to 9.98%, below the 10% well-capitalized

11   threshold.  After IndyMac failed to persuade the Auditors that the unrecorded

12   review differences should not be booked, IndyMac was faced with the choice of

13   either delaying its Q1 Form 10-Q filing on May 12, 2008 or filing a Q1 Form 10-Q

14   that reported a capital ratio below 10%.  To avoid that dilemma, on May 9, 2008,

15   Perry authorized IndyMac to contribute to IndyMac Bank $18 million (which was

16   nearly all the cash that IndyMac had on March 31) as of March 31.  Perry

17   purportedly received OTS approval to record the $18 million contribution as if it

18   had occurred on March 31, 2008 and considered IndyMac Bank's capital as of that

19   date.  That backdated capital contribution allowed IndyMac Bank to keep its

20   capital ratio above 10% even if the Auditors' review differences were recorded.

21   As a result of this undisclosed backdated capital contribution, IndyMac reported in

22   its Q1 filings that IndyMac Bank's capital ratio was above the 10% well-

23   capitalized threshold (10.26% instead of 9.98% with the unrecorded review

24   differences but without the backdated contribution).

25    50.    Perry knew, or was reckless in not knowing, that the Q1 Form 10-Q

26   and Q1 Earnings 8-K were false and misleading in that IndyMac Bank had

27   remained well-capitalized based, in part, on this backdated capital contribution.

28   ///

1  **D.    Defendants' Roles in IndyMac's False and Misleading Disclosures**

2      51.    As the CEO and CFO during IndyMac's financial meltdown in 2008,

3  Perry and Keys were well aware of IndyMac's deteriorating capital and liquidity

4  positions.  Each of them regularly received updated forecasts for IndyMac Bank's

5  capital ratio, reports on capital raising through the DSPP, and information on

6  material events such as downgrades on MBS bonds held by IndyMac Bank.

7  Despite being well informed of IndyMac's financial condition and integral

8  participants in IndyMac's financial reporting process, Defendants knowingly or

9  recklessly failed to disclose the extent of IndyMac's deteriorating capital and

10 liquidity positions to both existing shareholders and purchasers of common stock

11 through the DSPP.

12     **1.    The Periodic and Current Reports**

13     52.    Perry and Keys signed the 2007 Form 10-K (and the accompanying

14 Sarbanes-Oxley certifications), while Perry signed the Q1 Form 10-Q (and the

15 accompanying Sarbanes-Oxley certification) and the Q1 Earnings 8-K.

16     53.    Perry was actively involved in preparing the exhibits to Q1 Earnings

17 8-K, including the attached earnings press release and presentation and shareholder

18 letter.  For example, in a draft of presentation attached to the Q1 Earnings 8-K,

19 Perry changed the accurate statement that IndyMac "contributed $70 million to …

20 [IndyMac] Bank during Q1 08 and another $[18] million on May 9th" to falsely

21 state that IndyMac "contributed $88 million to the Bank during Q1 08."

22     54.    As the CFO, Keys was responsible for supervising IndyMac's

23 financial reporting department.  He received and reviewed multiple versions of the

24 2007 Form 10-K, including a review with the audit committee of IndyMac's board

25 of directors prior to the annual report's filing on February 29, 2008.

26     55.    Despite their responsibility for and participation in the filing of

27 IndyMac's periodic and current reports and, as discussed above, their knowledge

28 of IndyMac's deteriorating financial condition, Defendants knowingly or

1  recklessly failed to take any action to ensure that IndyMac's capital raising
2  activities and deteriorating capital and liquidity positions were fairly and
3  accurately disclosed in IndyMac's periodic and current reports.

4      **2.**    **The DSPP Offering**

5      56.    Perry and Keys signed the Form S-3 registration statement and
6  approved the dollar amounts and timing of capital raised through the DSPP. As a
7  member of IndyMac's board of directors, Perry authorized the offer and sale of
8  common stock and the preparation and filing of each DSPP prospectus by the CEO
9  or his delegate. As IndyMac's CFO (and the CEO's delegate), Keys approved the
10  filing of the October 11, 2007 and April 3, 2008 DSPP prospectuses.

