D. Jean Veta (Admitted *Pro Hac Vice*)
jveta@cov.com
Benjamin J. Razi (Admitted *Pro Hac Vice*)
brazi@cov.com
Dennis B. Auerbach (Admitted *Pro Hac Vice*)
dauerbach@cov.com
Nishchay H. Maskay (Admitted *Pro Hac Vice*)
nmaskay@cov.com
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, D.C.  20004
Tel:   (202) 662-6000
Fax:   (202) 662-6291

David B. Bayless (SBN 189235)
dbayless@cov.com
Tammy Albarrán (SBN 215605)
talbarran@cov.com
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA  94111-5356
Tel.:  (415) 591-6000
Fax:   (415) 591-6091

Attorneys for Defendant
MICHAEL W. PERRY

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>     Plaintiff,<br><br>     v.<br><br>MICHAEL W. PERRY and A. SCOTT KEYS,<br><br>     Defendants. | Case No. CV-11-1309 R<br><br>**NOTICE OF MOTION AND MICHAEL W. PERRY'S MOTION FOR PARTIAL SUMMARY JUDGMENT PURSUANT TO RULE 56 OF THE FEDERAL RULES OF CIVIL PROCEDURE**<br><br>Date:  May 21, 2012<br>Time:  10:00 a.m.<br>Courtroom:  No. 8<br>Judge:  Honorable Manuel L. Real |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that Defendant Michael W. Perry, by his undersigned counsel, on May 21, 2012, at 10:00 a.m. in Courtroom 8 of the United States District Court for the Central District of California, Western Division, 312 N. Spring St., Los Angeles, CA 90012, or at such other time and place as the Court may direct, will and hereby does move this Court for an order granting Mr. Perry's Motion for Partial Summary Judgment.

This Motion for Partial Summary Judgment is made under Federal Rule of Civil Procedure 56 and Local Rule 56-1, and seeks partial summary judgment in Mr. Perry's favor on the following claims asserted by plaintiff the Securities and Exchange Commission:

1. The SEC's disgorgement claim against Mr. Perry;

2. The SEC's claims against Mr. Perry based on the Form 10-K filed by IndyMac Bancorp, Inc. ("Bancorp") for the year ended December 31, 2007;

3. The SEC's claims against Mr. Perry based on Bancorp's Form 8-K dated February 12, 2008;

4. The SEC's claims against Mr. Perry based on Bancorp's prospectuses for its Direct Stock Purchase Plan ("DSPP") dated October 11, 2007, April 3, 2008, and May 1, 2008; and

5. The SEC's claim against Mr. Perry based on the alleged untimely disclosure of decisions to defer the payment of dividends on preferred securities issued by Bancorp and its wholly-owned subsidiary, Indymac Bank, F.S.B.

The SEC's claims against Mr. Perry are asserted under Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 13(a)

NOTICE OF MOTION AND MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. CV-11-1309 R

of the Exchange Act, 15 U.S.C. § 78m(a), and SEC Rules 12b-20, 13a-1, 13a-11, and 13a-13, 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13.

As more fully explained in Mr. Perry's accompanying memorandum of points and authorities, the SEC cannot meet its burden of establishing a genuine issue for trial on the foregoing claims.  The undisputed evidence shows that Mr. Perry has no "ill-gotten gains" that can be subject to disgorgement.  And the SEC's claims based on the above-referenced documents filed or furnished to the SEC fail for a variety of reasons, including, *inter alia*, that (a) Bancorp adequately disclosed information about the DSPP; (b) certain of the statements challenged by the SEC constitute indisputably true statements of present or historical fact; (c) other statements challenged by the SEC are forward-looking statements accompanied by specific cautionary language, and as to which Bancorp had no legal duty to update; (d) there is no duty to disclose internal forecasts and projections under controlling Ninth Circuit law; and/or (e) Mr. Perry neither signed nor reviewed the DSPP prospectuses and thus cannot be liable as the "maker" of allegedly false or misleading statements contained in those documents. The SEC's claim based on alleged untimely disclosure of the decision to defer the payment of dividends likewise fails because such decision was duly disclosed within the four business days permitted by SEC rules.

This motion is based on this Notice and Motion for Partial Summary Judgment, the Memorandum of Points and Authorities in support thereof, the Statement of Uncontroverted Facts and Proposed Conclusions of Law, the Declaration of Michael W. Perry, the Declaration of Jason A. Levine and the exhibits attached thereto, and such further evidence and argument as the Court may deem appropriate.  The motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on March 23, 2012.

Dated:  April 6, 2012                              Respectfully submitted,

NOTICE OF MOTION AND MOTION FOR PARTIAL
SUMMARY JUDGMENT
Case No. CV-11-1309 R

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

/s/ D. Jean Veta
D. Jean Veta
COVINGTON & BURLING LLP
Counsel to Michael W. Perry

4

D. Jean Veta (Admitted *Pro Hac Vice*)
jveta@cov.com
Benjamin J. Razi (Admitted *Pro Hac Vice*)
brazi@cov.com
Dennis B. Auerbach (Admitted *Pro Hac Vice*)
dauerbach@cov.com
Nishchay H. Maskay (Admitted *Pro Hac Vice*)
nmaskay@cov.com
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, D.C.  20004
Tel:   (202) 662-6000
Fax:   (202) 662-6291

David B. Bayless (SBN 189235)
dbayless@cov.com
Tammy Albarrán (SBN 215605)
talbarran@cov.com
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA  94111-5356
Tel.:  (415) 591-6000
Fax:  (415) 591-6091

Attorneys for Defendant
MICHAEL W. PERRY

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>    v.<br><br>MICHAEL W. PERRY and A. SCOTT KEYS,<br><br>        Defendants. | Case No. CV-11-1309 R<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MICHAEL W. PERRY'S MOTION FOR PARTIAL SUMMARY JUDGMENT PURSUANT TO RULE 56 OF THE FEDERAL RULES OF CIVIL PROCEDURE**<br><br>Date:  May 21, 2012<br>Time:  10:00 a.m.<br>Courtroom:  No. 8<br>Judge:  Honorable Manuel L. Real |

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................1

I. UNDISPUTED FACTUAL BACKGROUND ...............................4

    A. Bancorp and the Bank ..................................................4

    B. Bancorp's Disclosures About the Bank's Financial Condition ...........4

    C. Bancorp's Direct Stock Purchase Plan ....................6

    D. Bancorp's 2007 10-K and DSPP Disclosures....................7

    E. Bancorp's Disclosure of Subsequent Challenges Faced by the Company ..............8

II. SUMMARY JUDGMENT STANDARD........................................8

III. ARGUMENT ................................................................................9

    A. Mr. Perry Is Entitled to Summary Judgment on the SEC's Disgorgement Claim. ..........9

    B. Mr. Perry Is Entitled to Summary Judgment on the SEC's Claims Based on the 2007 10-K. .............9

        1. The Undisputed Facts Belie the SEC's Claim That the 10-K Fraudulently Concealed Bancorp's Use of the DSPP. .............10

            a) The 10-K Disclosed Bancorp's Current Use of the DSPP. ..............10

            b) Bancorp Disclosed that DSPP Capital Would Be Used to Support the Bank. ..............11

        2. There Is No Basis for the SEC's Omission Claim Based on Bancorp's February 19, 2008 Capital Ratio Forecast. ........12

        3. Mr. Perry Cannot Be Liable Based on True Statements of Historical Fact Contained in the 10-K. ................13

4. Bancorp's Statement of Belief Regarding the Adequacy of the Bank's Liquidity to Meet Future Requirements Is Not Actionable..........................................................14

C. Mr. Perry Is Entitled to Summary Judgment on the SEC's Claims Based on Bancorp's February 12, 2008 8-K. .........................16

