D. Jean Veta (Admitted *Pro Hac Vice*)
jveta@cov.com
Benjamin J. Razi (Admitted *Pro Hac Vice*)
brazi@cov.com
Dennis B. Auerbach (Admitted *Pro Hac Vice*)
dauerbach@cov.com
Nishchay H. Maskay (Admitted *Pro Hac Vice*)
nmaskay@cov.com
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, D.C. 20004
Tel: (202) 662-6000
Fax: (202) 662-6291

David B. Bayless (SBN 189235)
dbayless@cov.com
Tammy Albarrán (SBN 215605)
talbarran@cov.com
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA 94111-5356
Tel.: (415) 591-6000
Fax: (415) 591-6091

Attorneys for Defendant
MICHAEL W. PERRY

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>    v.<br><br>MICHAEL W. PERRY and A. SCOTT KEYS,<br><br>        Defendants. | Case No. CV-11-1309 R<br><br>**STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MICHAEL W. PERRY'S MOTION FOR PARTIAL SUMMARY JUDGMENT PURSUANT TO RULE 56 OF THE FEDERAL RULES OF CIVIL PROCEDURE**<br><br>Date: May 21, 2012<br>Time: 10:00 a.m.<br>Courtroom: No. 8<br>Judge: Honorable Manuel L. Real |

Pursuant to Fed. R. Civ. P. 56(d) and Local Rule 56.1 of this Court, defendant Michael W. Perry sets forth the following uncontroverted facts and conclusions of law in support of his motion for partial summary judgment:

## UNCONTROVERTED FACTS

### I. Bancorp and the Bank

1. IndyMac Bank, F.S.B. (the "Bank") was a federally-chartered thrift regulated by the Office of Thrift Supervision ("OTS"). IndyMac Bancorp, Inc. ("Bancorp") was a publicly-owned thrift holding company incorporated in Delaware. SEC Complaint ("Compl.") ¶¶ 4, 9, 10; Mr. Perry's Answer to SEC's Complaint ("Answer") ¶¶ 4, 9, 10.

2. The Bank was a wholly-owned subsidiary of Bancorp. Bancorp had no operations of its own, and the Bank was its only significant asset. Declaration of Jason A. Levine, dated April 4, 2008 ("Levine Declaration"), Exh. A (Form 8-K, Ex. 99.2 at 7 (Feb. 12, 2008) [hereinafter "2/12/08 8-K"]).

3. Bancorp's Board of Directors included a former member of the Board of Governors of the Federal Reserve System, a former United States Senator, a former Vice Chairman of Ernst & Young, a former dean of the UCLA School of Management, and several former practicing accountants and financial industry executives. Levine Declaration, Exh. B (Excerpts of Bancorp's 2008 Proxy Statement (Mar. 24, 2008)).

4. On July 11, 2008, the OTS closed the Bank and placed it under receivership. Bancorp filed for bankruptcy shortly thereafter, on July 31, 2008. Compl. ¶¶ 4, 9, 10; Answer ¶¶ 4, 9, 10.

### II. Mr. Perry's and Others' Ownership of Bancorp Common Stock

5. Mr. Perry acquired 35,000 shares of Bancorp common stock on March 23, 2007, at a cost of more than $1.03 million. Perry Declaration ¶ 2.

6. Mr. Perry acquired 328,987.99 shares of Bancorp common stock on February 15, 2008, at a cost of more than $2.6 million. Perry Declaration ¶ 3.

7. Mr. Perry did not sell a single share of Bancorp stock in 2006, 2007, or 2008. Perry Declaration ¶ 4.

8. No Bancorp executive officer or director sold shares of Bancorp common stock in 2008, through the date Bancorp filed for bankruptcy. Perry Declaration ¶ 5.

9. Mr. Perry beneficially owned more than 3.1 million shares of Bancorp common stock (including stock options) on February 29, 2008, comprising about 3.9 percent of issued and outstanding shares. He was the largest non-institutional Bancorp shareholder at the time. Perry Declaration ¶ 6; Levine Declaration, Exh. B (Excerpts of Bancorp's 2008 Proxy Statement (Mar. 24, 2008)).

