DONALD W. SEARLES, Cal. Bar No. 135705
E-mail: searlesd@sec.gov
NICHOLAS S. CHUNG, Cal. Bar No. 192784
E-mail: chungni@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
John M. McCoy, III Associate Regional Director
John W. Berry, Regional Trial Counsel
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036-3648
Telephone:  (323) 965-3998
Facsimile:  (323) 965-3908

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                Plaintiff,<br><br>        vs.<br><br>MICHAEL W. PERRY and A. SCOTT KEYS,<br><br>                Defendants. | Case No. CV 11-1309 R (JCx)<br><br>**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:        May 21, 2012<br>Time:        10:00 a.m.<br>Place:        Courtroom of<br>                Hon. Manuel L. Real |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.  INTRODUCTION ...................................................................................1

II. STATEMENT OF FACTS .....................................................................2

    A.  Background ...................................................................................2

    B.  IndyMac's Direct Stock Purchase Plan ......................................2

    C.  The Materially Dilutive Effect Of The DSPP Stock Sales .................3

    D.  IndyMac's Publicly-Disclosed "Realistic" 2008 Business Plan ...........3

    E.  IndyMac's Materially Misleading 2007 Form 10-K ...........................4

    F.  IndyMac's Materially Misleading Updates To The Market ................5

    G.  IndyMac's False And Misleading May 12, 2008 Form 10-Q .............6

    H.  IndyMac's False And Misleading DSPP Prospectuses ........................7

III. ARGUMENT .........................................................................................7

    A.  Both Defendants Can Be Held Liable For The False
        And Misleading DSPP Prospectuses ...........................................8

    B.  Defendants Are Liable For Material Misrepresentations
        In the 2007 Form 10-K And DSPP Prospectuses .........................9

        1.  The 2007 Form 10-K misrepresented IndyMac's
            capital raising activity through the DSPP .................................9

        2.  The 2007 Form 10-K and DSPP prospectuses
            also misstated IndyMac's capital and liquidity
            condition ...................................................................................11

    C.  Defendants Are Liable For The Material Omissions
        In The 2007 Form 10-K, The DSPP Prospectuses And
        Other SEC Filings ......................................................................15

i

1.  Defendants cannot escape their disclosure
    obligations ................................................................................16

2.  Defendants had a duty of disclosure in light of
    the ongoing DSPP offering .........................................................18

3.  The Defendants were also required to update
    their February 2008 statements when they later
    became misleading ......................................................................19

D.  Defendants Are Also Liable For Scheming To
    Defraud IndyMac Investors Under Rule 10b-5(a) And
    (c) And Section 17(a)(1) ..................................................................22

E.  The Commission's Disgorgement Claim Is Valid And,
    In Any Event, Assessing That Equitable Remedy
    Now Is Premature ............................................................................24

IV.  CONCLUSION.............................................................................................25

# TABLE OF AUTHORITIES

<u>Page</u>

## <u>CASES</u>

*Anderson v. Liberty Lobby, Inc.*
   477 U.S. 242 (1986)................................................................7

*Bankshares, Inc. v. Sandberg*
   501 U.S. 1083 (1991) .........................................................14

*Caiola v. Citibank, N.A., N.Y.*
   295 F. 3d 312 (2d Cir. 2002) .............................................22

*Celotex Corp. v. Catrett*
   477 U.S. 317 (1986).............................................................7

*Dolphin & Bradbury, Inc. v. SEC*
   512 F.3d 634 (D.D.C. 2008)...............................................13

*Durning v. First Boston Corp.*
   815 F.2d 1265 (9th Cir. 1987) ............................................7

*Fecht v. The Price Co.*
   70 F.3d 1078 (9th Cir. 1995) ................................. 7, 13, 22

*Gallagher v. Abbott Laboratories*
   269 F.3d 806 (7th Cir. 2001) .............................................16

*Howard v. Everex Systems, Inc.*
   228 F.3d 1057 (9th Cir. 2000) .............................................8

*Huddleston v. Herman & MacLean*
   640 F.2d 534 (5th Cir.1981),
   *rev'd in part on other grounds*, 459 U.S. 375 (1983) ........... 13, 22

*In re Apple Computer Secs. Litig.*
   886 F.2d 1109 (9th Cir. 1989) ...........................................21

*In re Bank of America Corp. Sec., Der. and ERIS Litig.*
   757 F.Supp.2d 260 (S.D.N.Y. 2010) ..................................22

*In re Boeing Sec. Litig.*
40 F.Supp.2d 1160 (W.D. Wash. 1998) ........................................................13

*In re Bristol Meyers Squibb Sec. Litig.*
2005 WL 20070004 (D.N.J. Aug. 17, 2005)...............................................15

*In re Burlington Coat Factory*
114 F.3d 1410 (3d Cir. 1997) ................................................. 17, 21

*In re Convergent Sec. Litig.*
948 F.2d 507 (9th Cir. 1991) ................................................. 16, 17

*In re Crown Am. Realty Trust Sec. Litig.*
1999 WL 529581 (W.D. Pa. July 21, 1999)...............................................23

*In re Foxhollow Tech., Inc. Sec. Litig.*
359 App'x 802 (9th Cir. 2009) ........................................................17

*In re Merck & Co., Inc. Sec. Litig.*
2011 WL 3444199 (D.N.J. Aug. 8, 2011) ........................................................9

*In re Novastar Sec. Litig.*
2005 WL 1279033 (W.D. Mo. May 12, 2005)...............................................10

*In re Pfizer Inc. Sec. Litig.*
2012 WL 983548 (S.D.N.Y. Mar. 22, 2012)...............................................8

*In re Prudential Sec. Inc. Ltd. Partnership Litig.*
930 F.Supp. 68 (S.D.N.Y. 1996) ................................................. 13, 22

*In re Time Warner Sec. Litig.*
9 F.3d 259 (2d Cir. 1993) ................................................. 15, 16, 19

*In re Verifone Sec. Litig.*
11 F.3d 865 (9th Cir. 1993) ................................................. 16, 17

*In re Worlds of Wonder Sec. Litig.*
35 F.3d 1407 (9th Cir.1994) ................................................. 12, 13

*Janus Capital Group, Inc. v. First Derivative Traders*
___ U.S. ___, 131 S. Ct. 2296 (2011) ........................................................8, 9

iv

*Middlesex Retirement Sys. v. Quest Software Inc.*
 527 F. Supp. 2d 1164 (C.D. Cal. 2007) ........................................................23

*N.Y. City Emp. Retirement System v. Berry*
 616 F.Supp.2d 987 (S.D.N.Y. 2009) ............................................................18

*Reese v. BP Exploration (Alaska) Inc.*
 643 F.3d 681 (9th Cir. 2011) ......................................................................17

*Ross v. A.H. Robins*, Co.
 465 F.Supp. 904 (S.D.N.Y. 1979),
 *rev'd on other grounds*, 607 F.2d 545 (2d Cir. 1979) ........................... 15, 16

*Rubinstein v. Collins*
 20 F.3d 160 (5th Cir. 1994) ..................................................................... 12, 13

*SEC v. Bangor Punta Corp.*
 331 F.Supp. 1154 (S.D.N.Y. 1971) ..............................................................16

*SEC v. Blavin*
 760 F.2d 706 (6th Cir. 1985) ................................................................... 9, 12

*SEC v. Carter*
 2011 WL 5980966 (N.D. Ill. Nov. 28, 2011) ..................................................8

*SEC v. Church Extension of the Church of God, Inc.*
 429 F.Supp.2d 1045 (S.D. Ind. 2005) ...........................................................25

*SEC v. Conaway*
 2009 WL 902063 (E.D. Mich. March 31, 2009) ...................................... 24, 25

*SEC v. Daifotis*
 2011 WL 3295139 (N.D. Cal. Aug. 1, 2011) ..................................................9

*SEC v. Fehn*
 97 F.3d 1276 (9th Cir. 1996) .......................................................................15

*SEC v. First Pac. Bancorp*
 142 F.3d 1186 (9th Cir. 1998) ......................................................................25

*SEC v. JT Wallenbrock & Assoc.*
 440 F.3d 1109 (9th Cir. 2006) ......................................................................25

*SEC v. Manor Nursing Centers, Inc.*
    458 F.2d 1082 (2d Cir. 1972) ................................................................. 16, 24

*SEC v. Mercury Interactive, LLC*
    2011 WL 5871020 (N.D. Cal. Nov. 22, 2011) ........................................ 9, 18

