1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br>MICHAEL W. PERRY and A. SCOTT KEYS,<br><br>    Defendants. | Case No. CV-11-1309 R<br><br><br>**UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW REGARDING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**<br><br><br>Hearing Date:  May 21, 2012<br>Time:  10:00 a.m.<br>Courtroom:  No. 8<br>Judge:  Honorable Manuel L. Real |

1

After consideration of the papers in support of and in opposition to Defendants Michael W. Perry and A. Scott Keys' ("Defendants") Motions for Summary Judgment, the oral argument of counsel, all papers filed in connection with the motion, and all other matters presented to the Court, the Court makes the following findings of uncontroverted facts and conclusions of law:

## **UNCONTROVERTED FACTS**

**I.    Bancorp and the Bank**

1.    IndyMac Bank, F.S.B. (the "Bank") was a federally-chartered thrift regulated by the Office of Thrift Supervision ("OTS").  IndyMac Bancorp, Inc. ("Bancorp") was a publicly-owned thrift holding company incorporated in Delaware.  SEC Complaint [Dkt. # 1] ("Compl.") ¶¶ 4, 9, 10; Mr. Perry's Answer to SEC's Complaint [Dkt. # 25] ("Answer") ¶¶ 4, 9, 10.

2.    The Bank was a wholly-owned subsidiary of Bancorp.  Bancorp had no operations of its own, and the Bank was its only significant asset.  Declaration of Jason A. Levine in Support of Motion for Partial Summary Judgment, dated April 6, 2008 [Dkt. # 46] ("Levine Declaration"), Exh. A at 88 (Form 8-K, Ex. 99.2 at 7 (Feb. 12, 2008) [hereinafter "2/12/08 8-K"]).

3.    Bancorp's Board of Directors included a former member of the Board of Governors of the Federal Reserve System, a former United States Senator, a former Vice Chairman of Ernst & Young, a former dean of the UCLA School of Management, and several former practicing accountants and financial industry executives.  Levine Declaration, Exh. B at 133–36 (Excerpts of Bancorp's 2008 Proxy Statement (Mar. 24, 2008)).

**II.    Defendants' Ownership of Bancorp Common Stock**

4.    Mr. Perry acquired 35,000 shares of Bancorp common stock on March 23, 2007, at a cost of more than $1.03 million.  Declaration of Michael W. Perry in Support of His Motion for Partial Summary Judgment, dated April 6, 2008 [Dkt. # 47] ("Perry Declaration") ¶ 2.

5.      Mr. Perry acquired 328,987.99 shares of Bancorp common stock on February 15, 2008, at a cost of more than $2.6 million.  Perry Declaration ¶ 3.

6.      Mr. Keys acquired over $100,000 worth of Bancorp stock into his 401(k) on April 2, 2007.  Declaration of A. Scott Keys in Support of His Motion for Summary Judgment, dated April 6, 2008 [Dkt. # 48-1] ("Keys Declaration") ¶ 2.

7.      Neither Defendant sold a single share of Bancorp stock in 2006, 2007, or 2008.  Perry Declaration ¶ 4; Keys Declaration ¶ 4.

8.      No Bancorp executive officer or director sold shares of Bancorp common stock in 2008, through the date Bancorp filed for bankruptcy.  Perry Declaration ¶ 5.

9.      Mr. Perry beneficially owned more than 3.1 million shares of Bancorp common stock (including stock options) on February 29, 2008, comprising about 3.9 percent of issued and outstanding shares.  He was the largest non-institutional Bancorp shareholder at the time.  As of December 31, 2006, the Bancorp common stock and options Mr. Perry beneficially owned had a value of more than $69 million.  His investment in Bancorp constituted the vast majority of his net worth.  By February 29, 2008, the value of his investment in Bancorp shares (including the additional stock and options acquired in 2007 and 2008) had plummeted to less than $4 million.  As a result of Bancorp's bankruptcy filing on July 31, 2008, Mr. Perry lost virtually the entire remainder of his investment in the company.  Perry Declaration ¶¶ 6–7; Levine Declaration, Exh. B at 131 (Excerpts of Bancorp's 2008 Proxy Statement (Mar. 24, 2008)).

10.     In 2008, Bancorp's Management Development and Compensation Committee awarded discretionary bonuses to the company's senior managers in order to retain and motivate them.  Neither Mr. Perry nor Mr. Keys participated in this plan and thus received no bonus for 2007 or 2008.  Perry Declaration ¶ 9; Keys Declaration ¶ 6.