11      57.    Perry and Keys also knew, or were reckless in not knowing, that
12  certain actions were taken to increase the amount of capital raised by the DSPP
13  prior to the release of IndyMac's first quarter 2008 financial results:

14          a.    On or about March 5, 2008, the window period for DSPP sales
15      was shortened from up to twelve days to just one or two days.
16      Since DSPP sales were contingent on IndyMac's volatile
17      common stock price exceeding a certain threshold during a
18      window of time, shortening the window improved the
19      likelihood that IndyMac stock would exceed the threshold
20      price; and

21          b.    On or about April 4, 2008, Perry recommended postponing
22      IndyMac's earnings release date from May 1 to May 12 to give
23      IndyMac "the maximum time possible to . . . raise capital
24      through the DSPP." At the time, there were a number of
25      unresolved regulatory, accounting, and auditor issues that could
26      negatively affect Q1 2008 results and future DSPP sales. The
27      delay in the earnings release date permitted IndyMac to raise
28      $13.3 million through the DSPP between May 1 and 12.

1   58.   Despite their responsibility for and participation in IndyMac's DSPP

2   offering and, as discussed above, their knowledge of IndyMac's deteriorating

3   financial condition, Defendants knowingly or recklessly failed to take any action to

4   ensure that the DSPP offering documents fairly and accurately disclosed

5   IndyMac's deteriorating financial condition.

6   **3.   Q1 2008 Earning Call**

7   59.   During IndyMac's Q1 2008 earnings conference call on May 12,

8   2008, Perry stated that IndyMac had "contribute[d] $88 million … to [the B]ank

9   during the first quarter to remain well capitalized."

10   60.   Perry's statement was materially false and misleading because

11   IndyMac had only contributed $70 million to the Bank during the first quarter of

12   2008.  The remaining $18 million had been contributed on May 9, 2008, over five

13   weeks after the end of the first quarter.  Without the backdated contribution,

14   IndyMac was faced with the choice of either delaying its Q1 10-Q filing on May

15   12, 2008 or filing the Q1 10-Q with a capital ratio below 10%.

16   **DEFENDANTS BENEFITED FROM THE FRAUD**

17   61.   During the period at issue, Perry and Keys received substantial

18   salaries and incentive-based and other forms of compensation.

19   **FIRST CLAIM FOR RELIEF**

20   **FRAUD IN THE OFFER OR SALE OF SECURITIES**

21   **Violations of Section 17(a) of the Securities Act**

22   **(Against All Defendants)**

23   62.   The Commission realleges and incorporates by reference ¶¶ 1 through

24   61 above.

25   63.   Defendants, and each of them, by engaging in the conduct described

26   above, directly or indirectly, in the offer or sale of securities by the use of means or

27   instruments of transportation or communication in interstate commerce or by the

28   use of the mails:

a.     with scienter, employed devices, schemes, or artifices to defraud;

b.     obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c.     engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

64.     By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

**SECOND CLAIM FOR RELIEF**

**FRAUD IN CONNECTION WITH THE PURCHASE**

**OR SALE OF SECURITIES**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder**

65.     The Commission realleges and incorporates by reference ¶¶ 1 through 61 above.

66.     Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

a.     employed devices, schemes, or artifices to defraud;

b.     made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

///

c.      engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

67.   By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

**THIRD CLAIM FOR RELIEF**

**VIOLATIONS OF COMMISSION PERIODIC**

**REPORTING REQUIREMENTS**

**Aiding and Abetting Violations of Section 13(a) of the Exchange Act**

**and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder**

68.   The Commission realleges and incorporates by reference ¶¶ 1 through 61 above.

69.   IndyMac violated Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 & 240.13a-13, by filing with the Commission an annual report on Form 10-K for the year ended December 31, 2007, a quarterly report on Form 10-Q for the quarter ended March 31, 2008, and a current report on Form 8-K dated May 12, 2008 that were materially false and failed to include material information necessary to make the required statements, in light of the circumstances under which they were made, not misleading.