1. Bancorp's DSPP Prospectuses and Registration Statement Did Not Incorporate the 8-K by Reference. ...........16

2. The Ninth Circuit Does Not Recognize a Duty to Update Statements That Were True When Made. ................................17

3. Even if There Were a Duty to Update, It Would Not Apply to the Projections Contained in the 8-K. ......................17

   a) Bancorp Disclaimed any Obligation to Update Its Forecasts..........................................................17

   b) The Statements in Question Did Not Involve Fundamental Changes to Bancorp's Business. ..............19

   c) Bancorp's DSPP Sales Did Not Impose a Heightened Duty. ...........................................................20

4. The 8-K Statements Cited by the SEC That Are Not Forward-Looking Likewise Are Not Actionable. ...................20

D. Mr. Perry Is Entitled to Summary Judgment on the SEC's Claims Based on the DSPP Prospectuses. ..........................................21

1. Mr. Perry Cannot Be Liable Under Section 10(b) or Rule 10b-5 Because He Was Not the "Maker" of the Prospectus Statements. .........................................................22

2. Mr. Perry Cannot Be Liable Under Section 17(a) Based on Prospectuses That He Did Not Sign or Review. ................23

3. The SEC Cannot Circumvent the Need to Establish That Mr. Perry "Made" the Alleged False Statements. ....................24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MEMORANDUM OF POINTS AND AUTHORITIES
Case No. CV-11-1309 R

E.    Mr. Perry Is Entitled to Summary Judgment on the SEC's Claim That Bancorp Fraudulently Delayed Disclosure of the Decision to Defer the Payments of Dividends....................................24

CONCLUSION......................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Celotex Corp. v. Catrett*,
477 U.S. 317, 91 L.Ed.2d 265, 106 S. Ct. 2548, 2552 (1986) ............................ 8

*Emp'rs Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*,
353 F.3d 1125 (9th Cir. 2004) ....................................................................... 15

*Hammerstone NV, Inc. v. Hoffman*,
No. 09-CV-2685, 2010 U.S. Dist. LEXIS 22182 (S.D.N.Y. Mar. 10,
2010) ............................................................................................................. 25

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997) ....................................................................... 20

*In re Convergent Techs. Sec. Litig.*,
948 F.2d 507 (9th Cir. 1991) ................................................................ 9, 12, 20

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010) .................................................................. 12, 21

*In re Donald J. Trump Casino Sec. Litig.*,
7 F.3d 357 (3d Cir. 1993) ......................................................................... 15, 16

*In re Foxhollow Tech., Inc. Sec. Litig.*,
359 F. App'x 802 (9th Cir. 2009) ........................................................ 17, 18, 21

*In re Metris Cos., Inc. Sec. Litig.*,
428 F. Supp. 2d 1004 (D. Minn. 2006) ......................................................... 21

*In re Syntex Corp. Sec. Litig.*,
855 F. Supp. 1086 (N.D. Cal. 1994), *aff'd*, 95 F.3d 922 (9th Cir. 1996) .......... 21

*In re Verifone Sec. Litig.*,
11 F.3d 865 (9th Cir. 1993) ...................................................................... 12, 20

*In re Worlds of Wonder Sec. Litig.*,
35 F.3d 1407 (9th Cir. 1994) ........................................................................ 14

*Janus Capital Group, Inc. v. First Derivative Traders*,
131 S. Ct. 2296, 180 L.Ed.2d 166 (2011) .................................................. 22, 24

*Reese v. BP Exploration (Alaska) Inc.*,
    643 F.3d 681 (9th Cir. 2011) ............................................................... 12, 17, 22

*SEC v. Clark*,
    915 F.2d 439 (9th Cir. 1990) ................................................................... 9

*SEC v. Dain Rauscher, Inc.*,
    254 F.3d 852 (9th Cir. 2001) ................................................................... 23

*SEC v. First Pac. Bancorp*,
    142 F.3d 1186 (9th Cir. 1998) ................................................................. 9

*SEC v. Global Express Capital Real Estate Inv. Fund, I, LLC*,
    289 F. App'x 183 (9th Cir. 2008) ........................................................... 23

*SEC v. Kelly*,
    817 F. Supp. 2d 340 (S.D.N.Y. 2011) ................................................ 23, 24

*SEC v. Mercury Interactive, LLC*,
    No. 5:07-cv-02822-WHA, 2011 U.S. Dist. LEXIS 134580
    (N.D. Cal. Nov. 22, 2011) ....................................................................... 22

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*,
    365 F.3d 353 (5th Cir. 2004) ................................................................... 23

*United States v. Schiff*,
    602 F.3d 152 (3d Cir. 2010) .................................................................... 19

*Vaughn v. Teledyne, Inc.*,
    628 F.2d 1214 (9th Cir. 1980) ................................................................ 12

*Winick v. Pacific Gateway Exch., Inc.*,
    73 F. App'x 250 (9th Cir. 2003), *withdrawn on other grounds*,
    80 F. App'x 1 (9th Cir. 2003) ......................................................... 18, 19, 20

*WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*,
    655 F.3d 1039 (9th Cir. 2011) ................................................................ 24

**STATUTES, REGULATIONS AND RULES**

15 U.S.C. § 77q(a) (Securities Act § 17(a)) ....................................... 23, 24

15 U.S.C. § 78j(b) (Securities Exchange Act § 10(b)) ...................... 22, 23

12 U.S.C. § 1831o ..................................................................................... 5

12 C.F.R. § 562.2 ................................................................................................ 5

12 C.F.R. § 565.4 ................................................................................................ 5

17 C.F.R. § 230.175 (SEC Rule 175) ..................................................... 14

17 C.F.R. § 240.10b-5 (SEC Rule 10b-5) ........................... 12, 22, 23, 24

17 C.F.R. § 240.13a-11 (SEC Rule 13a-11) ............................................ 25

Fed. R. Civ. P. 56(a) ........................................................................... 8

**OTHER AUTHORITIES**

Exchange Act Form 8-K, Questions and Answers of General Applicability §
    117.08 (Apr. 2, 2008), *available at* http://www.sec.gov/divisions/
    corpfin/guidance/8-kinterp.htm ............................................. 25

SEC Form 8-K, *available at* http://www.sec.gov/about/forms/form8-k.pdf .... 17, 25

## INTRODUCTION

Defendant Michael Perry is the former CEO and Chairman of IndyMac Bancorp, Inc. ("Bancorp"), and its wholly-owned subsidiary, Indymac Bank, F.S.B. (the "Bank"). Like many other financial institutions, Bancorp and the Bank were unable to survive the global financial crisis of 2008. Bancorp's SEC filings disclosed the severe losses suffered by the company as a result of cataclysmic disruptions of the housing market, and contained extensive warnings about future risks the company faced in attempting to navigate through the nation's worst financial storm since the Great Depression.

The financial crisis has generated intense pressure on the SEC to target the leaders of the many financial institutions that failed in its wake. While that may be warranted in some cases, here the SEC has wrongly maligned the reputation of a CEO who was transparent in disclosing the many challenges Bancorp faced, and whose conduct as a Bancorp shareholder demonstrates that he strongly believed the company could meet those challenges. Things obviously did not turn out as hoped, but that does not justify the SEC's baseless allegations of securities fraud.

As shown below, Mr. Perry is entitled to summary judgment on most of the SEC's claims. The remainder can be disposed of at trial. Mr. Perry's entitlement to summary judgment is readily apparent on, for example, the SEC's claim that he realized "ill-gotten gains" that he must disgorge. Despite investigating this case for more than three years, the SEC can offer no evidence of any such ill-gotten gains. To the contrary, the uncontroverted evidence establishes that Mr. Perry did not sell a single Bancorp share during the period at issue in the case (or, for that matter, the preceding two years). Instead, he acquired an additional $2.6 million worth of Bancorp stock in February 2008, when he purportedly knew that Bancorp's situation was worse than the company publicly disclosed. The vast majority of Mr. Perry's net worth was invested in Bancorp stock -- and he lost virtually all of it.