10. As of December 31, 2006, the Bancorp common stock and options Mr. Perry beneficially owned had a value of more than $69 million. His investment in Bancorp constituted the vast majority of his net worth. By February 29, 2008, the value of his investment in Bancorp shares (including the additional stock and options acquired in 2007 and 2008) had plummeted to less than $4 million. As a result of Bancorp's bankruptcy filing on July 31, 2008, Mr. Perry lost virtually the entire remainder of his investment in the company. Perry Declaration ¶ 7; Levine Declaration, Exh. B (Excerpts of Bancorp's 2008 Proxy Statement (Mar. 24, 2008)).

11. In 2008, Bancorp's Management Development and Compensation Committee awarded discretionary bonuses to the company's senior managers in order to retain and motivate them. Mr. Perry did not participate in this plan and thus received zero bonus for 2007 or 2008. Perry Declaration ¶ 9.

12. In April 2008, Mr. Perry voluntarily cancelled his fully vested options to purchase one million shares of Bancorp common stock in order to make more stock options available for the company's shareholders and for the retention of its employees. Perry Declaration ¶ 10.

STATEMENT OF UNCONTROVERTED FACTS
AND CONCLUSIONS OF LAW
Case No. CV-11-1309 R

13.     The SEC has presented no evidence to support its disgorgement claim.  Levine Declaration, Exh. C (Excerpts of the SEC's Amended Responses to Mr. Perry's First Set of Interrogatories, No. 23 (Apr. 2, 2012)).

## III.     Bancorp's Disclosures About the Bank's Financial Condition

14.     The SEC contends that Mr. Perry is liable for securities fraud based on various alleged false statements and omissions, including alleged false statements and omissions in Bancorp's SEC Form 8-K (Feb. 12, 2008), SEC Form 10-K (Feb. 29, 2008), and prospectuses filed pursuant to a June 30, 2006 Form S-3.  The SEC's specific allegations are set forth in its Complaint, as subsequently clarified in responses to Mr. Perry's interrogatories.

15.     Among other things, Bancorp's SEC Form 8-K, issued on February 12, 2008, and exhibits attached thereto, appended to the Levine Declaration as Exhibit A, contain the following statements and information:

 a. "2007 was a terrible year for our industry, for IndyMac and for you, our owners."  2/12/08 8-K, Ex. 99.2 at 1.

 b. "All home lenders, including Indymac, were a part of the problem, and, as Indymac's CEO, I take full responsibility for the mistakes that we made."  *Id.* at 3.

 c. "[T]hings could get worse, including our potentially incurring more rightsizing costs, or selling non-performing assets in bulk at a loss or having to raise very dilutive capital . . . ."  *Id.* at 8.

 d. Bancorp disclosed that under one adverse scenario, the Bank's total risk-based capital ratio would fall to 9.78%, below the threshold for a well-capitalized thrift.  2/12/08 8-K, Ex. 99.3 at 26.

 e. "We believe that, under current regulations, the Bank will continue to meet its 'well-capitalized' minimum capital requirements in the foreseeable future."  2/12/08 8-K, at 33.

STATEMENT OF UNCONTROVERTED FACTS
AND CONCLUSIONS OF LAW
Case No. CV-11-1309 R

f.   "The Bank's regulatory capital compliance could be impacted by a number of factors, such as changes to applicable regulations, adverse action by our regulators, changes in our mix of assets, decline in real estate values, interest rate fluctuations, loan loss provisions and credit losses, or significant changes in the economy in areas where we have most of our loans, or future disruptions in the secondary mortgage market.  Any of these factors could cause actual future results to vary from anticipated future results and consequently could have an adverse impact on the ability of the Bank to meet its future minimum capital requirements."  2/12/08 8-K, at 33.

g.   "IndyMac lost $609 million for the year [2007], the first annual loss in our 23-year history.  As a result of this loss and panic market conditions for anything or anyone involved in mortgages, Indymac lost $2.8 billion, or 85%, of its market capitalization in 2007.  The only good news is that, even with this significant loss, we remain in a fundamentally sound financial position as a result of raising $676 million in equity capital in 2007 . . . ."  2/12/08 8-K, Ex. 99.2 at 2.

h.   "[F]orward-looking statements" are "inherently subject to risks and uncertainties, many of which cannot be predicted or quantified.  Actual results and the timing of certain events could differ materially from those projected in or contemplated by the forward-looking statements due to a number of factors, including," inter alia, (1) "the level and volatility of interest rates," (2) "the accuracy of subjective estimates used in determining the fair value of financial assets of Indymac," and

5

(3) "the various credit risks associated with our loans and other financial assets."  2/12/08 8-K, at 3 & Ex. 99.1 at 3 & Ex. 99.2 at 9 & Ex. 99.3 at 1.

      i.    Readers are cautioned "not to place undue reliance on forward-looking statements, which speak only as of the date they are made.  Indymac does not undertake to update or revise forward-looking statements to reflect the impact of circumstances for events that arise after the date the forward-looking statements are made."  2/12/08 8-K, at 3.