*SEC v. Mozilo*
    2010 WL 3656068 (C.D. Cal. Sept. 16, 2010) ........................................ 8, 14

*SEC v. Pentagon Capital Management PLC*
    2012 WL 479576 (S.D.N.Y. Feb. 14, 2012) ..................................................9

*SEC v. Phan*
    500 F.3d 895 (9th Cir. 2007) ........................................................................21

*SEC v. Platforms Wireless Int'l Corp.*
    617 F.3d 1072 (9th Cir. 2010) ......................................................................25

*SEC v. Rana Research, Inc.*
    8 F.3d 1358 (9th Cir. 1993) ..........................................................................12

*SEC v. Reys*
    712 F. Supp. 2d 1170 (W.D. Wash. 2010) ....................................................15

*SEC v. Todd*
    642 F.3d 1207 (9th Cir. 2011) ........................................................................7

*Shaw v. Digital Equipment Corp.*
    82 F.3d 1194 (1st Cir. 1996)...................................................... 16, 17, 18, 21

*Shawmut Bank, N.A. v. Kress Associates*
    33 F.3d 1477 (9th Cir. 1994) ........................................................................16

*Siemers v. Wells Fargo & Co.*
    2006 WL 2355411 (N.D. Cal. Aug. 14, 2006)..............................................10

*TSC Indus., Inc. v. Northway Inc.*
    426 U.S. 438 (1976)........................................................................................15

*United States v. Schiff*
    602 F.3d 152 (3d Cir. 2010) ..........................................................................17

*Virginia Bankshares, Inc. v. Sandberg*
    501 U.S. 1083 (1991) ................................................................................21

*Yanek v. STAAR Surgical Co.*
    388 F.Supp.2d 1110 (C.D. Cal. 2005) ...........................................................15

## FEDERAL STATUTES

**<u>Securities Act of 1933</u>**

Section 17(a)
    [15 U.S.C. § 77q(a)] .........................................................................9

## FEDERAL REGULATIONS

Rule 10b-5(a)
    [17 C.F.R. § 240.10b-5(a)] ...............................................................18

Rule 10b-5(c)
    [17 C.F.R. § 240.10b-5(c)] ...............................................................18

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 56(c)............................................................................7

## Note on Citations

Factual citations in this Memorandum are as follows:  (a) citations to transcripts or exhibits to the accompanying Declaration of Nicholas S. Chung are denoted as "**Pl. Ex. __**"; (b) citations to exhibits attached to the Declaration of Jason A. Levine concurrently filed with Defendants' Motions for Partial Summary Judgment are denoted as "**Def. Ex. __**"; (c) citations to the accompanying Commission's Statement of Genuine Issues of Fact (*i.e.*, the response to Defendants' Statement of Undisputed Facts) are denoted as "**Pl. SoGIF ¶ __**"; and (d) citations to the Commission's accompanying Statement of Additional Material Facts that Preclude Summary Judgment are denoted as "**Pl. SoF ¶ __**".

# I.     **INTRODUCTION**

One month away from trial, in the face of ongoing discovery and a record of over 3,000 pages of exhibits and testimony, Defendants Michael Perry and Scott Keys ask this Court to summarily dismiss some, but not all, of the Commission's claims against them. Putting aside the fact that their motions are a waste of judicial resources, they also fail to establish the absence of genuine issues of fact.

This case is about the many false statements and omissions Defendants made in their public filings with the SEC in 2008 as the former CEO and CFO of the now defunct IndyMac Bancorp, Inc. ("IndyMac") and its wholly-owned thrift mortgage bank, IndyMac Bank, F.S.B. (the "Bank"). Each took specific steps to misrepresent or conceal from the investing public IndyMac's deteriorating capital and liquidity condition as the U.S. mortgage market collapsed in early 2008.

The dilemma Perry and Keys faced at the time was how to keep IndyMac's banking regulators at bay, while simultaneously convincing the market that the Bank remained safe and sound. Their solution was to raise dilutive capital, despite having previously assured the market they would not do so; they then failed to disclose that new plan to investors. As the facts demonstrate, this was just one of many material mis-statements and omissions Defendants made to reassure the market that IndyMac had "turned the corner." In fact, and as Defendants well knew, IndyMac was on the precipice of disaster, and it ultimately became one of the most expensive bank failures in U.S. history.

Defendants' fraud also constituted a scheme under the federal securities laws, as it relied on a variety of nefarious means to maintain the Bank's well-capitalized regulatory status, including backdating a capital contribution to the Bank and manipulating the manner in which the Bank calculated its capital ratios.

In short, and as the record shows, triable issues of fact exist regarding Defendants' conduct and misrepresentations. Their motions for partial summary judgment, therefore, should be denied.

1

## II.   STATEMENT OF FACTS[1]

### A.   Background

IndyMac was the publicly-traded holding company for the Bank. Pl. SoF ¶ 1. The Bank originated, traded, and serviced mortgage loans, and also sold whole loans and mortgage-backed securities ("MBS"). As a thrift, the Bank was subject to regulatory capital requirements that measure a bank's safety and soundness. *Id.* ¶ 2. In order to be considered "well-capitalized," the Bank was required to maintain a total risk-based capital ratio of 10% or higher. *Id.* If the Bank fell below that threshold it was subject to various remedial actions by the Office of Thrift Supervision ("OTS"), the most important of which would be the inability to accept brokered deposits absent a waiver from the Federal Deposit Insurance Corporation ("FDIC"). *Id.*

### B.   IndyMac's Direct Stock Purchase Plan

IndyMac had, what it called, a Direct Stock Purchase Program ("DSPP") since at least 2002. *Id.* ¶ 8. The DSPP had two components: a dividend reinvestment plan (or "DRIP"), through which investors could purchase relatively small quantities of stock in open market purchases over the Internet; and a "waiver program," through which IndyMac sold large volumes of newly issued shares to select investors at a 1 to 2.5% discount to the market price. *Id.* ¶¶ 13-15. Under this waiver program, IndyMac and the DSPP's outside administrator privately solicited and accepted bids to purchase stock, so there was no public disclosure of the DSPP capital raising efforts. *Id.* ¶ 17.

As Bears Stearns advised IndyMac in promoting the use of the DSPP, "most importantly there are no signals sent to the market when the Company decides to grant waivers." *Id.* ¶ 18. Perry also understood that capital raising under the waiver

---

[1] This is meant only to be a summary of the genuine issues of material fact that establish Defendants' liability and preclude the granting of summary judgment in their favor. A more detailed recitation of these and other facts is found in the Commission's Statement of Additional Material Facts that Preclude Summary Judgment (cited as "Pl. SoF").

program could be done "all pretty quietly." *Id.* ¶ 19.  Rather, IndyMac only disclosed at the end of quarter what, if anything, it had raised under the DSPP.  *Id.* ¶ 60.

### C.     The Materially Dilutive Effect Of The DSPP Stock Sales

Defendants knew no later than November 2007 that IndyMac's stock price had fallen far below its book value, thus making any capital raising under the DSPP extremely dilutive to existing shareholders.  *Id.* ¶¶ 23-24, 26.  Knowing that dilutive capital raising could be viewed as a sign of financial weakness to the market, and would be a source of concern to existing shareholders, Perry stated during an earnings call on November 6, 2007, that since IndyMac's "stock is trading far below [its] book value … we're not going to out and raise capital through the direct stock purchase plan." *Id.* ¶ 25.  In addition to being dilutive to book value, Perry and Keys also understood that issuing new shares under the DSPP placed downward pressure on IndyMac's stock price.  *Id.* ¶ 26.

As events unfolded in early 2008, IndyMac had no choice but to resort to dilutive capital raising under the DSPP to try to protect the Bank's "well capitalized" regulatory status.  *Id.* ¶ 41.  Perry conceded in his recent deposition that "there was no place to go other than dilute shareholders." *Id.*  Unfortunately, at the time, Defendants were less than candid with the public about IndyMac's business options and the Bank's prospects for survival.

### D.     IndyMac's Publicly-Disclosed "Realistic" 2008 Business Plan

On February 12, 2008, IndyMac filed a Form 8-K releasing its financial results for 2007.  *Id.* ¶ 28.  While IndyMac reported a $509 million loss and the Bank's capital ratio falling from 11.79% to 10.50% in the fourth quarter of 2007, the Defendants presented what they called a "realistic" business plan for 2008 that projected the Bank's capital ratio increasing throughout 2008—*without raising capital by issuing any new shares*—by suspending IndyMac's common dividend and shrinking the Bank's balance sheet.  *Id.* ¶¶ 29-31.  Both Perry's shareholder letter and an accompanying 2007 Webcast presentation, both of which were included in the Form 8-

3

K, emphasized that "due to our low stock price to book value per share, *our 2008 plan does not rely on the capital markets for raising capital*." *Id.* ¶ 30 (emphasis added). Following the filing of the Form 8-K, IndyMac's stock price rose 8.4%. *Id.* ¶ 32.