[PROPOSED]  UNCONTROVERTED
FACTS AND CONCLUSIONS OF LAW
Case No. CV-11-1309 R

11.     In April 2008, Mr. Perry voluntarily cancelled his fully vested options to purchase one million shares of Bancorp common stock in order to make more stock options available for the company's shareholders and for the retention of its employees.  Perry Declaration ¶ 10.

12.     The SEC has presented no evidence to support its disgorgement claim.  Levine Declaration, Exh. C at 141 (Excerpts of the SEC's Amended Responses to Mr. Perry's First Set of Interrogatories, No. 23 (Apr. 2, 2012)).

**III.     Bancorp's Disclosures About the Bank's Financial Condition**

13.     Among other things, Bancorp's disclosures throughout the period at issue in the SEC's complaint included specific cautionary language regarding the risks that the Bank faced.  These risk disclosures included statements regarding the significant disruption to the mortgage-backed and asset-backed securities markets and the potential negative impact of this disruptions on the bank and market liquidity; material risks to the Bank's well-capitalized status; and other economic fluctuations that could impact the Bank's capital requirements.  For example:

      a.    "2007 was a terrible year for our industry, for Indymac and for you, our owners."  Levine Declaration, Exh. A at 82 (2/12/08 8-K, Exh. 99.2 at 1).

      b.    "[T]hings could get worse, including our potentially incurring more rightsizing costs, or selling non-performing assets in bulk at a loss or having to raise very dilutive capital . . . ."  *Id.* at 89 (2/12/08 8-K, Ex. 99.2 at 8).

      c.    "The Bank's regulatory capital compliance could be impacted by a number of factors, such as changes to applicable regulations, adverse action by our regulators, changes in our mix of assets, decline in real estate values, interest rate fluctuations, loan loss provisions and credit losses, or

4

significant changes in the economy in areas where we have most of our loans, or future disruptions in the secondary mortgage market.  Any of these factors could cause actual future results to vary from anticipated future results and consequently could have an adverse impact on the ability of the Bank to meet its future minimum capital requirements." *Id.* at 39 (2/12/08 8-K, at 33).

d.   "IndyMac lost $609 million for the year [2007], the first annual loss in our 23-year history.  As a result of this loss and panic market conditions for anything or anyone involved in mortgages, Indymac lost $2.8 billion, or 85%, of its market capitalization in 2007.  The only good news is that, even with this significant loss, we remain in a fundamentally sound financial position as a result of raising $676 million in equity capital in 2007 . . . ." *Id.* at 83 (2/12/08 8-K, Ex. 99.2 at 2).

e.   "[F]orward-looking statements" are "inherently subject to risks and uncertainties, many of which cannot be predicted or quantified.  Actual results and the timing of certain events could differ materially from those projected in or contemplated by the forward-looking statements due to a number of factors, including," inter alia, (1) "the level and volatility of interest rates," (2) "the accuracy of subjective estimates used in determining the fair value of financial assets of Indymac," and (3) "the various credit risks associated with our loans and other financial assets."  "Indymac does not undertake to update or revise forward-looking statements to reflect the impact of circumstances for [sic] events that arise after the date the forward-looking statements are made."  Levine Declaration,

5

Exh. A at 7, 81, 90, 92 (2/12/08 8-K, at 3 & Ex. 99.1 at 3 & Ex. 99.2 at 9 & Ex. 99.3 at 1); Exh. M at 237 (2007 Form 10-K at 3 (Feb. 29, 2008) [hereinafter "2007 10-K"]).

f.   Bancorp disclosed that under one adverse scenario, the Bank's total risk-based capital ratio would fall to 9.78%, below the threshold for a well-capitalized thrift.  Levine Declaration, Exh. A at 117 (2/12/08 8-K, Ex. 99.3 at 26).

g.   "While we currently have regulatory capital ratios in excess of the 'well capitalized' requirement and have implemented a plan to reduce our balance sheet and increase our capital ratios, there can be no assurance that we will not suffer material losses or that our plans to reduce the balance sheet will succeed.  In those circumstances, we may be required to seek additional regulatory capital to maintain our capital ratios at the 'well capitalized' level.  Such capital raising could be at terms that are very dilutive to existing shareholders and there can be no assurance that any capital raising we undertake would be successful given the current level of disruption in financial markets."  Exh. M at 304 (2007 10-K at 69).

h.   "A key area of risk for us is interest rate sensitivity." *Id.* at 292 (2007 10-K at 59).