70.   Defendants Perry and Keys, and each of them, knowingly provided substantial assistance to IndyMac in its violation of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20 and 13a-1 thereunder, 17 C.F.R. §§ 240.12b-20 & 240.13a-1, in connection with IndyMac's Form 10-K for the year ended December 31, 2007.

///

1    71.    Defendant Perry knowingly provided substantial assistance to

2   IndyMac in its violation of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a),

3   and Rules 12b-20, 13a-11, and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20,

4   240.13a-11 & 240.13a-13, in connection with IndyMac's quarterly report for the

5   first quarter of 2008 and current report dated May 12, 2008.

6    72.    By engaging in the conduct described above and pursuant to Section

7   20(e) of the Exchange Act, 15 U.S.C. § 78t(e), Defendants aided and abetted

8   IndyMac's violations, and unless restrained and enjoined will continue to aid and

9   abet violations, of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and

10  Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder, 17 C.F. R. §§ 240.12b-20,

11  240.13a-1, 240.13a-11 & 240.13a-13.

12                          **PRAYER FOR RELIEF**

13          WHEREFORE, the Commission respectfully requests that the Court:

14                                **I.**

15          Issue findings of fact and conclusions of law that Defendants committed the

16  alleged violations.

17                                **II.**

18          Issue a judgment, in a form consistent with Fed. R. Civ. P. 65(d),

19  permanently enjoining defendant Perry and his agents, servants, employees,

20  attorneys, and those persons in active concert or participation with any of them,

21  who receive actual notice of the order by personal service or otherwise, from

22  violating Section 17(a) of the Securities Act, and Sections 10(b) of the Exchange

23  Act, and Rule 10b-5 thereunder, and from aiding and abetting violations of

24  Sections 13(a) of the Exchange Act, and Rules 12b-20, 13a-1, 13a-11, and 13a-13

25  thereunder.

26                                **III.**

27          Issue a judgment, in a form consistent with Fed. R. Civ. P. 65(d),

28  permanently enjoining defendant Keys and his agents, servants, employees,

23

1    attorneys, and those persons in active concert or participation with any of them,

2    who receive actual notice of the order by personal service or otherwise, from

3    violating Section 17(a) of the Securities Act, and Sections 10(b) of the Exchange

4    Act, and Rule 10b-5 thereunder, and from aiding and abetting violations of

5    Sections 13(a) of the Exchange Act, and Rules 12b-20 and 13a-1, thereunder.

6                                               **IV.**

7           Enter an order, pursuant to Section 20(e) of the Securities Act, 15 U.S.C.

8    § 77t(e), and/or 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), prohibiting

9    Defendants from acting as officers or directors of any issuer that has a class of

10   securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l,

11   or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 15

12   U.S.C. § 78o(d).

13                                              **V.**

14          Order Defendants to disgorge all ill-gotten gains from their illegal conduct,

15   together with prejudgment interest thereon.

16                                             **VI.**

17          Order Defendants to pay civil penalties under Section 20(d)(1) of the

18   Securities Act, 15 U.S.C. § 77t(d)(1), and Section 21(d)(3) of the Exchange Act, 15

19   U.S.C. § 78u(d)(3).

20                                            **VII.**

21          Retain jurisdiction of this action in accordance with the principles of equity

22   and the Federal Rules of Civil Procedure in order to implement and carry out the

23   terms of all orders and decrees that may be entered, or to entertain any suitable

24   application or motion for additional relief within the jurisdiction of this Court.

25   ///

26   ///

27   ///

28   ///

1

## VIII.

2       Grant such other and further relief as this Court may determine to be just and

3    necessary.