Mr. Perry is also entitled to summary judgment on the SEC's claims regarding five Bancorp SEC filings:  (a) its 10-K for the year ended December 31, 2007; (b) its 8-K reporting 2007 earnings dated February 12, 2008; and (c) three prospectuses for its so-called Direct Stock Purchase Plan ("DSPP"), wherein Bancorp periodically offered shares of its common stock to investors.

The heart of the SEC's case is that Bancorp sold stock in late February 2008 pursuant to the DSPP, while allegedly concealing that it was doing so, and without disclosing that the proceeds would likely be contributed to the Bank to bolster its financial strength.  Bancorp's SEC filings belie this claim.  Its 2007 10-K, filed on February 29, 2008, expressly disclosed Bancorp's current use of the DSPP.  The 10-K and Bancorp's February 12, 2008 8-K also disclosed that the DSPP was a "Principal Source of Cash" for the company, and that funds raised through the DSPP had historically been used to support the Bank, Bancorp's only significant asset.  In light of these disclosures, there is no basis for the SEC's claim that Mr. Perry fraudulently concealed Bancorp's use of the DSPP.  Because Bancorp made appropriate disclosures, the Court need not even reach the separate issue of intent to defraud, *i.e.*, scienter.  But even as to scienter, on which the SEC has the burden of proof at trial, the SEC cannot produce so much as a shred of supporting evidence after more than three years of investigation and discovery.

Mr. Perry is also entitled to summary judgment on the SEC's related claim that Bancorp's 10-K was fraudulent because it did not disclose an informal internal forecast generated by the company on February 19, 2008, one of many forecasts prepared during the period.  The document reflected that, based on an anomalous spike in interest rates, the Bank's "capital ratio" might be right at or just below the minimum threshold for a "well-capitalized" institution established by the Office of Thrift Supervision ("OTS"), the Bank's principal federal regulator, at the end of 2008's first quarter.

This claim fails because the Ninth Circuit has held that there is no duty to

disclose internal forecasts, and because Bancorp's February 12 8-K and the 10-K *specifically* warned of the risk that the Bank could lose its well-capitalized status in certain scenarios -- *including* as a result of adverse interest-rate fluctuations. Moreover, on February 29, 2008 -- the date Bancorp filed its 10-K -- the company's best forecast based on more current interest rate and other data was that the Bank's capital ratio at quarter end would comfortably exceed the well-capitalized minimum.  For this further reason, Bancorp had no duty to disclose its prior, superseded February 19 forecast.

The SEC's allegations concerning the DSPP disclosures and February 19 forecast account for most of the statements or omissions that the SEC contends were false or misleading in Bancorp's 10-K, February 12, 2008 8-K, and DSPP prospectuses.  The SEC's remaining claims based on those filings may likewise be disposed of at the summary judgment stage:

- The SEC's claim concerning two of the statements fail because the statements were true disclosures of present or historical fact;

- The SEC's claim concerning one of the statements fails because the statement was a projection about future performance accompanied by clear cautionary language;

- The SEC's claims concerning several of the statements fail because they are founded on an alleged duty to update projections based on subsequent events, which is simply not supported by governing Ninth Circuit authority;

- The SEC's claim concerning one of the statements fails because that statement constitutes inactionable "puffery" and is otherwise inactionable; and

- The SEC's claims concerning a number of the statements fail because the statements are in documents that Mr. Perry neither signed nor reviewed.

In addition to these claims based on the 10-K, 8-K and DSPP prospectuses, Mr. Perry is entitled to summary judgment on the SEC's claim that Mr. Perry fraudulently delayed disclosure of Board decisions to defer the payment of

dividends on certain securities issued by Bancorp and the Bank.  The undisputed evidence establishes that such deferrals were duly disclosed by Bancorp within the four business days permitted by SEC regulations.

If partial summary judgment is entered in Mr. Perry's favor on these claims, it will substantially narrow the issues for trial and thus promote the interests of judicial economy.  Accordingly, Mr. Perry's motion should be granted.

## I. <u>UNDISPUTED FACTUAL BACKGROUND</u>

### A. Bancorp and the Bank

The facts relevant to this motion are straightforward and undisputed.  The Bank was a federally-chartered thrift regulated by the OTS, which failed in July 2008 amid the global financial crisis.  It was a wholly-owned subsidiary of Bancorp, a publicly-owned thrift holding company.  Bancorp's only significant asset was the Bank.  Accordingly, when the Bank failed in July 2008, Bancorp was forced to file for bankruptcy shortly thereafter.  (*See* Statement of Uncontroverted Facts and Conclusions of Law ("SUF") ¶¶ 4, 9–10.)  Bancorp had a strong, independent Board comprised, inter alia, of a former Federal Reserve Governor, former E&Y Vice Chairman, and former U.S. Senator.  (SUF ¶ 3.)

Mr. Perry was the largest non-institutional Bancorp shareholder.  He acquired 35,000 shares in March 2007 at a cost of more than $1 million, and an additional 328,987 shares at a cost of more than $2.6 million in February 2008.  He did not sell a single share in 2007 or 2008; received no bonus for those years; and voluntarily relinquished his right to receive one million stock options in April 2008 so that they could be redistributed to other employees.  (SUF ¶ 5–7, 9–12.)

### B. Bancorp's Disclosures About the Bank's Financial Condition

In 2007, the Bank (and, by extension, Bancorp) suffered a $609 million loss, mainly due to the cataclysmic collapse of the housing market during the second half of that year.  As Mr. Perry reported in a February 12, 2008 letter to Bancorp shareholders, "2007 was a terrible year for our industry, for Indymac and

1   for you, our owners."  8-K, Ex. 99.2 at 1 (Feb. 12, 2008) [hereafter "8-K"].  Mr.

2   Perry accepted "full responsibility for the mistakes that we made."  *Id.* at 3.

3        Despite the substantial loss that the Bank suffered in 2007, its "risk-based

4   capital ratio" continued to exceed the minimum threshold for a "well-capitalized"

5   institution under OTS regulations as of December 31, 2007.  A "risk-based capital

6   ratio" is a measure used by the OTS to assess the capital adequacy of thrifts under

7   its jurisdiction.  There are five categories used by the OTS to measure capital

8   adequacy.  *See* 12 U.S.C. § 1831o (2008); 12 C.F.R. § 565.4 (1992).  "Well

9   capitalized" is the highest such measure.  An institution's total risk-based capital

10  ratio must equal or exceed 10 percent for it to qualify as "well-capitalized."  12

11  C.F.R. § 565.4(b)(1)(i).  The Bank reported its risk-based capital ratio to the OTS

12  on a quarterly basis pursuant to OTS regulations.  *See* 12 C.F.R. § 562.2 (1992).

13       In its February 12, 2008 8-K, Bancorp reported that the Bank was well

14  capitalized as of December 31, 2007, and projected that it would continue to be so

15  for the foreseeable future.  It disclosed, however, that the Bank's capital ratios

16  could be adversely impacted by a number of factors, including, for example,

17  "interest rate fluctuations."  The 8-K stated that "*[a]ny of these factors could*

18  *cause future results to vary from anticipated future results and consequently could*

19  *have an adverse impact on the ability of the Bank to meet its future minimum*

20  *capital requirements*."  8-K at 33 (emphases here and elsewhere added).  A

21  shareholder presentation attached as an exhibit to the 8-K specifically reflected

22  that, under one adverse scenario, the Bank's capital ratio could be as low as 9.78

23  percent at the end of 2008, 22 basis points below the well-capitalized minimum.

24  8-K, Ex. 99.3 at 26.  The shareholder letter attached to the 8-K stated that Bancorp

25  wanted to avoid raising capital externally, but disclosed that it might need to do so

26  on dilutive terms to maintain the Bank's well-capitalized status.  8-K, Ex.99.2 at 8.