16.    On February 19, 2008, due to an anomalous spike in interest rates and its effect on the value of the Bank's mortgage servicing rights ("MSR"), Bancorp's Chief Financial Officer, A. Scott Keys, sent an email to Mr. Perry projecting that the Bank's capital ratio might be right at or slightly under the 10% level at quarter end absent improvement measures.  This was one of a number of forecasts prepared during the period.  Levine Declaration, Exh. D (Testimony Exh. 571); Exh. E (Excerpt from A. Scott Keys Investigative Testimony at 120:5–18 (Nov. 19, 2009)); Exh. F (Excerpt from S. Blair Abernathy Investigative Testimony at 228:7–24 (Dec. 11, 2009)).

17.    A subsequent forecast on February 29 based on updated information projected that the Bank's capital ratio at quarter end would be at least 10.61 percent, 61 basis points above the 10 percent minimum for a well-capitalized institution under OTS regulations.  Levine Declaration, Exh. G (Testimony Exh. 563).

**IV.    Bancorp's Direct Stock Purchase Plan**

18.    In response to Mr. Keys' February 19 email, Mr. Perry authorized Mr. Keys to raise up to $50 million of capital through Bancorp's direct stock purchase plan ("DSPP") in $10-$15 million increments and to "be prepared to contribute $25 to $50 million of holding company cash to the bank just before

quarter-end if we need to do so."  Mr. Perry wrote that the dilution from such a capital raise through the DSPP would be "relatively minimal" and that he "believe[s] we should be okay" and "stay above 10% [for] this quarter."  Levine Declaration, Exh. D (Testimony Exh. 571).

19.     On October 11, 2007, Bancorp filed a prospectus pursuant to SEC Rule 424(b)(3) and a Registration Statement that had been filed on Form S-3 on June 30, 2006.  The prospectus authorized the company to issue up to 10 million new shares of common stock pursuant to the DSPP.  IndyMac filed further DSPP prospectuses on April 3, 2008 and May 2, 2008, each authorizing the issuance of up to 10 million additional shares of Bancorp common stock.  Levine Declaration, Exh. H (Prospectus (Form 424B3) (Oct. 11, 2007)); Exh. I (Prospectus (Form 424B3) (Apr. 3, 2008)); and Exh. J (Prospectus (Form 424B3) (May 2, 2008)).

20.     The DSPP prospectuses state that Bancorp's DSPP "provides [the company] with an economical and flexible mechanism to raise equity capital through sales of our common stock" by purchasing shares directly over the Internet in an amount between $250 and $10,000.  Bancorp "intends to use the net proceeds from sales of common stock directly issued by [the company] under the plan for general corporate purposes, including investment in [its] subsidiaries. Bancorp could, at its discretion, "elect to offer shares at a discount from prevailing market prices" and/or waive the $10,000 maximum per account per month. Levine Declaration, Exh. H (Prospectus (Form 424B3) (Oct. 11, 2007)); Exh. I (Prospectus (Form 424B3) (Apr. 3, 2008)); and Exh. J (Prospectus (Form 424B3) (May 2, 2008)).

21.     The three DSPP prospectuses also each state that Bancorp "from time to time may offer the IndyMac Direct Stock Purchase Plan, a direct stock purchase plan designed to provide investors with a convenient method to purchase shares of our common stock."  The prospectuses further provide that shares purchased through the program would be at market value, "less any discount that IndyMac

STATEMENT OF UNCONTROVERTED FACTS
AND CONCLUSIONS OF LAW
Case No. CV-11-1309 R

may decide to offer."  Finally, each prospectus incorporates by reference other filed reports, but not "documents or information deemed to have been furnished and not filed in accordance with SEC rules."  Levine Declaration, Exh. H (Prospectus (Form 424B3) (Oct. 11, 2007)); Exh. I (Prospectus (Form 424B3) (Apr. 3, 2008)); and Exh. J (Prospectus (Form 424B3) (May 2, 2008)).

22.     Mr. Perry did not sign or review the DSPP prospectuses.  Levine Declaration, Exh. K (Excerpt from Pamela Marsh Investigative Testimony at 22:19–22 (Nov. 5, 2009)); and Exh. L (Excerpt from Michael W. Perry Investigative Testimony at 159:21–23 (Dec. 16, 2009)).