IndyMac's "realistic" 2008 business plan crumbled just one week later in the face of interest rate fluctuations. *Id.* ¶ 32. Quarter-end projections showed that IndyMac's capital ratio was below the "well-capitalized" 10% threshold. *Id.* ¶¶ 32-33. For that reason, Defendants privately authorized the resumption of stock sales under the DSPP for the purpose of contributing cash down to the Bank to keep the Bank's capital ratio above 10%. *Id.* ¶ 34. Pursuant to Perry's directive, DSPP stock sales resumed on February 26, 2008, and continued, on a nearly daily basis, through May 9, 2008. *Id.* ¶¶ 36, 64.

In all, IndyMac issued over 22 million new shares under the DSPP increasing shares outstanding by over 25%, and raising $98,350,000. *Id.* ¶ 35. Although Perry conceded that IndyMac's resumption of the DSPP in late February, and his plan to raise between $1 and $3 million on a daily basis under that plan, would have been material information to investors, none of that activity was disclosed to the public until May 2008. *Id.* ¶¶ 41-42, 44-46, 69.

### E.   IndyMac's Materially Misleading 2007 Form 10-K

On February 29, 2008, IndyMac filed its 2007 Form 10-K, which Perry and Keys signed. Rather than disclose the resumption of dilutive stock sales under the DSPP on February 26, the Form 10-K merely stated that "we *may* be required to raise capital at terms that are materially adverse to shareholders." *Id.* ¶¶ 57-58. The 2007 Form 10-K also made materially false statements about its capital and liquidity positions, which statements Defendants knew were false and misleading in light of the Bank's deteriorating capital ratios and their plan to contribute capital to the Bank, by way of dilutive capital raising under the DSPP, in order to try to keep the Bank "well-capitalized." *Id.* ¶¶ 53-57, 62.

///

4

**F.     IndyMac's Materially Misleading Updates To The Market**

On March 11, 2008, IndyMac, at Perry's suggestion, issued a Form 8-K which disclosed that "panic market conditions" had led to "credit spreads widening significantly," which was "expected to have a negative effect on the value of [IndyMac's] MBS portfolio, and therefore on the first quarter 2008 forecast presented to shareholders on February 12, 2008." *Id.* ¶ 65.  The Form 8-K then immediately dismissed the effects of the worsening market conditions, asserting that any "potential" negative financial impact was "not warranted" and that those same conditions would have a *positive* financial impact in subsequent quarters.  *Id.*  That filing was materially false and misleading as it failed to disclose that IndyMac had resumed dilutive stock sales under the DSPP three weeks earlier.  *Id.* ¶ 67.

On May 1, 2008, IndyMac filed another Form 8-K, announcing that Keys had taken a sudden medical leave of absence.  *Id.* ¶ 87.  To counteract that negative news, Perry provided a positive financial update to the market, asserting that IndyMac had "turned a corner" and that its business "was improving," and he provided certain facts that purportedly supported his views.  *Id.* ¶ 88-90.

Perry failed to disclose, however, two material events that directly undermined management's positive assessment.  First, on April 23, 2008, Moody's had downgraded a large number of mortgage-backed bonds that negatively affected IndyMac's balance sheet and regulatory capital ratios.  *Id.* ¶ 81.  As Perry recently testified, those downgrades caused "a significant change in the regulatory capital requirement for the second quarter of 2008."  *Id*  On April 24, 2008, Perry informed IndyMac's Board that the Bank would need an additional $120 million in risk-weighted capital, and that the Bank's capital ratio was projected to fall to 9.85% as result of the bond downgrades.  *Id.* ¶ 83.  The impact of those bond downgrades were not disclosed in the May 1st Form 8-K, notwithstanding IndyMac's past practice of promptly updating the market, in a matter of days, on the impact of prior bond downgrades.  *Id.* ¶¶ 46-47.

Second, in light of those bond downgrades and the Bank's need for additional regulatory capital to remain "well-capitalized," Perry, who was the Chairman of the Board of both IndyMac and the Bank, told the Board on April 24th that the preferred dividend payments by both IndyMac and the Bank would be suspended "from here on out." *Id.* ¶¶ 83-84. The Board could have approved Perry's decision that day. *Id.* ¶ 84.[2] Knowing that an announcement of IndyMac's decision to suspend preferred dividends would have a negative effect on IndyMac's stock price and result in an inability to raise even more capital under the DSPP, IndyMac delayed announcing that decision until May 12, 2008, when it filed its first quarter Form 10-Q. *Id.* ¶¶ 75-86. None of this was disclosed in the May 1st Form 8-K. *Id.* ¶¶87-93

### G. IndyMac's False And Misleading May 12, 2008 Form 10-Q

On May 12, 2008, IndyMac filed its first quarter Form 10-Q, which reported the Bank's total risk-based capital ratio at 10.26%. *Id.* ¶ 103. IndyMac was able to report that the Bank remained "well-capitalized" based on two undisclosed material events: (1) the Bank's reported capital ratio included a backdated $18 million capital contribution to the Bank, which was made on May 9, 2008, but was deemed retroactive to March 31, 2008; and (2) IndyMac had changed how it calculated the Bank's capital ratio by no longer double risk-weighting subprime assets, as required by the June 2000 Order from the OTS approving IndyMac's acquisition of the Bank *Id.* ¶¶ 4, 49, 52, 94-106.[3] Both of these events, had they been disclosed, would have been material information to investors. *Id.* ¶¶ 106-108.

---

[2] It is not clear that Board approval was even required for IndyMac to suspend payment of the preferred dividends. *Id.* ¶¶ 85, 86. In addition, given the Bank's rapidly deteriorating capital position, and the likelihood of a "CAMELS" downgrade by the OTS and the FDIC, Defendants knew, no later than April 2008, that IndyMac's regulators would never approve the continued payment of preferred dividends. *Id.* ¶¶ 78-80.

[3] Defendants claim that they obtained a waiver from the OTS to double risk-weight subprime assets in a phone calls in late February 2008. The evidence demonstrates, however, that the Bank continued to report subprime adjusted capital ratios to the OTS in May 2008, just at it had always done. The only thing that changed was that IndyMac no longer reported its subprime adjusted capital ratios in its filings with the Commission. *Id.* ¶¶ 48-51.

**H.      IndyMac's False And Misleading DSPP Prospectuses**

For the DSPP stock sales beginning on February 26, 2008, IndyMac relied on a DSPP prospectus previously filed on October 11, 2007. *Id.* ¶¶ 9-12. Two more supplemental prospectuses were filed on April 3 and May 2, 2008. *Id.* Each of which registered an additional 10 million shares under the DSPP. *Id.* These prospectuses were part of a June 2006 Form S-3 shelf registration statement, which Perry and Keys signed. *Id.* ¶ 70. All three prospectuses were materially misleading as they incorporated by reference IndyMac's SEC filings, including the 2007 Form 10-K, the May 1, 2008 Form 8-K and the May 12, 2008 Form 10-Q. *Id.* ¶¶ 10, 52-63, 87-93, 103-108.

## III.  <u>ARGUMENT</u>

Summary judgment is only appropriate when no genuine disputes of material fact exist, and the moving party has the burden of demonstrating the absence of triable issues of fact. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A genuine factual dispute exists when there is sufficient evidence for a rational trier of fact to find in favor of the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making that assessment, courts must view the evidence in the light most favorable to the non-movant, "and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

Because the Commission's case challenges the truth and materiality of disclosures, summary judgment "is only appropriate when the adequacy of the disclosure is 'so obvious that reasonable minds could not differ.'" *SEC v. Todd*, 642 F.3d 1207, 1220-21 (9th Cir. 2011) (reversing summary judgment for defendant before bench trial) (*quoting Fecht v. The Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995); *Durning v. First Boston Corp.*, 815 F.2d 1265, 1268 (9th Cir. 1987)).

Because they have failed to satisfy this burden, each of Defendants' motions should be denied.

///

1   **A.    Both Defendants Can Be Held Liable For The False And**
2   **Misleading DSPP Prospectuses**

3   Relying on *Janus Capital Group, Inc. v. First Derivative Traders*, __ U.S. __,
4   131 S. Ct. 2296 (2011) , Perry attempts to avoid liability for the DSPP prospectuses
5   by claiming he did not "make" any of the prospectuses' false and misleading
6   statements.  *See* Def. Mot. at 22-23.  Notably, Keys does not join in this argument.