i.   "There can be no assurance that our interest rate risk strategies or their implementation will be successful in any particular interest rate environment." *Id.* at 308 (2007 10-K at 73).

j.   "As has been widely publicized, the capital markets in recent days have taken another turn for the worse with credit spreads widening significantly due to panic market conditions caused by uncertainty in the U.S. housing and mortgage markets,

renewed margin calls by Wall Street repo lenders on mortgage REITs and hedge funds, and other economic and financial uncertainties. Spreads on everything from relatively risk-free instruments such as Fed Funds to LIBOR and U.S. Treasuries to Fannie Mae and Freddie Mac mortgage-backed securities ('MBS') have widened substantially to at or near all-time historic levels. Spreads between Treasuries and other instruments, in particular, non-GSE mortgage assets, are difficult to ascertain, given the fact that there are virtually no new non-GSE mortgage securities issuances and the only resale activity is a handful of distressed sales. As a result, the financial impact of this spread widening on Indymac is difficult to estimate at this time, but it is expected to have a negative effect on the value of IMB's MBS portfolio, and therefore on the first quarter 2008 forecast presented to shareholders on February 12, 2008." Levine Declaration, Exh. P at 444 (Form 8-K, Ex. 99.1 (Mar. 11, 2008)).

14. On February 19, 2008, due to an anomalous spike in interest rates and its effect on the value of the Bank's mortgage servicing rights ("MSR"), Bancorp's Chief Financial Officer, Mr. Keys, sent an email to Mr. Perry projecting that the Bank's capital ratio might be right at or slightly under the 10% level at quarter end absent improvement measures. This was one of a number of forecasts prepared during the period. Levine Declaration, Exh. D (Testimony Exh. 571); Exh. E at 153 (Excerpt from A. Scott Keys Investigative Testimony at 120:5–18 (Nov. 19, 2009)); Exh. F at 159 (Excerpt from S. Blair Abernathy Investigative Testimony at 228:7–24 (Dec. 11, 2009)).

15. A subsequent forecast on February 29 based on updated information projected that the Bank's capital ratio at quarter end would be at least 10.61

percent, 61 basis points above the 10 percent minimum for a well-capitalized institution under OTS regulations. Levine Declaration, Exh. G (Testimony Exh. 563).

**IV. Bancorp's Direct Stock Purchase Plan**

16.     In response to Mr. Keys' February 19 email, Mr. Perry authorized Mr. Keys to raise up to $50 million of capital through Bancorp's direct stock purchase plan ("DSPP") in $10–$15 million increments and to "be prepared to contribute $25 to $50 million of holding company cash to the bank just before quarter-end if we need to do so." Levine Declaration, Exh. D (Testimony Exh. 571).

17.     On June 20, 2006, Bancorp filed a registration statement on Form S-3, and on October 11, 2007, Bancorp filed a prospectus pursuant to SEC Rule 424(b)(3). The October prospectus authorized the company to issue up to 10 million new shares of common stock pursuant to the DSPP. IndyMac filed further DSPP prospectuses on April 3, 2008 and May 2, 2008, each authorizing the issuance of up to 10 million additional shares of Bancorp common stock. Levine Declaration, Exh. H (Prospectus (Form 424B3) (Oct. 11, 2007)); Exh. I (Prospectus (Form 424B3) (Apr. 3, 2008)); and Exh. J (Prospectus (Form 424B3) (May 2, 2008)).

18.     The DSPP prospectuses state that Bancorp's DSPP "provides [the company] with an economical and flexible mechanism to raise equity capital through sales of our common stock" by purchasing shares directly over the Internet in an amount between $250 and $10,000. Bancorp "intends to use the net proceeds from sales of common stock directly issued by [the company] under the plan for general corporate purposes, including investment in [its] subsidiaries. Bancorp could, at its discretion, "elect to offer shares at a discount from prevailing market prices" and/or waive the $10,000 maximum per account per month. Levine Declaration, Exh. H (Prospectus (Form 424B3) (Oct. 11, 2007)); Exh. I

(Prospectus (Form 424B3) (Apr. 3, 2008)); and Exh. J (Prospectus (Form 424B3) (May 2, 2008)).

19. The three DSPP prospectuses also each state that Bancorp "from time to time may offer the IndyMac Direct Stock Purchase Plan, a direct stock purchase plan designed to provide investors with a convenient method to purchase shares of our common stock." The prospectuses further provide that shares purchased through the program would be at market value, "less any discount that IndyMac may decide to offer." Finally, each prospectus incorporates by reference other filed reports, but not "documents or information deemed to have been furnished and not filed in accordance with SEC rules." Levine Declaration, Exh. H (Prospectus (Form 424B3) (Oct. 11, 2007)); Exh. I (Prospectus (Form 424B3) (Apr. 3, 2008)); and Exh. J (Prospectus (Form 424B3) (May 2, 2008)).