4

5    DATED:  February 11, 2011              Respectfully submitted,

6

7

8                                          Nicholas S. Chung
                                           Attorney for Plaintiff
9                                          Securities and Exchange Commission

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge George King and the assigned discovery Magistrate Judge is Jacqueline Chooljian.

The case number on all documents filed with the Court should read as follows:

## CV11- 1309 GHK (JCx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| **[X] Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | **[ ] Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | **[ ] Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

Donald W. Searles, Cal. Bar No. 135705
Email: searlesd@sec.gov
Nicholas S. Chung, Cal. Bar No. 192784
Email: chungni@sec.gov
Securities and Exchange Commission
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
Telephone: (323) 965-3998 / Facsimile: (323) 965-3908

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| SECURITIES AND EXCHANGE COMMISSION | CASE NUMBER |
|---|---|
| PLAINTIFF(S) | **CV11 01309 GHK (JCx)** |
| v. | |
| MICHAEL W. PERRY and A. SCOTT KEYS | **SUMMONS** |
| DEFENDANT(S). | |

TO:   DEFENDANT(S): _____

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, _Donald W. Searles / Nicholas S. Chung_ , whose address is _SEC, 5670 Wilshire Boulevard, 11th Floor, Los Angeles, CA 90036_____ . If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.   You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: ___FEB 1 1 2011___

By: _____
CHRISTOPHER POWERS
Deputy Clerk

*(Seal of the Court)*

1181

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

**SUMMONS**

**COPY**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐)<br>SECURITIES AND EXCHANGE COMMISSION | DEFENDANTS<br>MICHAEL W. PERRY and A. SCOTT KEYS<br><br>Los Angeles County |
|---|---|
| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)<br><br>Donald W. Searles and Nicholas S. Chung     (323) 965-3998<br>Securities and Exchange Commission<br>5670 Wilshire Boulevard, 11th Floor, Los Angeles, CA 90036 | Attorneys (If Known)<br>See attached list. |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☒ 1 U.S. Government Plaintiff     ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant     ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding     ☐ 2 Removed from State Court     ☐ 3 Remanded from Appellate Court     ☐ 4 Reinstated or Reopened     ☐ 5 Transferred from another district (specify):     ☐ 6 Multi-District Litigation     ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:  JURY DEMAND:** ☐ Yes  ☒ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes  ☒ No          ☐ MONEY DEMANDED IN COMPLAINT: $_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
The Complaint alleges violations of the federal securities laws.  15 U.S.C. §§ 77q(a), 77q(a)(2) & 77q(a)(3); 15 U.S.C. § 78j(b) & 17 C.F.R. § 240.10b-5; 15 U.S.C. § 78m(a);

**VII. NATURE OF SUIT** (Place an X in one box only.)  17 C.F.R. § 240.12b-20, 240.13a-1, 240.13a-11 & 240.13a-13.

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☒ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 630 Liquor Laws | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 640 R.R. & Truck | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 650 Airline Regs | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | IMMIGRATION | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | | | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**CV11    01309**

FOR OFFICE USE ONLY:     Case Number: _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No ☑ Yes
If yes, list case number(s): CV 08-3812 GW (VBKx); CV 07-1635 GW (VBKx)

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply) ☑ A. Arise from the same or closely related transactions, happenings, or events; or

   ☑ B. Call for determination of the same or substantially related or similar questions of law and fact; or

   ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

   ☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☑ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Michael W. Perry - Los Angeles County; and A. Scott Keys - Los Angeles County | |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
  Note: **In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

***Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _Nicholas A. C____  Date _February 11, 2011_

  Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

Counsel Information for *SEC v. Michael W. Perry and A. Scott Keys*

**Counsel for Michael W. Perry:**
D. Jean Veta, Esq.
Benjamin J. Razi, Esq.
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-6000

**Counsel for A. Scott Keys:**
Gregory S. Bruch, Esq.
Jessica L. Matelis, Esq.
Willkie Farr & Gallagher LLP
1875 K Street, NW
Washington, D.C. 20006-1238
Telephone: (202) 303-1000