27       An adverse interest rate fluctuation of the kind cautioned about in the 8-K

28  did in fact occur a week later, on February 19, 2008.  On that date, Bancorp's

CFO, defendant A. Scott Keys, sent Mr. Perry an email stating that, because of an anomalous spike in interest rates, he projected that the Bank's capital ratio at quarter end might be right at or just below 10 percent, absent improvement efforts. Interest rates soon eased, however, as reflected in later forecasts. By February 29, Bancorp was projecting that the Bank's capital ratio at March 31 would be at least 10.61 percent, 61 basis points above the well-capitalized minimum. (SUF ¶ 29.)

**C.     Bancorp's Direct Stock Purchase Plan**

Nonetheless, in response to Mr. Keys' February 19 email, Mr. Perry prudently authorized raising up to $50 million through the DSPP, stated that Bancorp should be prepared to contribute $25 to $50 million to the Bank before quarter end "if we need to do so," and noted that dilution from such DSPP sales would be "relatively minimal." (SUF ¶ 18.) The DSPP was a longstanding program wherein investors could purchase Bancorp common stock directly over the internet at a small discount to market price. Investors interested in investing more than $10,000 could also participate in the DSPP "waiver program." Bancorp had frequently used the DSPP in the past to raise capital for the Bank, principally through the waiver program. It raised $145.6 million through the DSPP in 2007, which it contributed to the Bank. 10-K, at F-7 (Feb. 29, 2008) [hereinafter "10-K"]. (SUF ¶ 23.) Bancorp also raised (and contributed to the Bank) $148.5 million through the DSPP during the year ended December 31, 2006. (SUF ¶ 24.)

Bancorp resumed raising capital through the DSPP on February 26, 2008, and raised $11.2 million from February 26–29. The DSPP shares were sold pursuant to a June 2006 shelf registration statement and a prospectus dated October 11, 2007, which authorized the company to issue up to 10 million shares of stock. (SUF ¶ 19.) New prospectuses, each authorizing the issuance of 10 million additional shares, were filed on April 3, 2008 and May 2, 2008. (*Id.*) The prospectuses stated that Bancorp "from time to time may offer the [DSPP], a direct stock purchase plan designed to provide investors with a convenient method

to purchase shares of our common stock."  (SUF ¶ 21.)  They also stated that DSPP proceeds would be used "for general corporate purposes, including investment in our subsidiaries."  (SUF ¶ 20.)  Mr. Perry neither signed nor reviewed the prospectuses.  (SUF ¶ 22.)

**D.   Bancorp's 2007 10-K and DSPP Disclosures**

On February 29, 2008 Bancorp filed its 10-K for the year ended December 31, 2007, which Mr. Perry signed as Bancorp's CEO and Chairman.  On that same day, Pamela Marsh, who was in charge of financial forecasting, sent Mr. Perry an email forecasting that the Bank's total risk-based capital ratio as of March 31, 2008 would be 10.61 percent without any contribution of DSPP capital raised in 2008 from Bancorp to the Bank.  Ms. Marsh further stated that the capital ratio would be 10.69 percent if Bancorp were to contribute to the Bank the $11.2 million raised through the DSPP since February 26.  This was Ms. Marsh's "best forecast" as of February 29, the date the 10-K was filed.  (SUF ¶ 29.)

Like the February 12 8-K, the 10-K disclosed that the Bank faced risks in maintaining its "well-capitalized" status.  It explained that "[w]hile we currently have regulatory capital ratios in excess of the 'well capitalized' requirement and have implemented a plan to reduce our balance sheet and increase our capital ratios, there can be no assurance that we will not suffer material losses or that our plans to reduce the balance sheet will succeed."  10-K at 69.  The 10-K stated that "[i]n those circumstances, we may be required to seek additional regulatory capital to maintain our capital ratios at the 'well capitalized' level" and that such capital raising "could be at terms that are very dilutive to existing shareholders."  *Id.*  At the time the 10-K was filed, Bancorp was exploring the possibility of a $500 million capital infusion if required to meet the Bank's capital needs.  (SUF ¶ 26.)

The 10-K further disclosed information about the DSPP.  It stated that the DSPP "offers investors the ability to purchase shares of our common stock directly over the Internet" and that "[i]nvestors interested in investing over

1  $10,000 can also participate in the [DSPP] waiver program . . . ." 10-K at 13. It

2  also disclosed that the DSPP was one of the company's "Principal Sources of

3  Cash" and that "[d]uring the year ended December 31, 2007, we raised $145.6

4  million of capital . . . through this plan." *Id.* at 57, 59. Bancorp's filings,

5  including the 10-K, were reviewed by Bancorp's outside counsel and outside

6  auditors. (SUF ¶ 32.)

7  **E.  Bancorp's Disclosure of Subsequent Challenges Faced by the Company**

8       The economy further deteriorated as 2008 progressed, prompting Bancorp

9  to issue an 8-K on March 11 warning of "panic" conditions in the credit markets

10  that negatively affected the company's outlook as set forth in the February 12 8-K.

11  (SUF ¶ 33.) Then, in late April 2008, rating agencies downgraded certain bonds

12  held by the Bank, adversely impacting its capital ratios. (SUF ¶ 34) Based on this

13  downgrade and other factors, the Boards of Bancorp and the Bank decided on May

14  8, 2008 to conserve cash by deferring the payment of dividends on preferred

15  securities issued by Bancorp and the Bank. These Board actions were disclosed

16  two business days later in Bancorp's 10-Q for the first quarter. (SUF ¶ 38.)

17  ## II.  SUMMARY JUDGMENT STANDARD

18       Summary judgment is appropriate where the evidence shows that there is

19  "no genuine dispute as to any material fact and [that] the movant is entitled to

20  judgment as a matter of law." Fed. R. Civ. P. 56(a). The court will grant

21  summary judgment "against a party who fails to make a showing sufficient to

22  establish the existence of an element essential to that party's case . . . ." *Celotex*

23  *Corp. v. Catrett*, 477 U.S. 317, 322–23, 91 L.Ed.2d 265, 106 S. Ct. 2548, 2552

24  (1986). If the moving party demonstrates the absence of a factual dispute, the

25  nonmoving party can defeat summary judgment only by designating "specific

26  facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S. Ct. at 2553

27  (citation and internal quotation marks omitted). To survive summary judgment on

28  a securities fraud claim, a plaintiff must come forward with evidence that a

"particular statement" in a securities filing was false or misleading.  *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991).  As shown below, Mr. Perry is entitled to partial summary judgment under this standard.

## III.    ARGUMENT

### A.    Mr. Perry Is Entitled to Summary Judgment on the SEC's Disgorgement Claim.

Mr. Perry's entitlement to summary judgment is perhaps most clear on the SEC's disgorgement claim.  "Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable."  *SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1191 (9th Cir. 1998).  Its purpose is to prevent retention of "*profits* realized from violations of the securities laws."  *SEC v. Clark*, 915 F.2d 439, 453 (9th Cir. 1990).

The SEC can present no evidence to support its disgorgement claim here. In an April 2, 2012 interrogatory response, it was unable to identify any "ill-gotten" gains subject to disgorgement.  (SUF ¶ 13.)  It thus has manifestly failed to meet its burden of establishing a genuine issue for trial.

That the SEC cannot meet its burden is further established by the undisputed facts that Mr. Perry (a) acquired more than $1 million of Bancorp stock in 2007; (b) acquired more than $2.6 million of additional shares in February 2008; (c) did not sell a single Bancorp share from 2006 to 2008; (d) received no bonus for 2007 or 2008; (e) voluntarily relinquished one million stock options in April 2008; and (f) lost virtually the full value of his Bancorp holdings when the company filed for bankruptcy in July 2008. (SUF ¶¶ 5–7, 9–12.)  Putting aside the SEC's inability to prove liability, Mr. Perry plainly has no "profits" to disgorge.