23.     Bancorp disclosed in an exhibit to its Form 8-K, dated February 12, 2008, that it "raised a total of $176 million of common equity and trust preferred securities and contributed the proceeds to the Bank during 2007."  Of the $176 million, $145.6 million was raised through the DSPP in 2007.  Levine Declaration, Exh. A (2/12/08 8-K, at 42 & Ex. 99.3 at 3).

24.     As disclosed in Bancorp's 2007 10-K, in 2006 Bancorp raised $148.5 million through the DSPP and $188 million by issuing trust preferred securities, and contributed over $300 million to the Bank.  Levine Declaration, Exh. M (Form 10-K, at F-37 (Feb. 29, 2008) [hereinafter "2007 10-K"]).

25.     Bancorp raised $11.2 million of capital between February 26 and February 29, 2008 through the DSPP.  Levine Declaration, Exh. G (Testimony Exh. 563).

26.     On February 28, 2008, Mr. Perry stated in an email to Bancorp's Board of Directors that the company is "exploring more seriously than we discussed at our board meeting this week, a significant capital raise . . . . $500 million or so."  Levine Declaration, Exh. N (Testimony Exh. 593).

27.     Bancorp's senior management, including its Head of Investor Relations and Chief Accounting Officer, distinguished between capital raised via the DSPP and capital raised through a large capital transaction.  Management

understood only the latter to be "very dilutive" to existing shareholders. Levine Declaration, Exh. O (Excerpt from Pamela Marsh Deposition Testimony at 9:14–10:2 & 163:12–165:21 (Feb. 28, 2012)).

28.    As previously noted, Mr. Perry sent an email on February 19, 2008, stating that any dilution from raising capital through the DSPP would be "relatively minimal." Levine Declaration, Exh. D (Testimony Exh. 571).

**V.    Bancorp's 2007 10-K and DSPP Disclosures**

29.    On February 29, 2008, Pamela Marsh, who was responsible for financial planning and forecasting in early 2008, sent an email to Mr. Perry projecting that the Bank's total risk-based capital ratio as of March 31, 2008, would be 10.61 percent without any contribution from Bancorp to the Bank of DSPP capital raised since February 26, and that the capital ratio would be 10.69 percent if Bancorp contributed to the Bank the $11.2 million raised through the DSPP since February 26. This was Ms. Marsh's "best forecast" on February 29, 2008. Levine Declaration, Exh. G (Testimony Exh. 563) & Exh. O (Excerpt from Pamela Marsh Deposition Testimony at 241:19 (Feb. 28, 2012)); *see also* Levine Declaration, Exh. K (Excerpt from Pamela Marsh Investigative Testimony at 26:17–27:2 & 130:5–7 (Nov. 5, 2009)) (describing Ms. Marsh's responsibilities at IndyMac and authenticating Testimony Exh. 563).

30.    The date of Ms. Marsh's email -- February 29, 2008 -- was the same day Bancorp filed its 10-K for the year ended December 31, 2007. Levine Declaration, Exh. G (Testimony Exh. 563) & Exh. M (2007 10-K).

31.    Among other things, Bancorp's SEC Form 10-K, filed on February 29, 2008, and attached to the Levine Declaration as Exhibit L, contains the following statements and information:

> a.    "The Company has a direct stock purchase plan which offers investors the ability to purchase shares of our common stock directly over the Internet. Investors interested in investing over

9

$10,000 can also participate in the waiver program administered by Melon Investor Services LLC."  2007 10-K, at 13.

b.    Bancorp's DSPP was listed as one of the company's "Principal Sources of Cash."  "During the year ended December 31, 2007, we raised $145.6 million of capital by issuing 7,427,104 shares of common stock through this plan."  *Id.* at 57, 59.

c.    Bancorp reported capital contributions to the Bank in 2005, 2006, and 2007 of $247,265,000, $354,127,000, and $260,000,000, respectively.  Based on Bancorp's consolidated Statement of Cash Flows, these contributions were Bancorp's largest use of cash.  *Id.* at F-37.

d.    Bancorp reported that its book value per share exceeded its market value per share.  *Id.* at 16.

e.    "As of December 31, 2007, Indymac Bank met all of the requirements of a 'well-capitalized' institution under the general regulatory capital regulations."  *Id.* at 47, F-57.