7   Perry's argument fails for a simple reason—he signed the Form S-3 shelf
8   registration statement that registered the shares offered through the prospectuses.
9   *See* Pl. SoF ¶ 9.  Because the Form S-3 and the DSPP prospectuses each explicitly
10  state that the prospectuses are "part of the registration statement" (*see id.*, ¶ 11), by
11  signing the Form S-3, Perry became responsible for any statements in the
12  prospectuses.  *See Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1061 (9th Cir.
13  2000) (holding signers of SEC documents responsible for the statements they sign);
14  *SEC v. Mozilo*, 2010 WL 3656068, *15 (C.D. Cal. Sept. 16, 2010) (Walter, J.)
15  (holding defendant liable for misstatements in Form 10-K because he signed Form
16  S-3 incorporating Form 10-K by reference).

17  Therefore, whether or not Perry signed the prospectuses is irrelevant; indeed,
18  no one signed them.  *See id.* ¶ 12.  Under Perry's logic no one would be responsible
19  for the misleading statements and omissions in the DSPP prospectuses and the
20  documents they incorporate.  Nothing under *Janus* commands such an absurd result.
21  *See In re Pfizer Inc. Sec. Litig.*, 2012 WL 983548, at *4 n.3 (S.D.N.Y. Mar. 22,
22  2012) (defendant signing public filings sufficient under *Janus*); *SEC v. Carter*, 2011
23  WL 5980966, at *2-3 (N.D. Ill. Nov. 28, 2011) (defendant CEO signing Form 8-K
24  attaching press release sufficient to hold him liable for release under *Janus*).[4]

25
26  [4]  In any event, *Janus* "certainly cannot be read to restrict liability for Rule 10b-5 claims against
    corporate officers to instances in which a plaintiff can plead, and ultimately prove, that those
27  officers—as opposed to the corporation itself—had 'ultimate authority' over the statement." *In
    re Merck & Co., Inc. Sec. Litig.*, 2011 WL 3444199, at *25 (D.N.J. Aug. 8, 2011) (*quoting
28  Janus*, 131 S. Ct. at 2302).  Thus, genuine issues of material fact remain as to whether Perry's
    involvement with the preparation and dissemination of the DSPP prospectuses—including his

1    Perry's argument also fails because *Janus* was limited to interpreting the word

2  "make" in Rule 10b-5(b) for implied private right of actions. As such, courts in this

3  and other Circuits have refused to hold that *Janus* applies to claims under Section

4  17(a) (whose language and purpose differ from Rule 10b-5(b)) or to claims for

5  scheme liability (which are brought under Rule 10b-5(a) and (c)), and there is no

6  reason for this Court to do so here. *See SEC v. Daifotis*, 2011 WL 3295139, at \*5-6

7  (N.D. Cal. Aug. 1, 2011); *SEC v. Mercury Interactive, LLC*, 2011 WL 5871020, at

8  \*3 (N.D. Cal. Nov. 22, 2011); *SEC v. Pentagon Capital Management PLC*, 2012

9  WL 479576, at \*42 (S.D.N.Y. Feb. 14, 2012); *SEC v. Geswein*, 2011 WL 4565861,

10  at \*2 (N.D. Ohio Sept. 29, 2011).

11    **B.    Defendants Are Liable For Material Misrepresentations In the**

12           **2007 Form 10-K And DSPP Prospectuses**

13       **1.    The 2007 Form 10-K misrepresented IndyMac's capital**

14             **raising activity through the DSPP**

15    The 2007 Form 10-K signed by Defendants falsely stated that IndyMac "*may*

16  be required to raise capital at terms that are materially adverse to shareholders."

17  Def. Ex. M (10-K) at 304 (emphasis added). It is undisputed that when the Form

18  10-K was filed, IndyMac had already commenced raising dilutive capital under the

19  DSPP. *See id.* ¶¶ 32-35. That makes the disclosure in the Form 10-K materially

20  misleading on its face, especially since Defendants had, just two weeks earlier, told

21  investors IndyMac would *not* raise new capital. *See id.* ¶ 30; *SEC v. Blavin*, 760

22  F.2d 706, 711 (6th Cir. 1985) (statement that defendant advisory firm "'may' trade"

23  "for its own account" was "material misstatement" because firm was already doing

24  so).[5] Even Perry concedes that the Form 10-K "didn't disclose … we had begun

25  —————————————————————————————

26  ratifying and approving them as a board member (*see id.* ¶¶ 70, 72)—is sufficient under *Janus*.
   *See id.* (CEO deemed "maker" under *Janus* because "[h]e made the statements pursuant to his

27  responsibility and authority to act as an agent of Merck, not as in *Janus*, on behalf of some
   separate and independent entity").

28  [5] *See also Siemers v. Wells Fargo & Co.*, 2006 WL 2355411, \*5 (N.D. Cal. Aug. 14, 2006)
   (statements that mutual fund "*may*" consider sales of fund shares in selecting advisor was

9

1    raising dilutive capital," and that IndyMac's plan to raise $1-3 million per day for

2    the remainder of the year would have been material to shareholders.

3         Pointing to a different section of the Form 10-K, Defendants contend that

4    IndyMac disclosed the DSPP was in current use.  In particular, Defendants refer to

5    statements in the Form 10-K explaining that IndyMac (1) "*has* a direct stock purchase

6    plan which *offers* investors the ability to purchase shares of our common stock

7    directly over the Internet," and (2) "[i]nvestors interested in investing more than

8    $10,000 *can* also participate in the waiver program."  Def. Mot. at 10; Def. Ex. M (10-

9    K) at 247.  But merely stating that IndyMac has a DSPP plan is not the same as

10   disclosing that the holding company was, in fact, using it.  Keys himself

11   acknowledged in his deposition that these disclosures have nothing to do with the

12   capital raising activity in 2008.  Pl. SoF ¶ 61.[6]

13        Defendants also argue that the statements that IndyMac "may be required" to

14   raise capital were accurate because "testimony" shows that these statements refer to

15   a potential "transaction to raise $500 million."  Def. Mot. at 11.  The "testimony"

16   they cite, however, does not even mention the Form 10-K.  *See id.* (*citing* Def. Ex. O

17   at 425).  Also, the risk factor stating that IndyMac "may raise capital" makes no

18   mention of a "possible" $500 million deal.  Defendants' only "evidence" of this

19   transaction comes from an internal email.  *See* Pl. SoGIF ¶ 26.

20

21   _____

22   misleading because "in truth, the investment advisor had *already* entered into firm kickback
     arrangements") (emphasis in original and added); *In re Novastar Sec. Litig.*, 2005 WL

23   1279033, at *3-4 (W.D. Mo. May 12, 2005) (statement that company's failure to comply with
     regulation "'*could* adversely affect our operations and profitability'" was misleading because it

24   had *already* been fined for not complying with regulations) (emphasis added).

25   [6]  The first disclosure only describes the DSPP program that allows investors to buy shares on the
     open market, as opposed to the DSPP's "waiver program" which was the part of the DSPP

26   IndyMac used in 2008.  *See id.* ¶¶ 13-15.  The other disclosure Defendants identify just
     explains that this waiver program is limited to investors purchasing more than $10,000 per

27   month (typically institutional investors).  *See id.*  Neither discloses anything about IndyMac's
     dilutive capital raising activity in 2008, or that IndyMac had actually resumed stock sales under

28   the DSPP at that time.  Indeed, one of the principal benefits of the DSPP waiver program was
     that capital could be raised without sending any signals to the market.  *Id.* ¶¶ 18-19.

Finally, Defendants argue that this risk factor does not address the DSPP capital raising activity in 2008 because it only addresses capital raising that is "very dilutive," while in a February 2008 email Perry said the dilutive effect of the DSPP capital raising was "relatively minimal." Def. Mot. at 11; Def. Ex. D (email) at 143; Def. Ex. M (10-K) at 247. But in 2007, when Perry was assuring investors he would not raise capital, he actually said the exact opposite—that to raise capital under the DSPP would be "*extremely* dilutive to existing shareholders." Pl. SoF ¶ 25. Also, in his email, Perry is merely comparing the dilutive effect of raising $10-15 million in four days "versus everything else we can do." Def. Ex. D at 143.