20. Mr. Perry neither reviewed nor signed the DSPP prospectuses, nor did Mr. Keys sign the DSPP prospectuses. Levine Declaration, Exh. K at 218 (Excerpt from Pamela Marsh Investigative Testimony at 22:19–22 (Nov. 5, 2009)); and Exh. L at 229 (Excerpt from Michael W. Perry Investigative Testimony at 159:21–23 (Dec. 16, 2009)).

21. Bancorp disclosed in an exhibit to its Form 8-K, dated February 12, 2008, that it "raised a total of $176 million of common equity and trust preferred securities and contributed the proceeds to the Bank during 2007." Of the $176 million, $145.6 million was raised through the DSPP in 2007. Levine Declaration, Exh. A at 48, 94 (2/12/08 8-K, at 42 & Ex. 99.3 at 3).

22. As disclosed in Bancorp's 2007 10-K, in 2006 Bancorp raised $148.5 million through the DSPP and $188 million by issuing trust preferred securities, and contributed over $300 million to the Bank. Levine Declaration, Exh. M at 381 (2007 10-K at F-37).

23. Bancorp raised $11.2 million of capital between February 26 and February 29, 2008 through the DSPP. Levine Declaration, Exh. G (Testimony Exh. 563).

24. On February 28, 2008, Mr. Perry stated in an email to Bancorp's Board of Directors that the company is "exploring more seriously than we discussed at our board meeting this week, a significant capital raise . . . . $500 million or so." Levine Declaration, Exh. N (Testimony Exh. 593).

## V. Bancorp's 2007 10-K and DSPP Disclosures

25. On February 29, 2008, Pamela Marsh, who was responsible for financial planning and forecasting in early 2008, sent an email to Mr. Perry projecting that the Bank's total risk-based capital ratio as of March 31, 2008, would be 10.61 percent without any contribution from Bancorp to the Bank of DSPP capital raised since February 26, and that the capital ratio would be 10.69 percent if Bancorp contributed to the Bank the $11.2 million raised through the DSPP since February 26. This was Ms. Marsh's "best forecast" on February 29, 2008. Levine Declaration, Exh. G (Testimony Exh. 563); Exh. O at 435 (Excerpt from Pamela Marsh Deposition Testimony at 241:19 (Feb. 28, 2012)); *see also* Levine Declaration, Exh. K at 222–24 (Excerpt from Pamela Marsh Investigative Testimony at 26:17–27:2 & 130:5–7 (Nov. 5, 2009)) (describing Ms. Marsh's responsibilities at IndyMac and authenticating Testimony Exh. 563).

26. The date of Ms. Marsh's email -- February 29, 2008 -- was the same day Bancorp filed its 10-K for the year ended December 31, 2007. Levine Declaration, Exh. G (Testimony Exh. 563); Exh. M (2007 10-K).

27. Among other things, Bancorp's 2007 Form 10-K contained the following statements and information:

a. "The Company has a direct stock purchase plan which offers investors the ability to purchase shares of our common stock directly over the Internet. Investors interested in investing over

10

$10,000 can also participate in the waiver program administered by Melon Investor Services LLC." Levine Declaration, Exh. M at 247 (2007 10-K, at 13).

b.  Bancorp's DSPP was listed as one of the company's "Principal Sources of Cash." "During the year ended December 31, 2007, we raised $145.6 million of capital by issuing 7,427,104 shares of common stock through this plan." *Id.* at 292, 294 (2007 10-K at 57, 59).

c.  Bancorp reported capital contributions to the Bank in 2005, 2006, and 2007 of $247,265,000, $354,127,000, and $260,000,000, respectively. Based on Bancorp's consolidated Statement of Cash Flows, these contributions were Bancorp's largest use of cash. *Id.* at 381 (2007 10-K at F-37).

d.  "As of December 31, 2007, Indymac Bank met all of the requirements of a 'well-capitalized' institution under the general regulatory capital regulations." *Id.* at 282 (2007 10-K at 47).

e.  "[V]irtually all of our operating segments, except for the mortgage servicing division and Financial Freedom, our reverse mortgage lending subsidiary, reported material losses in 2007. For the year ended December 31, 2007, Indymac had a consolidated net loss of $614.8 million. Regarding business segment performance, the mortgage production division had a net loss of $96.8 million in 2007 while the mortgage servicing division had earnings of $181.4 million. Combining mortgage production and servicing, the mortgage banking segment recorded net earnings of $33.0 million. The thrift segment recorded a net loss of $199.2 million for 2007 and our

11

1        discontinued business activities recorded a net loss of $281.1

2        million.  As a result of our thrift structure and strong capital

3        and liquidity positions, we were not forced to sell assets at

4        liquidation prices and our funding capacity was not materially

5        impacted." *Id.* at 254 (2007 10-K at 19) (footnote omitted).