### B.    Mr. Perry Is Entitled to Summary Judgment on the SEC's Claims Based on the 2007 10-K.

The SEC also cannot meet its burden of demonstrating that Bancorp's 10-K was false or misleading.  The uncontroverted evidence establishes that each 10-K statement that the SEC alleges was fraudulent was in fact true on February 29,

2008, the date the 10-K was filed, and/or constituted a non-actionable projection about the future.  The SEC's omission claim concerning the 10-K similarly fails because it is based on a non-existent duty to disclose internal forecasts.

**1.    The Undisputed Facts Belie the SEC's Claim That the 10-K Fraudulently Concealed Bancorp's Use of the DSPP.**

        a)      The 10-K Disclosed Bancorp's Current Use of the DSPP.

The SEC first alleges that the 10-K fraudulently concealed that Bancorp was raising capital through the DSPP as of February 29, 2008, when the 10-K was filed.  Compl. ¶ 25.  The plain language of the 10-K refutes this claim.

The 10-K specifically disclosed that:  "The company *has* a direct stock purchase plan which *offers* investors the ability to purchase shares of our common stock directly over the Internet."  10-K at 13.  It states that  "[i]nvestors interested in investing over $10,000 *can* also participate in the waiver program administered by Mellon Investor Services LLC."  *Id*.  These statements are plainly in the present tense.  Moreover, the DSPP prospectuses disclosed that Bancorp would raise capital through the DSPP "from time to time" and DSPP purchasers obviously knew Bancorp was raising DSPP capital because they were the ones purchasing shares under the program.  Accordingly, the SEC cannot plausibly argue that Mr. Perry intended to hide Bancorp's current use of the DSPP.[1]

The SEC alleges fraud because Bancorp stated in its February 12 8-K that it did not want to raise external capital.  But the 8-K itself specifically stated that the company *might* need to raise capital on dilutive terms to keep the Bank safe and sound, even though it hoped not to do so.  *See* 8-K, Ex. 99.2 at 8 (stating that "things could get worse," triggering possible need to "raise very dilutive capital"

---

[1]  Bancorp also disclosed that DSPP shares would be sold for less than book value. The prospectuses disclosed that DSPP shares would be sold at or near market price (SUF ¶ 20), while the 10-K disclosed that Bancorp's stock traded at a discount to book value, *see* 10-K at 16 (SUF ¶ 31.d).

to maintain Bank's well-capitalized status); *see also* 8-K, Ex. 99.1 at 1 ("safety and soundness remains our highest priority during these challenging times").

The SEC also focuses on the 10-K statement that Bancorp "may be required to seek additional regulatory capital to maintain our capital ratios" on "very dilu-tive" terms, suggesting that this marked an effort to conceal the use of the DSPP. Compl. ¶¶ 24(d), 25.  But that claim, too, is at odds with the fact that the 10-K *disclosed* that the DSPP was in current use.  Further, the testimony is that the statement at issue refers to Bancorp's possible need for a transaction to raise $500 million of capital on very dilutive terms -- not to its routine use of the DSPP to raise much smaller sums.  As noted, Bancorp was exploring a major capital raise of $500 million when the 10-K was filed.  (SUF ¶¶ 26–27.)  Moreover, Mr. Perry stated in his February 19 email that dilution from raising up to $50 million through the DSPP  would be "relatively minimal."  (SUF ¶ 18.)  The 10-K disclosure, by contrast, refers to a possible "very dilutive" transaction of much larger magnitude.

   b)   Bancorp Disclosed that DSPP Capital Would Be Used to Support the Bank.

The SEC further contends that the 10-K failed to disclose that capital raised through the DSPP might be used to support the Bank (or to pay dividends on Bancorp's trust preferred securities), *see* Compl. ¶¶ 20, 22, but that claim also fails based on the undisputed facts.  Bancorp disclosed that it was a holding company without operations of its own, and that the Bank was its only significant asset. (*See* 8-K, Ex. 99.2 at 7.)  Bancorp likewise disclosed that its only significant obligation separate and apart from the Bank was to pay dividends on its trust preferred securities.  (*See id.*)  It thus made clear that the only possible use of cash raised through the DSPP was to support the Bank or pay the dividends.

In addition, the 10-K disclosed that, historically, the DSPP was one of Bancorp's "Principal Sources of Cash," *see* 10-K at 57, 59; that $145.6 million had been raised through the DSPP in 2007, *id.* at 59; and that Bancorp's single

largest *use* of cash was capital contributions to the Bank and other subsidiaries, *see id.* at F-37. The February 12, 2008 8-K similarly disclosed that capital raised through the DSPP in 2007 was contributed to the Bank. 8-K, Ex. 99.3 at 3. And Bancorp's DSPP prospectuses disclosed that DSPP proceeds would be "used for general corporate purposes, *including investments in our subsidiaries*." (SUF ¶ 20.) The SEC apparently contends that Bancorp should have said more, but "Rule 10b-5 [prohibits] only misleading and untrue statements, not statements that are incomplete . . . ." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1109 (9th Cir. 2010) (citation and quotation marks omitted).

### 2. There Is No Basis for the SEC's Omission Claim Based on Bancorp's February 19, 2008 Capital Ratio Forecast.

The SEC next alleges that Bancorp fraudulently did not disclose its February 19, 2008 forecast reflecting, based on an anomalous spike in interest rates, that the Bank's capital ratio might be right at or slightly below 10 percent at quarter end. Compl. ¶ 22 (alleging fraudulent omission of Bank's allegedly "rapidly deteriorating capital ratios"). This claim also cannot withstand scrutiny.

The Ninth Circuit has repeatedly held that there is no duty to disclose internal forecasts or projections. *See, e.g.*, *In re Verifone Sec. Litig.*, 11 F.3d 865, 867 (9th Cir. 1993) ("We conclude that the allegations . . . amount to no more than a failure to disclose forecasts, and as such, are not actionable."); *Convergent*, 948 F.2d at 516 ("Convergent was not obliged to disclose [its] internal projections."); *Vaughn v. Teledyne, Inc.*, 628 F.2d 1214, 1221 (9th Cir. 1980) (no duty "to disclose financial projections"). Bancorp thus was not required, as a matter of law, to disclose the February 19 forecast. That is especially so because Bancorp's filings specifically disclosed potential risks to the Bank's well-capitalized status -- *including* the risk of adverse "interest rate fluctuations." *See* 8-K at 33.

Moreover, to be actionable "a statement or omission must have been misleading *at the time it was made*." *Reese v. BP Exploration (Alaska) Inc.*, 643

F.3d 681, 693 (9th Cir. 2011) (citation and internal quotation marks omitted).
Bancorp's 2007 10-K was filed on February 29, 2008, ten days *after* the forecast
on which the SEC relies.  As explained above, on February 29, 2008, Bancorp's
"best forecast" was that the Bank's capital ratio would be 10.61 percent on March
31 *without* the contribution of any capital that had been raised since February 26
through the DSPP, and 10.69 percent if such funds *were* contributed to the Bank.
Either way, the Bank's capital ratio was forecast to be at least 61 basis points
above the "well-capitalized" minimum.  Because the February 19 forecast was
superseded by the date Bancorp filed its 10-K, there is no possible basis for the
SEC's claim that Bancorp was required to disclose it.