f.    "While we currently have regulatory capital ratios in excess of the 'well capitalized' requirement and have implemented a plan to reduce our balance sheet and increase our capital ratios, there can be no assurance that we will not suffer material losses or that our plans to reduce the balance sheet will succeed.  In those circumstances, we may be required to seek additional regulatory capital to maintain our capital ratios at the 'well capitalized' level.  Such capital raising could be at terms that are very dilutive to existing shareholders and there can be no assurance that any capital raising we undertake

10

would be successful given the current level of disruption in financial markets." *Id.* at 69

g. "Indymac does not undertake to update or revise forward-looking statements to reflect the impact of circumstances for [sic] events that arise after the date the forward-looking statements are made." *Id.* at 3.

h. "[V]irtually all of our operating segments, except for the mortgage servicing division and Financial Freedom, our reverse mortgage lending subsidiary, reported material losses in 2007. For the year ended December 31, 2007, Indymac had a consolidated net loss of $614.8 million. Regarding business segment performance, the mortgage production division had a net loss of $96.8 million in 2007 while the mortgage servicing division had earnings of $181.4 million. Combining mortgage production and servicing, the mortgage banking segment recorded net earnings of $33.0 million. The thrift segment recorded a net loss of $199.2 million for 2007 and our discontinued business activities recorded a net loss of $281.1 million. As a result of our thrift structure and strong capital and liquidity positions, we were not forced to sell assets at liquidation prices and our funding capacity was not materially impacted." *Id.* at 19 (footnote omitted).

32. Bancorp's filings, including the Form 10-K, were reviewed by Bancorp's outside counsel and outside auditors. Levine Declaration, Exh. O (Excerpt from Pamela Marsh Deposition Testimony at 234:13–235:16 (Feb. 28, 2012)); Levine Declaration, Exh. E (Excerpt from A. Scott Keys Investigative Testimony at 21:24–23:2 (Nov. 19, 2009)).

**VI. Bancorp's Disclosure of Subsequent Challenges Faced by the Company**

33. On March 11, 2008, Bancorp issued an 8-K to warn investors of "panic market conditions caused by uncertainty in the U.S. housing and mortgage markets, renewed margin calls by Wall Street repo lenders on mortgage REITs and hedge funds, and other economic and financial uncertainties." The 8-K added: "Spreads on everything from relatively risk-free instruments such as Fed Funds to LIBOR and U.S. Treasuries to Fannie Mae and Freddie Mac mortgage-backed securities ('MBS') have widened substantially to at or near all-time historic levels . . . . As a result, the financial impact of this spread widening on Indymac is difficult to estimate at this time, but it is expected to have a negative effect on the value of IMB's MBS portfolio, and therefore on the first quarter 2008 forecast presented to shareholders on February 12, 2008." Levine Declaration, Exh. P (Form 8-K, Ex. 99.1 (Mar. 11, 2008)).

34. In late April 2008, credit rating agencies downgraded the ratings on bonds held by the Bank. Compl. ¶ 34; Answer ¶ 34.

35. Bancorp issued certain trust preferred securities. Holders of these securities received dividends, also referred to as interest payments. Levine Declaration, Exh. M (2007 10-K, at F-32, F-33).

36. The Bank issued shares of Perpetual Non-Cumulative Fixed Rate Preferred Stock in the second quarter of 2007. Holders of these securities received dividends as well. Levine Declaration, Exh. M (2007 10-K, at F-58).

37. On Thursday, May 8, 2008, Bancorp's and the Bank's Boards of Directors approved the suspension/deferral of (a) interest payments on Bancorp's trust preferred securities, and (b) dividend payments on the Bank's preferred stock. Levine Declaration, Exh. Q (Testimony Exh. 757).

38. Bancorp disclosed these suspensions/deferrals in its first quarter Form 10-Q, filed on Monday, May 12, 2008. Compl. ¶ 43; Answer ¶ 43.

**CONCLUSIONS OF LAW**

1.     Mr. Perry is entitled to summary judgment on the SEC's disgorgement claim because the SEC has produced no evidence that Mr. Perry profited from the allegedly false and misleading statements, and therefore there is no genuine issue of material fact as to an essential element of the SEC's claim. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

2.     Mr. Perry is entitled to summary judgment on the SEC's allegations relating to statements of fact in Bancorp's 2007 10-K because each statement challenged by the SEC was true on February 29, 2008, when the 10-K was filed. The SEC has produced no evidence that such statements were false or misleading when they were made, and therefore there is no genuine issue of material fact as to an essential element of the SEC's claim.  *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 693 (9th Cir. 2011) (defendant's "statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events") (citation and internal quotation marks omitted).