Ultimately, the Defendants' subjective, after-the-fact construction of the words they used in the Form 10-K is irrelevant. IndyMac issued and sold over 22 million shares using the DSPP between February 26 and May 9, all at prices far below book value, which unquestionably had a material dilutive effect on IndyMac's shareholders. So instead what matters here is whether reasonable investors would have found that material, and there is uncontroverted evidence that they did. *See id.* ¶ 44.

### 2. The 2007 Form 10-K and DSPP prospectuses also misstated IndyMac's capital and liquidity condition

The 2007 Form 10-K and the DSPP prospectuses also falsely misrepresented the capital and liquidity strength of IndyMac. Specifically, the Form 10-K stated that IndyMac "currently believe[s] [its] liquidity level is sufficient to satisfy our operating requirements and meet our obligations and commitments in a timely and cost effective manner." Def. Ex. M (10-K) at 291.

That statement was demonstrably false when IndyMac filed the Form 10-K. At that time, a February 19th internal forecast showed the Bank's projected capital ratio falling below the 10% regulatory threshold. *See id.* ¶ 32. Because of that forecast, Defendants initiated a plan to rapidly raise dilutive capital and downstream cash to the Bank, thus jeopardizing the holding company's ability to pay its

11

1  dividends and other commitments. *See id*. ¶¶ 33-34.

2  Defendants claim that this statement was not false because IndyMac's "best

3  forecast" when it filed the Form 10-K "was that the … capital ratio would exceed"

4  10%. Def. Mot. at 16. That is not correct. The evidence clearly shows that this so-

5  called "best forecast" was made *after* the Form 10-K was filed on that day. The

6  "best forecast" available at the time of filing of the 10-K showed the capital ratio

7  dropping *below* 10%. *See id.* ¶ 32. Even if that February 29th forecast was

8  available before the Form 10-K was filed, it was based on the unreasonable

9  assumption that interest rates would not continue to vary. Def. Ex. G; Pl. SoF ¶¶

10  62-63. Not surprisingly, IndyMac took no solace in their so-called "best forecast"

11  and continued to raise dilutive capital under the DSPP on a nearly daily basis

12  through early May 2008. *See id*.

13  Defendants also argue that the statement about liquidity is not actionable

14  under the "bespeaks caution" doctrine because it is both "forward-looking" and

15  accompanied by "specific warnings and cautionary language." Def. Mot. at 14-16.

16  The "bespeaks caution" doctrine, however, does not apply to SEC enforcement

17  actions. That doctrine is premised on an investors' reasonable reliance on

18  cautionary language that puts allegedly misleading statements in context. *See In re*

19  *Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1414 (9th Cir.1994); *Rubinstein v.*

20  *Collins*, 20 F.3d 160, 167 (5th Cir. 1994). Because the Commission does not have

21  to prove reliance in an SEC enforcement action, the reasonableness of an investor's

22  reliance is irrelevant. *See SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1364 (9th Cir.

23  1993). As such, the "bespeaks caution" doctrine has no bearing here. *See Blavin*,

24  760 F.2d at 711 (rejecting defendant's argument that cautionary language shielded

25  him from liability for misstatements because SEC does not have to prove reliance).

26  Even if the doctrine did apply, it has "significant limitations" that render it

27  inapposite here. *In re Prudential Sec. Inc. Ltd. Partnership Litig.*, 930 F.Supp. 68,

28  72 (S.D.N.Y. 1996); *In re Boeing Sec. Litig.*, 40 F.Supp.2d 1160, 1170 (W.D. Wash.

1998) (doctrine is "applied narrowly").[7]  First, "cautionary language does not protect material misrepresentations or omissions when defendants knew they were false when made."  *In re Prudential*, 930 F.Supp. at 72; *Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634, 640 (D.D.C. 2008) (defendant's "cautionary language only disclosed a risk that tenants *might* leave [office]—not his knowledge that [a tenant] *actually planned* to do so in the near future").  As discussed above, the Commission's evidence establishes that the Defendants knew, or were reckless in not knowing, that the statement in the 2007 Form 10-K touting the thrift's capital and liquidity strength was false when made.

Second, the alleged misstatements must be accompanied by "'enough cautionary language or risk disclosure,' that 'reasonable minds' could not disagree that the challenged statements were not misleading."  *Fecht*, 70 F.3d at 1082 (*quoting In re Worlds of Wonder*, 35 F.3d at 1413).  The "bespeaks caution" doctrine "provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away."  *In re Prudential*, 930 F. Supp. at 72; *Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir.1981), *rev'd in part on other grounds*, 459 U.S. 375 (1983).

That is precisely the problem with the disclaimers here—Defendants warn of a ditch, when they know IndyMac's capital position is already at the precipice.  For example, Defendants' refer to the claim in the Form 10-K that "while we currently have regulatory capital ratios in excess of the 'well-capitalized' status, there can be no assurance that we will not suffer material losses."  Def. Mot. at 16; Def. Ex. M (10-K) at 304.  That statement, however, offers no cautionary warning because the Bank's ratio was already projected to be below 10%.  *See* Pl. SoF ¶ 32.  Similarly, Defendants argue that the February 12, 2008 Form 8-K has a disclaimer which

---

[7]    *See also Rubinstein*, 20 F.3d at 168 (mere existence of cautionary language is not a "*per se*" bar to recovery); *Fecht*, 70 F.3d at 1082 ("[i]nclusion of some cautionary language is not enough to support a determination as a matter of law that defendants' statements were not misleading").

cautions that market fluctuations "*could*" lead to changes in forecasts and adversely impact IndyMac's capital ratios, including one scenario where the ratio drops to 9.78%. Def. Mot. at 16; Def. Ex. A (8-K) at 39, 117.  But this disclaimer only warns that which has already happened, might happen—namely, interest rate fluctuations had already caused the Bank's projected quarter-end capital ratio to fall below 10% before the Form 10-K was filed.  *See id.* ¶ 32.[8]

Third, cautionary language cannot be meaningless boilerplate.  "[E]ven if [the cautionary] information is part of the total mix, the information must be transmitted with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by the insiders' one-sided representations." *Mozilo*, 2010 WL 3656068, *9 (quotations omitted).[9]  For this reason, the other two disclaimers identified by Defendants fail to insulate them from liability.  *See* Def. Mot. at 15.  One concerns the risks of "liquidity" in the secondary markets for mortgage- and asset-backed securities, and the other addresses risks associated with regulatory action from the Federal Home Loan Board and the Federal Reserve Board.  Def. Mot. at 15.  Neither disclaimer has anything to do with IndyMac's deteriorating capital and liquidity conditions, or its falling capital ratio.  As such, they are not sufficiently "tailored" to the alleged misstatements.  *SEC v. Reys*, 712 F. Supp. 2d 1170, 1176 (W.D. Wash. 2010).[10]

---

[8]  The disclaimer language in the Form 8-K has no bearing on the misleading statements in the Form 10-K.  In SEC enforcement actions, which do not involve a "fraud-on-the-market" presumption of reliance, "'[i]nvestors are not generally required to look beyond a given document to discover what is true and what is not'" *Mozilo*, 2010 WL 3656068 at *8-9 (because cautionary information must be "so readily available that a reasonable investor would consider it as part of the total mix of information," "omissions … are not rendered immaterial as a matter of law simply because the omitted facts were available to the public elsewhere") (quotations omitted); *see also Fecht*, 70 F.3d at 1082.

[9]  As the Supreme Court explained, "not every mixture with the true will neutralize the deceptive. If it would take a financial analyst to spot the tension between the one and the other, whatever is misleading will remain materially so, and liability should follow." *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991).

[10]  *See also Yanek v. STAAR Surgical Co.*, 388 F.Supp.2d 1110, 1123 (C.D. Cal. 2005) (Otero, J.) (cautionary language "inadequate" because they were too "broad" and "does not meaningfully

14

Therefore, the 2007 Form 10-K was materially misleading, as were the DSPP prospectuses that incorporated the 10-K by reference. At a minimum, triable issues of fact exist which preclude summary judgment.