**VI.    Bancorp's Disclosure of Subsequent Challenges Faced by the Company**

28.    Bancorp issued certain trust preferred securities.  Holders of these securities received dividends, also referred to as interest payments.  Levine Declaration, Exh. M at 376–77 (2007 10-K, at F-32, F-33).

29.    The Bank issued shares of Perpetual Non-Cumulative Fixed Rate Preferred Stock in the second quarter of 2007.  Holders of these securities received dividends as well.  *Id.* at 402 (2007 10-K, at F-58).

30.    On Thursday, May 8, 2008, Bancorp's and the Bank's Boards of Directors approved the suspension/deferral of (a) interest payments on Bancorp's trust preferred securities, and (b) dividend payments on the Bank's preferred stock.  Levine Declaration, Exh. Q (Testimony Exh. 757).

31.    Bancorp disclosed these suspensions/deferrals in its first quarter Form 10-Q, filed on Monday, May 12, 2008.  Compl. ¶ 43; Answer ¶ 43.

## CONCLUSIONS OF LAW

1.    The SEC's disgorgement claim against Defendants fails as a matter of law.  "The SEC's power to obtain injunctive relief has been broadly read to include disgorgement of profits realized from violations of the securities laws." *See SEC v. Clark*, 915 F.3d 439, 453 (9th Cir. 1990).  The amount of disgorgement includes "all gains flowing from the illegal activities."  *SEC v. Platform Wireless Int'l Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010) (citation omitted).  Although salary and benefits may be disgorged when derived from fraudulent activities, the burden is on the plaintiff to show that the compensation

was not earned from "various functions of value to the company other than the fraudulent activities." *SEC v. Resnick*, 604 F. Supp. 2d 773, 783 (D. Md. 2009). Because the SEC has failed to demonstrate that Defendants' salaries and benefits would not have been given but for the allegedly false and misleading statements, there is no genuine issue of material fact as to the SEC's disgorgement claim. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

2. The SEC's allegation relating to statements of fact in Bancorp's 2007 10-K fails as a matter of law. First, the 10-K states that Bancorp "may be required to raise capital at terms that are materially adverse to our shareholders" and "may be required to seek additional regulatory capital." Levine Declaration, Exh. M at 304 (2007 10-K at 69). The SEC alleges that these statements were false or misleading because Bancorp had already begun raising capital through the DSPP. However, the 10-K clearly discloses that Bancorp was raising capital through to the DSPP. *Id.* at 247 (2007 10-K at 13). Indeed, the 10-K states that the DSPP was one of Bancorp's principal sources of cash in 2007. *Id.* at 292, 294 (2007 10-K at 57, 59). Second, the 10-K states that Bancorp was "not forced to sell assets at liquidation prices and our funding capacity was not materially impacted." *Id.* at 254 (2007 10-K at 19). The SEC alleges that this statement was also false or misleading because Bancorp had begun raising capital through the DSPP. This statement, however, was clearly referring to conduct in 2007. The paragraph makes specific reference to "the year ended December 31, 2007." *Id.* Therefore, this statement was true, as stock sales through the DSPP did not begin until February 26, 2008.

3. The SEC's allegations relating to the fact that Bancorp's 10-K did not disclose its February 19, 2008 forecast fails as a matter of law because there is no duty to disclose internal forecasts, even if such forecasts provide additional, non-public information. *See, e.g.*, *In re Verifone Sec. Litig.*, 11 F.3d 865, 867 (9th Cir.

13

1  1993); *In re Lyondell Petrochemical Co. Sec. Litig.*, 984 F.2d 1050, 1052 (9th Cir.

2  1993); *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 516 (9th Cir. 1991).