### 3. Mr. Perry Cannot Be Liable Based on True Statements of Historical Fact Contained in the 10-K.

There likewise is no merit to the SEC's claim that Mr. Perry engaged in
securities fraud based on the 10-K statement that "[a]s a result of our . . . strong
capital and liquidity positions, we were not forced to sell assets at liquidation
prices and our funding capacity was not materially impacted."  Compl. ¶ 24.b.
The SEC contends that this statement refers to conditions on February 29, 2008,
when the 10-K was filed.  Its tense, however, makes clear that it was a statement
of historical fact about conditions on December 31, 2007, the last day of the 10-K
reporting period.  The 10-K states that, because of our strong capital and liquidity
positions, we "*were not*" forced to sell assets at liquidation prices and that our
funding capacity "*was not*" materially impacted.  10-K at 19.  These are obviously
past-tense assertions.

That the statement here is one of historical fact referring to December 31,
2007 is further apparent from its context.  It comes at the end of a paragraph that
repeatedly refers to "2007" and "the year ended December 31, 2007."  It directly
follows a sentence stating "[t]he thrift segment recorded a net loss of $199.2

1   million for 2007 and our discontinued business activities recorded a net loss of

2   $281.1 million." 10-K at 19. The only reasonable reading of the statement,

3   therefore, is that it is one of historical fact regarding conditions at December 31,

4   2007. The SEC does not allege that the facts were otherwise on that date.

5       Even if the statement were not one of historical fact, the SEC still could not

6   prevail. As noted, it is undisputed that, on the date the 10-K was filed, Bancorp's

7   "best forecast" was that the Bank's capital ratio on March 31 would be at least

8   10.61 percent, *i.e.*, comfortably above the well-capitalized minimum. (SUF ¶ 29.)

9   There is thus no basis for the SEC to suggest that the 10-K statement regarding

10  "strong capital and liquidity positions" was false as of February 29, 2008.

11      **4.    Bancorp's Statement of Belief Regarding the Adequacy of the
12             Bank's Liquidity to Meet Future Requirements Is Not
               Actionable.**

13      The 10-K states: "We currently believe our liquidity level is sufficient to

14  satisfy our operating requirements and meet our obligations and commitments

15  . . . ." 10-K at 56. The SEC cannot prevail on its claim that this statement was

16  fraudulent. It is, by its terms, a forward-looking statement expressing Bancorp's

17  belief that the Bank's liquidity would suffice to meet its future requirements and

18  obligations. Pursuant to the "bespeaks caution" doctrine, such a statement is not

19  actionable where, as here, it is accompanied by specific warnings and cautionary

20  language. *See, e.g.*, *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1414–15

21  (9th Cir. 1994); *see also* 17 C.F.R. § 230.175 (1981) (financial projection "shall be

22  deemed not to be a fraudulent statement" unless shown to have been made without

23  a reasonable basis or disclosed in other than good faith).

24      The bespeaks caution doctrine is based on the recognition that "predictive

25  statements are just what the name implies: predictions." *In re Worlds of Wonder*

26  *Sec. Litig.*, 35 F.3d at 1414. As such, "any optimistic projections contained in

27  such statements are necessarily contingent." *Id.* The doctrine "provides a

28  mechanism by which a court can rule as a matter of law (typically in a motion to

dismiss . . . or a motion for summary judgment) that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud." *Emp'rs Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1132 (9th Cir. 2004) (citation and internal quotation marks omitted).  Sufficient cautionary language "renders the alleged omissions or misrepresentations immaterial as a matter of law." *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 371 (3d Cir. 1993).

The 10-K contains cautionary language sufficient to satisfy the bespeaks caution doctrine.  It states that words such as "'believe' . . . identify forward-looking statements that are inherently subject to risks and uncertainties, many of which cannot be predicted or quantified."  10-K at 3.  It then discloses specific risks concerning the future adequacy of the Bank's liquidity.  The report explains that "[d]uring 2007, the secondary market for MBS and asset-backed securities ('ABS') experienced significant disruption resulting in a further decline in overall market liquidity," *id.* at 56, and that such disruption may continue to adversely impact the Bank's operations.  It states, for example, that "[w]hile our sources of liquidity are strong and have been stable throughout this current market disruption, there can be no assurance that actions by the FHLB or the Federal Reserve would not reduce our borrowing capacity or that we would be [able] to attract deposits at competitive rates." *Id.* at 76.  It concludes that "[s]uch events could have a material adverse impact on our results of operations and financial condition." *Id.*

The 10-K also states that "[w]hile we currently have regulatory capital ratios in excess of the 'well capitalized' requirement and have implemented a plan to reduce our balance sheet and increase our capital ratios, there can be no assurance that we will not suffer material losses or that our plans to reduce the balance sheet will succeed." *Id.* at 69.  Bancorp's 8-K issued 17 days earlier similarly warns of potential interest-rate fluctuations, declines in real estate prices, credit losses, future disruptions in the secondary mortgage market, and other risks,

1    noting that "[a]ny of these factors could cause actual future results to vary from

2    anticipated future results and consequently could have an adverse impact on the

3    ability of the Bank to meet its future minimum capital requirements."  8-K at 33.

4    The 8-K also disclosed an adverse scenario in which the Bank's capital ratio

5    would be 9.78 percent at the end of 2008, 22 basis points below the well-

6    capitalized minimum.  8-K, Ex. 99.3 at 26.  These warnings "directly address the

7    substance of the statement" that the SEC challenges, and thus satisfy the bespeaks

8    caution doctrine.  *See Trump Casino Sec. Litig.*, 7 F.3d at 372.

9        While the bespeaks caution doctrine does not protect a statement believed to

10   be false when made, the SEC can present no evidence of that here.  As explained

11   above, Bancorp's "best forecast" on the date the 10-K was filed was that the

12   Bank's capital ratio would exceed the 10 percent well-capitalized minimum by at

13   least 61 basis points.  (SUF ¶ 29.)  The February 19 forecast on which the SEC

14   relies in no way suggests that Mr. Perry believed on February 29 that Bancorp

15   would be unable to meet its future obligations and commitments.

16   **C.    Mr. Perry Is Entitled to Summary Judgment on the SEC's Claims
             Based on Bancorp's February 12, 2008 8-K.**

17

18       **1.    Bancorp's DSPP Prospectuses and Registration Statement Did
                  Not Incorporate the 8-K by Reference.**

19       Mr. Perry is likewise entitled to summary judgment on the SEC's claims

20   based on Bancorp's February 12, 2008 8-K.  As an initial matter, the SEC

21   contends that Mr. Perry is liable based on the 8-K only because it purportedly was

22   incorporated by reference in the DSPP prospectuses and registration statement.

23   *See* Compl. ¶ 21.  The SEC's incorporation assertion, however, is patently wrong.

24       The prospectuses and registration statement expressly state that they do *not*

25   incorporate "documents or information deemed to have been *furnished and not*

26   *filed* in accordance with SEC rules."  (SUF ¶ 21.)  The SEC's own instructions to

27   Form 8-K, meanwhile, state that information provided pursuant to Items 2.02 and

28   7.01 of the Form "will be deemed furnished, and not filed" unless the filer states

otherwise.  SEC Form 8-K, *available at* http://www.sec.gov/about/ forms/form8-k.pdf.  The 8-K statements here provided information pursuant to Items 2.02 and 7.01 only, and the 8-K did not indicate that the information was being "filed" rather than "furnished."  8-K at 3.  Accordingly, those 8-K statements were *not* incorporated by reference in the DSPP offering documents.  For that reason alone, Mr. Perry is entitled to summary judgment on the SEC's claims based on the 8-K.

### 2. The Ninth Circuit Does Not Recognize a Duty to Update Statements That Were True When Made.

Even if its incorporation point were valid, the SEC still could not prevail.  The SEC focuses on six 8-K statements.  Critically, it does not allege that they were false at the time the 8-K was issued, but that they became false and misleading based on subsequent events (and needed to be updated before Bancorp resumed selling stock through the DSPP on February 26).  *See* Compl. ¶¶ 19, 22.  This claim fails as a matter of law.