3.     Mr. Perry is entitled to summary judgment on the SEC's allegations relating to the fact that Bancorp's 10-K did not disclose its February 19, 2008 forecast, because there is no duty to disclose internal projections or forecasts under controlling Ninth Circuit authority.  *See, e.g.*, *In re Verifone Sec. Litig*, 11 F.3d 865, 867 (9th Cir. 1993); *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 516 (9th Cir. 1991).  Moreover, the February 19 forecast had been superseded by the date Bancorp filed its 10-K.  *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 693 (9th Cir. 2011) (defendant's "statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events") (citation and internal quotation marks omitted).

4.     Mr. Perry is entitled to summary judgment on the SEC's allegations relating to forward-looking statements in Bancorp's 8-K, issued on February 12, 2008 because they were accompanied by specific warnings and cautionary

language.  *See, e.g.*, *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1414–15 (9th Cir. 1994).

5.     Mr. Perry is entitled to summary judgment on the SEC's claims concerning Bancorp's February 12, 2008 8-K, because the 8-K was not incorporated by reference into the DSPP prospectuses and the registration statement, as the SEC alleges in paragraph 21 of its Complaint.  Information in an 8-K provided pursuant to Items 2.02 and 7.01 of the form is deemed "furnished," not "filed," unless the registrant specifically states that the information is to be considered "filed."  SEC Form 8-K, *available at* http://www.sec.gov/about/ forms/form8-k.pdf.  The information in Bancorp's 8-K that is at issue here was provided pursuant to Items 2.02 and 7.01; therefore, it was merely "furnished."

6.     Mr. Perry is entitled to summary judgment on the SEC's claim that Bancorp was required to update its forward-looking statements in its 8-K for several additional reasons.  First, there is no duty to update in the 9th Circuit.  *See Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 693 (9th Cir. 2011) (defendant's "statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events") (citation and internal quotation marks omitted).  Second, IndyMac specifically disclaimed any duty to update forward-looking statements, rendering such statements immaterial.  *Winick v. Pacific Gatewy Exch., Inc.*, 73 F. App'x 250, 254 (9th Cir. 2003), *withdrawn on other grounds*, 80 F. App'x 1 (9th Cir. 2003).  Third, the statements in question did not involve fundamental changes to Bancorp's business.  *See United States v. Schiff*, 603 F.2d 152, 170 (3d Cir. 2010).

7.     Mr. Perry is entitled to summary judgment on the SEC's claim that Bancorp was required to update the 8-K statement that Bancorp was in a "fundamentally sound position" because that statement cannot be deemed to have remained "alive" in the minds of investors and did not involve a "fundamental change" to Bancorp's business.  *In re Foxhollow Tech., Inc. Sec. Litig.*, 359 F.

14

App'x 802, 804 (9th Cir. 2009); *United States v. Schiff*, 602 F.3d 152, 170 (3d Cir. 2010). Moreover, such a statement of general optimism is immaterial as a matter of law. *See, e.g.*, *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1109 (9th Cir. 2010).

8. Mr. Perry is entitled to summary judgment on the SEC's claims based on the DSPP prospectuses because Mr. Perry did not sign or review the prospectuses, and thus was not the "maker" of the statements contained therein. *See, e.g.*, *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011); *SEC v. Global Express Capital Real Estate Inv. Fund, I, LLC*, 289 F. App'x 183, 186 (9th Cir. 2008). Moreover, Mr. Perry cannot be held liable as part of an alleged "scheme" under SEC Rule 10b-5(a) or (c) because the SEC's allegations relate entirely to alleged false statements and omissions in Bancorp's securities filings. *WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011).

9. Mr. Perry is entitled to summary judgment on the SEC's claim that Bancorp fraudulently delayed disclosure of its decision to defer the payment of trust preferred and Bank preferred dividends, because the deferrals were disclosed two business days after the Boards of Bancorp and the Bank approved them. Accordingly, such disclosure occurred within the four business days required by SEC regulations. *See* 17 C.F.R. § 240.13a-11 (2008); SEC Form 8-K.

Dated: April 6, 2012                              Respectfully submitted,

                                                  /s/ D. Jean Veta
                                                  D. Jean Veta
                                                  Counsel to Michael W. Perry