## C. Defendants Are Liable For The Material Omissions In The 2007 Form 10-K, The DSPP Prospectuses And Other SEC Filings

In addition to the material misstatements in the Form 10-K and DSPP prospectuses, Defendants failed to disclose several material events from February to May 2008. There is "'a duty to disclose material facts that are necessary to make disclosed statements, whether mandatory or volunteered, not misleading.' That duty is a general one, and arises whenever a disclosed statement would be 'misleading' in the absence of the 'disclosure of additional material facts' needed to make it not misleading." *SEC v. Fehn*, 97 F.3d 1276, 1290 n.12 (9th Cir. 1996) (*quoting Hanon v. Dataproducts Corp.*, 976 F.2d 497, 504 (9th Cir.1992)).[11]

Defendants also had a duty to update the market when the assurances previously given in the February 2008 Form 8-K and the 2007 Form 10-K became misleading. "A duty to disclose arises when disclosure is necessary to make prior statements not misleading." *In re Time Warner Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993); *Ross v. A.H. Robins*, Co., 465 F.Supp. 904, 908 (S.D.N.Y. 1979), *rev'd on other grounds*, 607 F.2d 545 (2d Cir. 1979) ("there is a duty to correct or revise a prior statement which was accurate when made but which has become misleading due to subsequent events")); *see also Shawmut Bank, N.A. v. Kress Associates*, 33 F.3d 1477, 1488 (9th Cir. 1994) (citing *Ross* and recognizing that "such a duty exists").

---

address the risks"). Defendants also contend that the use of the word "believe" alone indicates that the alleged misstatement is "forward-looking" and indicative of "risk and uncertainties." Def. Mot. at 15. But a defendant cannot rely on the very same language he claims makes a statement forward-looking to also be the cautionary language. *See In re Bristol Meyers Squibb Sec. Litig.*, 2005 WL 20070004, * 52 (D.N.J. Aug. 17, 2005).

[11] *See also TSC Indus., Inc. v. Northway Inc.*, 426 U.S. 438, 449 (1976) (if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available").

1    Moreover, whenever there is an offer and sale of securities in progress, parties

2    have a "heightened" duty of disclosure. *See SEC v. Manor Nursing Centers, Inc.*,

3    458 F.2d 1082, 1099 (2d Cir. 1972) ("the effect of the antifraud provisions of the

4    1933 and 1934 Acts is to require that the prospectus reflect post-effective

5    developments which make the prospectus misleading in any material respect").[12]

6    This "need for complete and prompt disclosure is particularly keen when a

7    corporation issues stock pursuant to a 'shelf registration." *Shaw v. Digital*

8    *Equipment Corp.*, 82 F.3d 1194, 1208 (1st Cir. 1996). The SEC regulation allowing

9    shelf registrations "permits offerings to be made on a 'continuous' or 'delayed' basis

10   because it envisions 'continuous' disclosure." *Id.* at 1209. Therefore, in addition to

11   Defendants' duty to update previous statements in the 2007 Form 10-K and the

12   Form 8-K that subsequently became misleading (*see In re Time Warner*, 9 F.3d at

13   267), ongoing duty to disclose material information while capital was being raised

14   under the DSPP shelf registration. *See Shaw*, 82 F.3d at 1208.[13]

15            **1.    Defendants cannot escape their disclosure obligations**

16            Relying on the Ninth Circuit's holdings in *Verifone* and *Convergent*,

17   Defendants contend the ongoing DSPP stock sales did not create a "heightened"

18   disclosure duty. Def. Mot. at 20. Both cases are distinguishable, however, because

19   they involve questions about the disclosure of internal projections, which is not at

20   issue here. *See In re Verifone Sec. Litig.*, 11 F.3d 865, 869 (9th Cir. 1993) (alleged

---

21

22   [12]  *See also Gallagher v. Abbott Laboratories*, 269 F.3d 806, 810-11 (7th Cir. 2001) ("A
      registration statement and prospectus for a new issue of securities must be accurate when it is
23   used to sell stock, and not just when it is filed."); *SEC v. Bangor Punta Corp.*, 331 F.Supp.
      1154, 1160 n. 10 (S.D.N.Y. 1971) (prospectus must "reflect any post-effective changes
24   necessary to keep the prospectus from being misleading in any material effect").

25   [13]  Despite what Defendants may argue (*see* Def. Mot. at 16-17), whether or not the February 2008
      Form 8-K was incorporated into the DSPP prospectuses is irrelevant. Independent of the
26   continuous duty to disclose arising from the ongoing DSPP sales (*Shaw*, 82 F.3d at 1208),
      Defendants had a duty to update any statements in the Form 8-K that may have been accurate
27   when made, but which later became misleading due to subsequent events. *In re Time Warner*,
      9 F.3d at 267; *Ross*, 465 F.Supp. at 908. That duty was enhanced for statements in the Form
28   10-K because that SEC filing was incorporated into the prospectuses.

                                              16

1   omissions were "failures to make a forecast of future events"); *In re Convergent*

2   *Sec. Litig.*, 948 F.2d 507, 516 (9th Cir. 1991) (holding that defendant "was not

3   obliged to disclose … internal projections"). Also, neither case addresses the issue,

4   present here and in *Shaw*, of "whether the nondisclosure of interim facts rendered

5   [a] prospectus materially incomplete." *Shaw*, 82 F.3d at 1210-11 (distinguishing

6   *Verifone* and *Convergent*). In contrast to the cases Defendants cite, this action

7   challenges Defendants' refusal to disclose, during an ongoing shelf registration

8   offering, that IndyMac was forced to sell "highly dilutive" capital because internal

9   forecasts had revealed a deteriorating capital ratio just weeks after Defendants

10  publicly vowed not to raise dilutive capital.

11      Defendants also argue there is no "duty to update statements that were true

12  when made." Def. Mot. at 17. In support of that argument, Defendants do not cite a

13  single case involving an ongoing offering of securities, like we have in this case.

14  *See id.* (*citing In re Foxhollow Tech., Inc. Sec. Litig.*, 359 App'x 802, 804 (9th Cir.

15  2009) (no sale of securities while alleged omissions made) and *Reese v. BP*

16  *Exploration (Alaska) Inc.*, 643 F.3d 681, 693 (9th Cir. 2011) (same)).

17      Defendants also contend that the duty to update "can … apply only where the

18  initial statement concerns 'fundamental changes' in the nature of the company."

19  Def. Mot. at 19. Defendants rely on the Third Circuit's *dicta* in *United States v.*

20  *Schiff*, 602 F.3d 152 (3d Cir. 2010), which in turn cites *In re Burlington Coat*

21  *Factory*, 114 F.3d 1410, 1433-34 (3d Cir. 1997), for the proposition that the duty to

22  update is "'narrow' because of 'the potential to create a sweeping continuing

23  obligation for corporations when they disclose information.'" Def. Mot. at 19

24  (*quoting Schiff*, 602 F.3d at 170). But, again, neither of these cases addresses the

25  duty to update in the context of an ongoing offering. As the First Circuit explained

26  in *Shaw*, during a shelf registration offering, the duty to disclose material

27  information is a continuing obligation. *Shaw*, 82 F.3d at 1208.

28      Moreover, the fact that the Commission is alleging scheme liability (discussed

below) renders Defendants' arguments that they had no duties to disclose or update irrelevant. Claims alleging a scheme to defraud are significantly different from claims alleging misstatements or omissions because a scheme claim "encompasses conduct beyond disclosure violations." *N.Y. City Emp. Retirement System v. Berry*, 616 F.Supp.2d 987, 995 (S.D.N.Y. 2009). As Defendants acknowledge, liability under Rules 10b-5(a) and (c) can exist "without making a false statement." Def. Mot. at 24. Thus, these claims are premised on conduct that only "makes it 'necessary or inevitable' that misrepresentations are made." *Berry*, 616 F. Supp. 2d at 996.[14] Therefore, the extent of disclosure, and the duty to make them, have no bearing on scheme liability. Accordingly, whether Defendants had a duty to disclose during the capital raising under the DSPP shelf registration or had a duty to update prior statements during that period are irrelevant as long as scheme liability is established.

### 2. Defendants had a duty of disclosure in light of the ongoing DSPP offering

Because IndyMac's DSPP capital raising was accomplished through a Form S-3 shelf registration, Defendants had an ongoing duty of disclosure. Despite this, Defendants did not disclose that IndyMac was selling shares in the market and had abandoned its 2008 plan to avoid dilutive capital raising. Indeed, as discussed above, the Form 10-K gave the impression that raising capital was just a mere possibility. In addition, Defendants failed to disclose that the reason IndyMac was raising dilutive capital at that time was because its capital ratio was below 10% and its capital position was deteriorating. The Form 10-K was completely silent on this issue, and the DSPP prospectuses only vaguely stated that the funds raised would be used for "general corporate purposes." Pl. SoF ¶ 21; *see also* 17 C.F.R. § 229.504.