3        4.    The SEC's allegations relating to forward-looking statements in

4  Bancorp's 10-K fail as a matter of law because the statements were accompanied

5  by specific warnings and cautionary language. "[T]he bespeaks caution doctrine

6  applies only to precise cautionary language which directly addresses itself to

7  future projections, estimates or forecasts . . . ." *Miller v. Pezzani (In re Worlds of*

8  *Wonder Sec. Litig.)*, 35 F.3d 1407, 1414 (9th Cir. 1994); *see also In re Donald J.*

9  *Trump Casino Sec. Litig.*, 7 F.3d 357, 371–72 (3d Cir. 1993); *Rubinstein v.*

10  *Collins*, 20 F.3d 160, 167 (5th Cir. 1994). Bancorp's 10-K states: "We currently

11  believe our liquidity level is sufficient to satisfy our operating requirements and

12  meet our obligations and commitments in a timely and cost effective manner."

13  Levine Declaration, Exh. M at 291 (2007 10-K at 56). This optimistic projection

14  was necessarily contingent on future events and accompanied by meaningful,

15  tailored cautionary language. Bancorp warned that the market for mortgage-

16  backed securities had been significantly disrupted; that such disruptions may

17  negatively impact the company's liquidity; that there were material risks to the

18  Bank maintaining its well-capitalized ratios; and that interest rate changes, real

19  estate value drops, and other economic fluctuations then occurring could impact

20  capital requirements. *See id.* at 303–12 (2007 10-K at 68–77). Accordingly, the

21  bespeaks caution doctrine renders the aforementioned forward-looking statements

22  immaterial as a matter of law.

23        5.    The SEC's allegation that Defendants are liable for statements made

24  in its February 12, 2008 8-K fails as a matter of law because the 8-K was not

25  incorporated by reference into the June 30, 2006 Form S-3 registration statement

26  and the DSPP prospectuses. The allegations relating to the 8-K are premised on

27  the purported fact that Bancorp's registration statement and October 11, 2007

28  prospectus incorporated by reference the 8-K. *See* Compl. ¶ 21. That premise is

14

wrong. Both the registration statement and the prospectus specifically state that they do not incorporate documents or information deemed to have been "furnished and not filed in accordance with SEC rules." *See, e.g.*, Levine Declaration, Exh. H at 169. Information in an 8-K provided pursuant to Items 2.02 and 7.01 of the form is deemed "furnished," not "filed," unless the registrant specifically states that the information is to be considered "filed." SEC Form 8-K § B.2. The information in Bancorp's 8-K that is at issue here was provided pursuant to Items 2.02 and 7.01; therefore, it was merely "furnished."

6. Furthermore, the SEC's allegations based on the DSPP prospectuses fail as a matter of law because Defendants did not prepare, review, or sign the prospectuses, and thus were not the "makers" of the statements contained therein. *See, e.g.*, *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302, 180 L.Ed. 166 (2011); *SEC v. Global Express Capital Real Estate Inv. Fund, I, LLC*, 289 F. App'x 183, 186 (9th Cir. 2008). "[T]he maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Capital Group, Inc.*, 131 S. Ct. at 2298. This requirement applies to claims under both Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, and Section 17(a) of the Securities Act of 1933. *See, e.g.*, *Global Express Capital Real Estate Inv. Fund, I, LLC*, 289 F. App'x at 186; *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 855–56 (9th Cir. 2001); *SEC v. Kelly*, 817 F. Supp. 2d 340, 345 (S.D.N.Y. 2011). It is undisputed that Defendants had no role in preparing or reviewing the prospectuses. Although Defendants signed the Form S-3 registration statement, they did so more than a year before the prospectuses were filed. For the foregoing reasons, Defendants cannot be held liable for the prospectuses' content under either Section 10(b) and Rule 10b-5 or Section 17(a).

7. The SEC's allegation that Bancorp fraudulently delayed disclosure of its decision to defer the payment of trust preferred and Bank preferred dividends

15

fails as a matter of law, because the deferrals were disclosed on May 12, 2008, two business days after the Boards of Bancorp and the Bank approved them. Every registrant subject to Rule 13a-11 of the Securities Exchange Act shall file a current report on Form 8-K within the period specified in that form. *See* 17 C.F.R. § 240.13a-11(a). Unless otherwise specified, a report is to be filed or furnished within four business days after occurrence of the event. *See* SEC Form 8-K § B.1. Although Mr. Perry had already told the Boards of Directors that he wanted to defer dividends, a mere expression of management's opinion is not actionable if it lacks the authority to enforce that opinion. *See In re Int'l Bus. Machines Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998).


DATED: May 31, 2012                    _____

                                       The Honorable Manuel L. Real
                                       United States District Court Judge