The Ninth Circuit has never recognized a duty to update statements that were true when made.  *See In re Foxhollow Tech., Inc. Sec. Litig.*, 359 F. App'x 802, 804 (9th Cir. 2009).  Indeed, it stated last year that there is no such duty.  In *Reese*, *supra*, the Ninth Circuit held that, for a plaintiff to prevail on a claim of securities fraud, defendant's "statement or omission must have been misleading at the time it was made; *liability cannot be imposed on the basis of subsequent events*."  *Reese*, 643 F.3d at 693 (citation and internal quotation marks omitted).  Accordingly, the SEC's claim that Mr. Perry is liable because statements in the 8-K became false and misleading as a result of subsequent events cannot stand.

### 3. Even if There Were a Duty to Update, It Would Not Apply to the Projections Contained in the 8-K.

#### a) Bancorp Disclaimed any Obligation to Update Its Forecasts.

Even if there were a duty to update, it would not apply here.  Courts that have recognized such a duty have held that it can apply only where "some continuing representation remains alive in the minds of investors when

circumstances change." *Foxhollow*, 359 F. App'x at 804-05 (describing narrow extent of duty articulated in other circuits). There can be *no* such duty, however, where a company "disclaim[s] any obligation to update its forecasts." *Winick v. Pacific Gateway Exch., Inc.*, 73 F. App'x 250, 254 (9th Cir. 2003), *withdrawn on other grounds*, 80 F. App'x 1 (9th Cir. 2003). In that circumstance, a filer's "predictions regarding its ability to meet its future obligations could not have remained 'alive' in the minds of reasonable investors." 73 F. App'x at 254.

With one exception addressed below, the 8-K statements focused on by the SEC are financial projections or other forward-looking statements. They are:

- "We *believe* that, under current regulations, *the Bank will continue to meet* its 'well-capitalized' minimum capital requirements in the foreseeable future." 8-K at 33.

- "We are *currently forecasting* that our balance sheet size *will decline* and our capital ratios *will increase* over the course of 2008 as we execute on our revised business model of primarily GSE lending." *Id.*

- Bancorp has "enough cash to pay [preferred dividends] *for over 2 years* without any dividends from the Bank or additional debt or equity raised."[2]

- Bancorp *projected* that the Bank's capital ratio would be 10.59 percent at March 31, 2008. 8-K, Ex. 99.3 at 33.

- "[W]e *believe we can maintain* our 'well-capitalized' capital ratios even under worsening industry conditions." 8-K, Ex. 99.2 at 2.

Bancorp expressly disclaimed any duty to update such forward-looking statements. The 8-K provides that "readers are cautioned not to place undue reliance on forward-looking statements, which speak only as of the date they are

---

[2] Even if this were deemed a statement of present fact, it would not be actionable because the SEC does not allege that the facts were otherwise on February 12.

made."  *See* 8-K at 3.  The 8-K then goes on to state that ***"IndyMac does not undertake to update or revise forward-looking statements to reflect the impact of circumstances for events that arise after the date the forward-looking statements are made."***  *Id.*  This disclaimer eliminated any possible duty to update pursuant to the Ninth Circuit's decision in *Winick*.

The absence of a duty to update is especially clear here because, as noted, the 8-K contained specific warnings about risks that could adversely impact Bancorp's business plan and threaten the Bank's well-capitalized status.  *See* section III.B.4, *supra.*  Moreover, Bancorp 's subsequent March 11 8-K warned that panic credit market conditions adversely impacted the company's outlook as described in the February 12 8-K.  In light of the March 11 submission, Bancorp's February 12 projections could not possibly have remained "alive" in the minds of investors.

> b)    The Statements in Question Did Not Involve Fundamental Changes to Bancorp's Business.

The SEC's duty-to-update claim fails for the further reason that courts recognizing such a duty have held that it is quite "narrow" because of "the potential to create a sweeping continuing obligation for corporations when they disclose information."  *United States v. Schiff*, 602 F.3d 152, 170 (3d Cir. 2010).  As the *Schiff* court explained, imposing a broad duty to update would improperly incentivize companies to "remain[] silent and releas[e] less information in the hope of avoiding the attachment of a continuing obligation to monitor and update all related information."  *Id.*  Such a duty can thus apply only where the initial statement concerns "'fundamental[] change[s]' in the nature of the company -- such as a merger, liquidation, or takeover attempt -- and when subsequent events produce an 'extreme' or 'radical' change in the continuing validity of that initial statement."  *Id.*  (citation omitted).

The statements on which the SEC focuses here are not subject to a duty to update under this standard.  They do not involve "fundamental changes" in the

nature of Bancorp's operations. Rather, they are financial projections that cannot be subject to a duty to update. *See, e.g.*, *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1432 (3d Cir. 1997) (no duty to update "ordinary earnings forecast[s]" unless they were "unreasonable when made").

c) Bancorp's DSPP Sales Did Not Impose a Heightened Duty.

Contrary to the SEC's claim, Bancorp's DSPP stock sales in late February 2008 did not create a heightened duty to update. In *Convergent*, *supra*, plaintiffs alleged securities fraud in connection with a stock offering because defendants did not disclose internal projections known to them at the time of the offering. The Ninth Circuit rejected this claim on a motion for summary judgment because defendant had no duty to disclose such projections. 948 F.2d at 516. The Ninth Circuit similarly rejected plaintiff's contention that, because of the ongoing stock offering "the defendants were obliged to release information as it became known to them." *Id.*; *see also Verifone,* 11 F.3d at 867 (dismissing claim that stock offering prospectus and registration statement "failed to disclose projected or potential changes in Verifone's product market" because allegations amounted to "no more than a failure to disclose forecasts, and as such, are not actionable"). It is all the more clear that Bancorp had no duty to update its projections here given its express disclaimer of any such duty. *See Winick*, 73 F. App'x at 254.

**4.    The 8-K Statements Cited by the SEC That Are Not Forward-Looking Likewise Are Not Actionable.**

The SEC contends that Mr. Perry is liable based on two 8-K statements that are not forward-looking, but they, too, are not actionable. They are: "We remain in a fundamentally sound financial position" and "[o]ur capital levels continue to exceed the levels defined as 'well capitalized' by our regulators." 8-K, Ex. 99.2 at 2. As with the other 8-K statements, the SEC does not allege that these were false when made, but that they became false and misleading as a result of subsequent events. *See* Compl. ¶¶ 19, 22. There is no basis for the SEC's claim that Bancorp

1    had a duty to update these statements.

2         Even if there were a duty to update in the Ninth Circuit, the first statement

3    is not actionable.  It is not a statement that can have remained "alive" in the minds

4    of investors, nor did it concern any "fundamental change" in Bancorp's business.

5    Moreover, the phrase "fundamentally sound position" is mere "puffery," a

6    statement of general optimism that cannot be objectively verified.  No reasonable

7    investor would consider a statement of this nature in deciding whether to invest.

8    *See, e.g.*, *Cutera*, 610 F.3d at 1111 ("When valuing corporations . . . investors do

9    not rely on vague statements of optimism like 'good,' 'well regarded,' or other

10   feel good monikers."); *In re Syntex Corp. Sec. Litig.*, 855 F. Supp. 1086, 1095

11   (N.D. Cal. 1994) (statement  that "[w]e're doing well and I think we have a great

12   future" was non-actionable "puffery"), *aff'd*, 95 F.3d 922 (9th Cir. 1996); *In re

13   Metris Cos., Inc. Sec. Litig.*, 428 F. Supp. 2d 1004, 1010 (D. Minn. 2006)

14   (statement that "we have built a fundamentally sound business" was "mere

15   puffery, which could not possibly significantly alter the available mix of

16   information in the mind of a reasonable investor").

17        The SEC also has no valid claim regarding the second statement:  that we

18   "continue to exceed the levels defined as 'well capitalized' by our regulators."