These were all material, misleading omissions. Defendants, however, argue that statements in the 2007 Form 10-K "made clear that the only *possible* use of

---

[14] *See also Mercury Interactive, LLC*, 2011 WL 5871020 at *3 ("fraudulent scheme claim under Rule 10b-5(a) or (c) cannot be premised on the alleged misrepresentations or omission that form the basis of a Rule b-5(b) claim").

cash raised through the DSPP was to support the Bank or pay dividends." Def. Mot. at 11 (emphasis added). But the issue is not whether the holding company *might* use DSPP funds to support the Bank or pay dividends. Rather, the issue was whether Defendants had disclosed to the market that IndyMac had to sell stock in a highly dilutive manner in order to raise cash to maintain the Bank's capital position and pay dividends. None of the statements Defendants point to disclose those facts.

### 3. The Defendants were also required to update their February 2008 statements when they later became misleading

The Defendants also had a duty to update the prior statement in the Form 10-K that IndyMac had "strong capital and liquidity positions." Def. Ex. M (10-K) at 254. That statement became misleading when it became clear, with the Bank's falling capital ratio, that IndyMac and the Bank's capital and liquidity positions were deteriorating to such an extent that Defendants had to renege on their earlier assurance not to raise dilutive capital. *See In re Time Warner*, 9 F.3d at 267. Defendants, however, argue that this disclosure only refers to the thrift's health as of December 31, 2007, and not as of the February 29, 2008 10-K filing date. *See* Def. Mot. at 13-14. But that misses the main point here. It is not that this statement was false as of year-end. Rather, Defendants knew, or were reckless in not knowing, that touting IndyMac's and the Bank's capital and liquidity strength became misleading when IndyMac had to resort to dilutive capital raising, purported OTS waivers, dividend suspensions, and backdated capital contributions to try to preserve the Bank's "well-capitalized" regulatory status health. *See id.* ¶¶ 75-108.

In addition, several statements in the February 2008 Form 8-K, which each Defendant signed, also had to be updated. Most importantly, in the 8-K, IndyMac stated that its "2008 plan does *not* rely on the capital markets for raising capital" because its "stock price to book value per share" was too "low." Def. Ex. A (8-K) at 95 (emphasis added). When Defendants began raising dilutive capital 14 days later, they were required to inform the market of their about-face, as knowledge of such a

19

1  change would have clearly been material to investors.  Similarly, Perry's letter to the

2  shareholders attached to the Form 8-K also stated that "we remain in a

3  "fundamentally sound financial position" and "our capital levels continue to exceed

4  the levels defined as 'well capitalized' by our regulators."  Def. Ex. A (8-K) at 80.

5  Defendants had a duty to update the market when this statement was no longer true

6  as IndyMac's capital health was deteriorating and the Bank's capital ratio was

7  projected to fall below the 10% "well-capitalized" threshold.

8       Defendants also had a duty to update the other statements in the February

9  2008 Form 8-K that later became false.  Specifically, it was reported that:  (1) the

10  Bank's projected capital ratio at March 31, 2008, was 10.59% (Def. Ex. A at 124);

11  (2) "the Bank will continue to meet its 'well-capitalized' minimum capital

12  requirements for the foreseeable future" (*id*. at 39); (3) "our balance sheet size will

13  decline and our capital ratios will increase over the course of 2008" (*id*.); (4)

14  IndyMac had "enough cash to pay [the dividends] for over 2 years without any

15  dividends from the Bank or additional debt or equity raised" (*id*. at 96); and, (5) in

16  Perry's letter to shareholders attached to the Form 8-K, "we can maintain our 'well-

17  capitalized' capital ratios even under worsening industry conditions."  *Id*. at 80.

18       Each of these statements became misleading after the Form 8-K was filed.

19  Within weeks, Defendants knew (or were reckless in not knowing) that the Bank's

20  projected capital ratio was below 10%.  As a result, the Bank could no longer

21  realistically claim that it could meet its "'well-capitalized' minimum capital

22  requirements for the foreseeable future," that its "capital ratios will increase" or that

23  it could maintain a capital ratio above 10% in "worsening economic conditions."

24  And in April 2008, Defendants knew (or were reckless in not knowing) that IndyMac

25  could no longer pay its dividends, and on April 24, Perry instructed the board that

26  payments would be suspended "from here on out."  *Id. ¶¶* 84-85.

27       Defendants, however, argue that the statement that IndyMac was in a

28  "fundamentally sound financial position" did not need to be updated because it was

1  "mere puffery." Def. Mot. at 21. But, again, because there was an ongoing shelf

2  registration offering, Defendants had a continuous duty to keep the investors

3  informed of material information. *Shaw*, 82 F.3d at 1208.[15]

4        Defendants further contend they had no duty to update these prior statements

5  because the disclosures did not "remain alive in the minds of investors." Def. Mot.

6  at 18. That forward-looking projections need to be "alive" is derived from the Third

7  Circuit's holding in *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1432.

8  But in that case, the Third Circuit was only addressing whether updates were

9  required of "ordinary, run-of-the-mill forecasts, such as earnings projections," which

10  are not at issue here. *Id.* There was also no ongoing offering like we have in this

11  case, which imposed an enhanced duty to update. *See Shaw*, 82 F.3d at 1208. In

12  any event, what remains "alive" in the minds of reasonable investors is a triable

13  issue of fact. This is especially true given the uncontroverted testimony of IndyMac

14  investors and analysts who believed that the undisclosed information about

15  IndyMac's true financial condition was material. *See id.* ¶¶ 44, 106, 108 (third-

16  party declarations of investors and analysts); *see also SEC v. Phan*, 500 F.3d 895,

17  908 (9th Cir. 2007) ("Materiality generally cannot be determined on summary

18  judgment because it depends on determining a hypothetical investor's reaction to the

19  alleged misstatement.").

20        Finally, Defendants argue that disclaimers shield them from liability for

21  failing to update the market as these statements became misleading. *See* Def. Mot.

22  at 19. But, as discussed above, even if the "bespeaks caution" doctrine applied here,

23  cautionary language can only absolve them of liability if the disclaimers "precisely

24

---

25  [15] In any event, "general expressions of optimism may be actionable under the federal securities

26  laws." *In re Apple Computer Secs. Litig.*, 886 F.2d 1109 (9th Cir. 1989); *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090-91 (1991) (knowingly false statements of reasons,

27  opinion, or belief, even though conclusory in form, may be actionable as misstatements of material fact). That is particularly true here, when the language Defendants call "puffery"—

28  "fundamentally sound financial position"—is far from the kind of "feel good monikers" normally associated with nonactionable puffery.

address the substance of the specific statement or omission that is challenged." *In re Prudential*, 930 F.Supp. at 72.  For the reasons give above, none of the disclaimers Defendants identify meet that standard.  Also as previously explained, it is not enough to merely caution investors about the possibility of capital problems, when those problems already exist.  "To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir. 1981), *rev'd in part on other grounds*, 459 U.S. 375 (1983).  None of Defendants' disclaimers offer "enough cautionary language or risk disclosure, that reasonable minds could not disagree that the challenged statements were not misleading." *Fecht*, 70 F.3d at 1082.

Finally, Defendants can take no refuge in their March 11 and May 1, 2008 Form 8-Ks, which purportedly updated the market.  The March 11th Form 8-K was false and misleading as it failed to disclose the resumption of DSPP sales three weeks earlier.  Similarly, although the May 1st Form 8-K finally disclosed IndyMac's DSPP sales, that filing was also false and misleading because it failed to disclose the impact of the MBS downgrades and IndyMac's decision to suspend payment of the preferred dividends.  All of this would have been material information to investors had it been disclosed.  Furthermore, the May 1st Form 8-K rendered IndyMac's May 2nd prospectus false and misleading as it was incorporated therein.[16]

### D.   Defendants Are Also Liable For Scheming To Defraud IndyMac Investors Under Rule 10b-5(a) And (c) And Section 17(a)(1)

In addition to alleging that Defendants misstated and omitted material facts in

---

[16]  Whenever a defendant voluntarily makes disclosures to the public, he must do so with candor and truth.  *See In re Bank of America Corp. Sec., Der. and ERIS Litig.*, 757 F.Supp.2d 260 (S.D.N.Y. 2010) ("'upon choosing to speak, one must speak truthfully about material issues'") (*quoting Caiola v. Citibank, N.A., N.Y.*, 295 F. 3d 312, 331 (2d Cir. 2002)).  Therefore, when IndyMac filed two DSPP prospectuses in April and May 2008, and filed two Forms 8-K on March 11 and May 1, 2008, Defendants had the duty to disclose material information known at the time to ensure that those filings were not materially misleading.

the SEC filings, the Commission has also alleged that they engaged in a scheme to defraud the market about IndyMac's capital strength. Scheme liability is established where a defendant "engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme." *Middlesex Retirement Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1191 (C.D. Cal. 2007) (Carter, J.).