19   This was a true statement of fact, not a representation that can be deemed to have

20   remained "alive" in the minds of investors.  *Foxhollow*, 359 F. App'x at 804–05.

21   It thus cannot have been subject to a duty to update.  *Id.*

22   **D.    Mr. Perry Is Entitled to Summary Judgment on the SEC's Claims
          Based on the DSPP Prospectuses.**

23        The undisputed facts also defeat the SEC's claims based on Bancorp's

24   DSPP prospectuses.  The SEC contends, among other things, that the prospectuses

25   purportedly did not disclose precisely how DSPP proceeds would be used.

26   Compl. ¶ 20.  That assertion is baseless for the reasons stated in section III.B.1,

27   but the SEC's prospectus claims fail for an even more fundamental reason:  Mr.

Perry neither signed nor reviewed the documents (*see* SUF ¶ 22), and thus cannot be liable for the alleged false statements contained in them.

### 1. Mr. Perry Cannot Be Liable Under Section 10(b) or Rule 10b-5 Because He Was Not the "Maker" of the Prospectus Statements.

Rule 10b-5(b), 17 C.F.R. § 240.10b-5 (1948), provides that it is unlawful for a person "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." The "maker" of a statement is the person with "ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302, 180 L.Ed.2d 166 (2011). Mr. Perry was not the "maker" of statements in the prospectuses under this standard.

As the Supreme Court explained in *Janus Capital*, the issue of who can be liable as the "maker" of an allegedly false statement is best "exemplified by the relationship between a speechwriter and a speaker." *Id.* The speaker is the person with "ultimate authority" over the statement because he or she is the one who delivers it in his or her own name. "[W]hen a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it." *Id.*

While Mr. Perry was Bancorp's CEO, the prospectuses were not delivered in his name or signed by him, nor did he play any role in preparing or reviewing the documents. (SUF ¶ 22.) An executive officer who has no connection to a statement cannot be liable as its "maker" under section 10(b) or Rule 10b-5. *See, e.g., Reese*, 643 F.3d at 693 n.8 ("under the law of our circuit, defendants have been subject to primary liability under section 10(b) for the misstatements of others only if defendants are alleged to have been intricately involved or to have substantially participated in the making of those misstatements"); *SEC v. Mercury Interactive, LLC*, No. 5:07-cv-02822-WHA, 2011 U.S. Dist. LEXIS 134580, at *4 (N.D. Cal. Nov. 22, 2011) ("The Court agrees that allegations regarding [General

Counsel's] involvement in preparing annual and quarterly reports that were not signed by or otherwise attributable to her are insufficient to state a Rule 10b-5(b) claim against [her]"); *see also Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 365 (5th Cir. 2004) ("corporate officers may not be held responsible for unattributed corporate statements solely on the basis of their titles . . .").

The SEC alleges that the prospectuses were simply addenda to a June 2006 Registration Statement regarding the DSPP that Mr. Perry signed.  Compl. ¶ 20. But the SEC does not allege that the Registration Statement itself contained any false or misleading statements; only that the prospectuses did.  Mr. Perry was not the "maker" of the prospectuses and thus cannot be held liable based on alleged false or misleading statements in those documents.

## 2.   Mr. Perry Cannot Be Liable Under Section 17(a) Based on Prospectuses That He Did Not Sign or Review.

Mr. Perry is likewise entitled to summary judgment on the SEC's claim that he is liable for alleged false statements in prospectuses under section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a).

While some courts have ruled that a defendant need not have been the "maker" of a false statement to be liable under section 17(a), the Ninth Circuit has expressly held that the "maker" requirement *does* apply to section 10(b) and section 17(a) claims alike.  "In order to prove securities fraud *under section 17(a)*, section 10(b) and Rule 10b-5, *the SEC must first establish that the defendants made* a material misstatement or omission in connection with the offer or sale of a security."  *SEC v. Global Express Capital Real Estate Inv. Fund, I, LLC*, 289 F. App'x 183, 186 (9th Cir. 2008); *see also SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 855–56 (9th Cir. 2001) (sections 17(a) and 10(b) both "forbid *making* a material misstatement or omission."); *SEC v. Kelly*, 817 F. Supp. 2d 340, 345 (S.D.N.Y. 2011) ("numerous courts have held that the elements of a claim under Section 17(a) are 'essentially the same' as those for claims under Rule 10b-5 . . .

To succeed on a misstatement claim under either Rule 10b-5[] or Section 17(a)(2), the SEC must prove that the defendant made materially false statements or omissions.") (citation omitted).

For the reasons stated above, Mr. Perry did not "make" the statements contained in the DSPP prospectuses under the *Janus Capital* standard. Accordingly, he cannot be liable for securities fraud under section 17(a).

### 3. The SEC Cannot Circumvent the Need to Establish That Mr. Perry "Made" the Alleged False Statements.

Mr. Perry also cannot be liable as part of an alleged fraudulent "scheme" to sell shares pursuant to the DSPP. Rule 10b-5(a) and (c) provide that a person can be liable for participation in a fraudulent scheme without making a false statement. However, "[a] defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and omissions under Rule 10b-5(a) or (c) when the scheme also encompasses conduct beyond those misrepresentations or omissions." *WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011); *accord Kelly*, 817 F. Supp. 2d at 343–44.

Here, the fraud alleged by the SEC with respect to the DSPP is based entirely on alleged false statements and omissions in Bancorp's securities filings; it encompasses no other alleged misconduct. Accordingly, the SEC cannot viably circumvent the need to show that Mr. Perry "made" the alleged false statements contained in the DSPP prospectuses by asserting "scheme" liability.

### E. Mr. Perry Is Entitled to Summary Judgment on the SEC's Claim That Bancorp Fraudulently Delayed Disclosure of the Decision to Defer the Payments of Dividends.

The undisputed facts further mandate dismissal of the SEC's claim that Bancorp fraudulently delayed disclosure of a May 2008 decision to defer the payment of dividends on preferred securities issued by Bancorp and the Bank. The Boards of Bancorp and the Bank approved deferral of such dividends on Thursday, May 8. (SUF ¶ 37.) Bancorp disclosed the deferrals on Monday, May

12.  (SUF 38.)  Such disclosure thus occurred within the four-business-day period required by SEC rules.  *See* 17 C.F.R. § 240.13a-11 (1977); SEC Form 8-K (requiring disclosure of reportable events within four business days).

Contrary to the SEC's allegation, Bancorp had no duty to disclose deferral of the dividends before the Board exercised its authority to take that action. Management's mere contemplation that the Board might or likely would do so was not an event that needed to be publicly disclosed.  *See, e.g.*, *Hammerstone NV, Inc. v. Hoffman,* No. 09-CV-2685, 2010 U.S. Dist. LEXIS 22182, at *21 (S.D.N.Y. Mar. 10, 2010) (no duty to disclose decision prior to time it was "finalized"); *cf.* Exchange Act Form 8-K, Questions and Answers of General Applicability § 117.08 (Apr. 2, 2008), *available at* http://www.sec.gov/divisions/corpfin/guidance/8-kinterp.htm (where corporate action requires shareholder approval to be effective, disclosure obligation is triggered by such approval).  Mr. Perry is thus entitled to summary judgment on the SEC's claim.

## CONCLUSION

For the foregoing reasons, the Court should grant Mr. Perry's motion for partial summary judgment and grant summary judgment in Mr. Perry's favor on the SEC's (a) disgorgement claim; (b) claims based on Bancorp's 2007 10-K; (c) claims based on Bancorp's February 12, 2008 8-K; (d) claims based on Bancorp's DSPP prospectuses; and (e) claim that Mr. Perry fraudulently delayed disclosure of the decision to defer the payment of dividends on preferred securities issued by Bancorp and the Bank.

Dated:  April 6, 2012

Respectfully submitted,

/s/ D. Jean Veta
D. Jean Veta
Counsel to Michael W. Perry