Here, the evidence establishes that Defendants took specific steps to conceal IndyMac's deteriorating capital and liquidity positions. To give the false impression that IndyMac and the Bank had sufficient capital, Defendants manufactured the Bank's capital ratio to remain above the all-important 10% regulatory threshold. To achieve this, they first initiated a clandestine plan to raise $1-3 million in capital on a daily basis through the DSPP "waiver program," without disclosing any of that to the market. *See id.* ¶¶ 32-35. Also, in order to more easily hit the well-capitalized 10% capital ratio, Defendants changed how IndyMac calculated its capital ratio by no longer double risk-weighting subprime assets. *See id.* ¶¶ 48-51. Later, in April 2008, when it became clear that the holding company, depleted of cash, would not have enough funds to pay its preferred dividends, Perry delayed Board approval of the suspension of dividends and the filing of the Form 10-Q to avoid disclosing that material event.[17] Then, after the first quarter closed and the capital ratio was calculated to fall below 10%, they orchestrated the backdating of an $18 million

---

[17] Defendants argue that they "had no duty to disclose deferral of the dividends before the Board exercised its authority to take that action." Def. Mot. at 25. But the record is not at all clear that Board approval was needed—and they offer no evidentiary support for that claim—and even if Board authorization was required, it could have approved the suspension in April 24, 2008, the day Perry told the Board that the dividend payments would be suspended "from here on out." *Id.* ¶¶ 84, 85; *see In re Crown Am. Realty Trust Sec. Litig.*, 1999 WL 529581, *4 (W.D. Pa. July 21, 1999) (court could not conclude that, on the "undeveloped" record," defendants' statements regarding payment of dividends "were merely expressions of management opinion and not actionable" because, "while it is true Crown's board was vested with the sole power to set dividends," "cash was tight" and defendants "(all of whom were members of the board)" "indisputably did have authority over Crown's operations").

1  capital contribution to the Bank to create a fictitious quarter-end capital balance.

2  *See id.* ¶¶ 94-102.

3        All of this was done for the principal purpose of creating the illusion that

4  IndyMac and the Bank remain well-capitalized.  At a minimum, triable issues of fact

5  clearly remain with respect to the Commission's scheme liability claim against the

6  Defendants.  *See*, *e.g.*, *Manor Nursing Centers*, 458 F.2d at 1094-95 (scheme

7  liability for inducing shareholders to sell stake in nursing home); *Berry*, 616

8  F.Supp.2d at 993 (scheme liability for backdating of stock options).

9        **E.    The Commission's Disgorgement Claim Is Valid And, In Any**

10              **Event, Assessing That Equitable Remedy Now Is Premature**

11       Finally, Perry contends the Commission "can present no evidence to support

12  its disgorgement claim" against him.  Def. Mot. at 9.  However, making a

13  determination about the merits of this equitable remedy at this stage of the case is

14  premature.  The "decision whether to order disgorgement, and in what amount, is a

15  fact intensive one that many courts suggest should be considered *only after* a finding

16  of liability."  *SEC v. Conaway*, 2009 WL 902063, *19 (E.D. Mich. March 31, 2009)

17  (and cased cited therein) (emphasis added).  Here, Perry offers no reason why the

18  Court should decide the remedy before it has determined liability.  And it is

19  improper to suggest, as Perry does (*see* Def. Mot. at 9), that the Commission has a

20  "burden" to present evidence on this issue before a trial on the merits is held.

21       In any event, the Commission's claim for disgorgement claim has merit.

22  Because "[d]isgorgement is designed to deprive a wrongdoer of unjust enrichment,

23  and to deter others from violating securities laws by making violations

24  unprofitable," "the amount of disgorgement should include all gains flowing from

25  the illegal activities."  *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1096

26  (9th Cir. 2010).  Here, the Court could order Perry to disgorge his salary and any

27  other employment benefits he earned while he misrepresented IndyMac's capital

28

                                              24

health and engaged in a fraudulent scheme to keep it afloat.[18]  It could also order

him to disgorge the millions of dollars in offering proceeds raised by IndyMac in

early 2008 through Perry's fraudulent efforts and scheme.[19]  At a minimum, there is

more than sufficient evidence to raise triable issues of fact that preclude summary

judgment on disgorgement at this stage of the case.

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, and based on the genuine issues of material fact

established by the Commission's accompanying Statement of Genuine Issues and by its

Statement of Additional Material Facts that Preclude Summary Judgment, the

Commission respectfully asks the Court to deny, in full, Defendants' Motions for Partial

Summary Judgment and to grant any other relief the Court deems just and proper.


Date:  April 26, 2012                    Respectfully submitted,


                                         */s/ Donald W. Searles*
                                         John W. Berry
                                         Donald W. Searles
                                         Nicholas S. Chung

                                         *Attorneys for Plaintiff*
                                         *Securities and Exchange Commission*

---

[18] "Maintaining a fraudulent scheme so that one may continue to reap the benefit of a salary or other employment related benefits is enough to support a disgorgement order."  *Conaway*, 2009 WL 902063 at *20 (*citing SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1992 (9th Cir. 1998) (ordering defendant to disgorge salary because his fraud delayed collapse of bank, allowing him to continue drawing salary); *SEC v. Church Extension of the Church of God, Inc.*, 429 F.Supp.2d 1045, 1050 (S.D. Ind. 2005) (similar).

[19] *See First Pac. Bancorp*, 142 F.3d at 1191-93 (ordering defendant officer to disgorge proceeds from bank holding company's public offering); *SEC v. JT Wallenbrock & Assoc.*, 440 F.3d 1109, 1111-13 (9th Cir. 2006) (similar); *Platforms Wireless*, 617 F.3d at 1098 ("We have never held that a personal financial benefit is a prerequisite for joint and several liability.").

## PROOF OF SERVICE

I am over the age of 18 years and not a party to this action.  My business address is:

[X]  U.S. SECURITIES AND EXCHANGE COMMISSION, 5670 Wilshire Boulevard, 11th Floor, Los Angeles, California 90036-3648

Telephone No. (323) 965-3998; Facsimile No. (323) 965-3908.

On April 26, 2012, I caused to be served the document entitled **PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT** on all the parties to this action addressed as stated on the attached service list:

[ ]  **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

    [ ]  **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service.  Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

    [ ]  **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

[ ]  **HAND DELIVERY:**  I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

[ ]  **UNITED PARCEL SERVICE:**  By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

[ ]  **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

[X]  **E-FILING:**  By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

[ ]  **FAX:**  By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

I declare under penalty of perjury that the foregoing is true and correct.

Date:  April 26, 2012                              /s/ Donald W. Searles
                                                               Donald W. Searles

**SEC v. MICHAEL W. PERRY and A. SCOTT KEYS**
**United States District Court – Central District of California**
**Case No. 2:11-cv-01309-R (JCx)**
**(LA-3517)**

SERVICE LIST

**Counsel for Michael W. Perry:**
D. Jean Veta, Esq. **(served via CM/ECF only)**
Benjamin J. Razi, Esq. **(served via CM/ECF only)**
Dennis B. Auerbach, Esq. **(served via CM/ECF only)**
Jason Levine, Esq. **(served via CM/ECF only)**
Nishchay H. Maskay, Esq. **(served via CM/ECF only)**
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
jveta@cov.com
brazi@cov.com
dauerbach@cov.com
jlevine@cov.com
nmaskay@cov.com

John C. Keith, Esq. **(served via CM/ECF only)**
Louis E. Kempinsky **(served via CM/ECF only)**
Valensi Rose PLC
1888 Century Park East, Suite 1100
Los Angeles, CA 90067
jck@vrmlaw.com
lek@vrmlaw.com

**Counsel for A. Scott Keys:**
Gregory S. Bruch, Esq. **(served via CM/ECF only)**
Jessica L. Matelis, Esq. **(served via CM/ECF only)**
Julie A. Smith, Esq. **(served via CM/ECF only)**
Willkie Farr & Gallagher LLP
1875 K Street, NW
Washington, D.C. 20006-1238
GBruch@willkie.com
JMatelis@willkie.com
jasmith@willkie.com

John L. Carlton, Esq. **(served via CM/ECF only)**
Medrano & Carlton
555 W. Fifth Street, 31st Floor
Los Angeles, CA 90013
jcarlton@medranocarlton.com