1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　Plaintiff,<br><br>　　v.<br><br>MICHAEL W. PERRY and A. SCOTT KEYS,<br><br>　　Defendants. | Case No. CV-11-1309 R<br><br>**UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW REGARDING DEFENDANT MICHAEL W. PERRY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S RISK WEIGHTING AND SECTION 17(a)(2) CLAIMS**<br><br>Hearing Date: September 10, 2012<br>Time:  10:00 a.m.<br>Courtroom:  No. 8<br>Judge:  Honorable Manuel L. Real |

Case 2:11-cv-01309-R-JC   Document 148   Filed 09/24/12   Page 2 of 11   Page ID #:6435

After consideration of the papers in support of and in opposition to Defendant Michael W. Perry's Motion for Partial Summary Judgment Concerning Plaintiff's Risk-Weighting and Section 17(a)(2) Claims, the oral arguments of counsel, all papers filed in connection with the motion, and all other matters presented to the Court, the Court makes the following findings of uncontroverted facts and conclusions of law:

## UNCONTROVERTED FACTS

### A.  Bancorp and the Bank

1. IndyMac Bank, F.S.B. (the "Bank") was a federally-chartered thrift regulated by the Office of Thrift Supervision ("OTS"). The Bank was a wholly-owned subsidiary of IndyMac Bancorp, Inc. ("IndyMac" or "Bancorp"), a publicly-owned thrift holding company. Bancorp had no operations of its own, and the Bank was its only significant asset. *See* Uncontroverted Facts and Conclusions of Law Regarding Motions for Summary Judgment ("Findings of Fact") ¶¶ 1–2 [Dkt. No. 88].

2. On July 11, 2008, the OTS closed the Bank and placed it under receivership. Bancorp filed for bankruptcy shortly thereafter, on July 31, 2008. SEC Complaint ("Compl.") ¶¶ 4, 9, 10 [Dkt. No. 1]; Mr. Perry's Answer to SEC's Complaint ("Answer") ¶¶ 4, 9, 10 [Dkt. No. 25].

### B.  Calculation of the Bank's Capital Ratios and the Bank's Operative Capital Ratios for Determining Well-Capitalized Status As of March 31, 2008

3. As an OTS-regulated thrift, the Bank reported its capital ratios to the OTS each quarter in a Thrift Financial Report ("TFR"), in accordance with TFR instructions. Declaration of Jason A. Levine ("Levine Decl."), Ex. 1 at 13 (Q1-08 Form 10-Q (May 12, 2008)) [Dkt. No. 108].

4. Since 2000, the Bank had been required to double risk-weight subprime assets pursuant to OTS Order No. 2000-55, dated June 20, 2000.

[PROPOSED] UNCONTROVERTED
FACTS AND CONCLUSIONS OF LAW
Case No. CV-11-1309 R

1  Declaration of Nicholas S. Chung ("Chung Decl."), Ex. 21 (OTS Order No. 2000-
2  55) [Dkt. No. 115].

3       5.     On February 26, 2008, Mr. Darrel Dochow, the OTS Director of the
4  Western Region, had a telephone conversation with Mr. Perry and Scott Keys.
5  During this phone call, the Bank requested relief from any OTS requirement that it
6  double risk-weight subprime assets in calculating its capital ratios for purposes of
7  determining whether the Bank's ratios exceeded the regulatory minimums for a
8  well-capitalized institution.  Mr. Dochow granted the Bank's request and agreed
9  that the Bank would not need to double risk-weight its subprime assets for
10  purposes of determining whether its capital ratios exceeded the well-capitalized
11  minimum.  Levine Decl. Ex. 2 at 149:2–150:12 (Excerpt from A. Scott Keys
12  Investigative Testimony (Nov. 19, 2009)); Ex. 3 at 160:6–23 (Excerpt from A.
13  Scott Keys Deposition Testimony (Apr. 5, 2012)); Ex. 4 (email reflecting that the
14  call with OTS was set for 8:30 a.m. on February 26, 2008).

15       6.     During the February 26 call, Mr. Dochow asked that the Bank
16  continue to submit its capital ratios with double risk-weighting of subprime assets
17  to the OTS as supplemental information so that the OTS would have this data
18  available in its capacity as the Bank's principal regulator.  Levine Decl. Ex. 2 at
19  150:11–12.

20       7.     On June 7, 2012, Mr. Dochow signed a declaration under penalty of
21  perjury regarding his February 2008 conversation with Messrs. Keys and Perry.
22  After meeting with the SEC on June 11, 2012, however, Mr. Dochow retracted
23  part of his declaration and stated that the entire matter of double risk-weighting is
24  clouded in his mind.  Levine Decl. Ex. 9 (Mr. Dochow's 6/7/12 signed declaration
25  and his 6/12/12 clarifying email).  Mr. Keys, however, has provided
26  uncontroverted testimony about what transpired during the February 2008 phone
27  call, and Mr. Perry's motion provides other uncontroverted evidence of follow-up
28

communications relaying the waiver.  *See, e.g.*, Levine Decl. Ex. 2 at 149:2–150:12; Ex. 3 at 160:6–23; Ex. 4.

8.  In determining whether the Bank was well capitalized as of March 31, 2008, the operative capital ratios for the OTS were the ratios calculated without double risk-weighting subprime assets.  Levine Decl. Ex. 2 at 150:8–10; Ex. 3 at 165:20–166:16; *see also* Levine Decl. Ex. 6 at 187 (Amended 3/31/08 CCR Addendum); Ex. 7 (July 1, 2008 letter from Darrel Dochow).

9.  In its TFR dated May 12, 2008, the Bank reported that its total risk-based capital ratio was 10.26 percent as of March 31, 2008.  This ratio was calculated without double risk-weighting subprime assets.  Levine Decl. Ex. 1 at 10; Ex. 6 at 187; Declaration of Jason A. Levine in Support of Supplemental Brief ("Supp. Levine Decl."), Ex. 1 at 27 [Dkt. No. 140-1].

10.  The Bank informed the OTS of its capital ratios with double risk-weighting of subprime assets as of March 31, 2008 in an addendum to the TFR (a "CCR Addendum"), dated May 12, 2008.  The CCR Addendum reflected that the Bank's capital ratio would have been 9.96 percent, *i.e.*, below the 10 percent well-capitalized minimum, had double risk-weighting of subprime assets been required.  Levine Decl. Ex. 6 at 187.

11.  The 10.26 percent capital ratio calculated without double risk-weighting of subprime assets was the Bank's operative capital ratio as of March 31, 2008, *i.e.*, the capital ratio considered by the OTS in determining whether the Bank was well capitalized.  That is demonstrated by the fact that the OTS knew the Bank's capital ratio calculated with double risk-weighting of subprime assets was below the 10 percent well-capitalized minimum as of March 31, 2008, but did not reclassify the Bank from well capitalized to adequately capitalized until July 1, 2008.  Levine Decl. Ex. 6 at 187; Ex. 7 at 190.

### C. IndyMac's Reporting of the Bank's Capital Ratios in Its May 12, 2008 SEC Filings

12. Historically, Bancorp's SEC filings disclosed the Bank's capital ratios calculated both with and without double risk-weighting of subprime assets. *See, e.g.*, Levine Decl. Ex. 10 at 204 (Excerpt of Q3-07 Form 10-Q (Nov. 6, 2007)). Based on the February 2008 OTS waiver, however, Bancorp reported only the Bank's capital ratios calculated without double risk-weighting of subprime assets in its Form 10-Q for the first quarter of 2008 and its May 12, 2008 Form 8-K. Levine Decl. Ex. 1 at 10, 13 n.14, 49; Ex. 2 at 153:19–154:5; Chung Decl. Ex. 6 at 114–15 (May 12, 2008 Form 8-K).

13. Bancorp's Form 10-Q for the first quarter of 2008 contained a table reflecting the Bank's capital ratios for the first quarter of 2008 and the four quarters that preceded it. The table compared the Bank's 10.26 percent total risk-based capital ratio calculated without double risk-weighting of subprime assets with the comparable ratios (i.e., without the double risk-weighting) for the four prior quarters, as disclosed in Bancorp's SEC filings for those quarters. Specifically, the Bank reported the following ratios in the table, which were calculated without double risk-weighting subprime loans:

- 1st Quarter 2007:  11.37 percent.
- 2nd Quarter 2007:  12.24 percent
- 3rd Quarter 2007:  12.01 percent
- 4th Quarter 2007:  10.81 percent
- 1st Quarter 2008:   10.26 percent

*See* Levine Decl. Ex. 1 at 10; Ex. 10 at 204.

14. The Form 10-Q did not indicate that the 10.26 percent ratio was calculated without double risk-weighting of subprime assets or report the OTS waiver. Moreover, the Form 10-Q did not state that the OTS waiver affected whether the Bank remained well capitalized. Nonetheless, the Form 10-Q

1  accurately disclosed that the Bank was well capitalized based on the operative
2  capital ratios.  The subprime-adjusted capital ratios were hypothetical ratios that
3  did not alter the Bank's well-capitalized status.  Levine Decl. Ex. 2 at 150:8–10;
4  Ex. 3 at 165:20–166:16; Ex. 6 at 187; Supp. Levine Decl. Ex. 1 at 27.

5       15.     In addition to reporting the Bank's declining capital ratios since the
6  second quarter of 2007 as reflected in the above-referenced table, Bancorp's first
7  quarter 2008 Form 10-Q contained the following statements and information:

8       a.     Bancorp disclosed that the company incurred a $184 million loss
9  during the first quarter of 2008, and that it experienced an additional $245 million
10 in net unrealized losses for the quarter.  Levine Decl. Ex. 1 at 107.

11      b.     "The Bank's regulatory capital compliance could be impacted by a
12 number of factors, such as changes to applicable regulations, adverse action by our
13 regulators, changes in our mix of assets, decline in real estate values, interest rate
14 fluctuations, loan loss provisions and credit losses, or significant changes in the
15 economy in areas where we have most of our loans, or future disruptions in the
16 secondary mortgage market or MBS market.  Any of these factors could cause
17 actual future results to vary from anticipated future results and consequently could
18 have an adverse impact on the ability of the Bank to meet its future minimum
19 regulatory requirements."  *Id.* at 50.

20      c.     "There are scenarios where we could be adequately capitalized during
21 this crisis; regulatory response to being adequately capitalized is not known."  *Id.*

22      d.     "As of March 31, 2008, Indymac Bank met all of the requirements of
23 a 'well-capitalized' institution under the prompt corrective action and regulatory
24 capital regulations.  However, there can be no assurances that we will be able to
25 maintain the status of a 'well-capitalized' institution in the future."  *Id.*

26      e.     "If our regulatory capital position were to deteriorate such that we
27 were classified as an 'adequately capitalized' institution, we might not be able to
28 use brokered deposits as a source of funds.  A 'well-capitalized' savings

association or bank may accept brokered deposits without restriction.  An 'adequately capitalized' savings association must obtain a waiver from the FDIC in order to accept, renew or roll over brokered deposits.  Our brokered and solicited deposits represent funds that brokers gather from third parties and package in batches or that we solicit directly and on which we pay higher interest rates than are typically available for certificates of deposit.  Although an institution could seek permission from the FDIC to accept brokered deposits if it were no longer considered to be a 'well-capitalized' institution, the FDIC may deny permission, or may permit the institution to accept fewer brokered deposits than the level considered desirable.  Even with a waiver, the interest rate limitations on brokered and solicited deposits could have the effect of reducing demand for some of the deposit products.  If our level of deposits were to be reduced, either by the lack of a full brokered deposit waiver or by the interest rate limits on brokered or solicited deposits, we anticipate that we would reduce our assets and, most likely, curtail our lending activities.  Other possible consequences of classification as an 'adequately capitalized' institution include the potential for increases in our borrowing costs and terms from the FHLB and other financial institutions, as well as in our premiums to the Deposit Insurance Fund administered by the FDIC to insure bank and savings association deposits and in our assessment payments to OTS.  Such changes could have an adverse effect on our operations." *Id.*

16.  Bancorp's first quarter 2008 10-Q further disclosed that, if an April 2008 downgrade of bonds held by the Bank had occurred a few weeks earlier, then the Bank's total risk-based capital ratio at March 31, 2008 would have been 9.27 percent — 73 basis points below the well-capitalized minimum.  Levine Decl. Ex. 1 at 49.  The 10-Q also disclosed a hypothetical scenario in which the Bank's total risk-based capital ratio at March 31 might have exceeded 10.26 percent.  *Id.*

**D. Facts Relating to the SEC's Allegation That Mr. Perry "Obtain[ed] Money or Property" by Means of Alleged False Statements or Omissions in IndyMac's May 12 Filings**

17. Bancorp raised capital through its Direct Stock Purchase Plan ("DSPP") between February 26, 2008 and May 9, 2008, but raised no further DSPP capital between May 9 and July 31, 2008, when Bancorp filed for bankruptcy. Declaration of Michael W. Perry in Support of His Mot. for Partial Summary Judgment ("Perry Decl.") ¶¶ 3–4 [Dkt. No. 109].

18. Although Bancorp's DSPP administrator, Mellon Bank, received money on account from DSPP bidders after May 12, 2008, Mellon refunded those monies because the minimum threshold trading price set by IndyMac was not satisfied. IndyMac never received or used those funds. Pl.'s Opp'n to Mot. for Summary Judgment at 23:26–28 [Dkt. No. 114]; Def.'s Reply at 12:19:24 [Dkt. No. 117].

19. Mr. Perry sold no IndyMac stock in 2006, 2007, or 2008 and received no bonus for 2007 or 2008. Findings of Fact ¶¶ 7, 10 [Dkt. No. 88]; Perry Decl. ¶ 5.

20. Mr. Perry's IndyMac salary and benefits were not related in any way to the alleged false statements and omissions that the SEC contends were contained in IndyMac's May 12, 2008 SEC filings. Perry Decl. ¶ 5.

## CONCLUSIONS OF LAW

**A. Risk-Weighting Claim**

1. Once the moving party demonstrates the absence of a factual dispute, the nonmoving party can defeat summary judgment only by designating "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

2. To establish a violation of section 17(a) of the Securities Act or section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated

1  thereunder, a plaintiff must establish, *inter alia*, (1) that the defendant made a false
2  or misleading statement, or that the defendant omitted a fact necessary in order to
3  make other statements made, in light of the circumstances, not misleading, and (2)
4  materiality. *See, e.g.*, 15 U.S.C. § 77q(a) (section 17(a)); 15 U.S.C. § 78j(b)
5  (section 10(b)); 17 C.F.R. § 240.10b-5 (Rule 10b-5); *SEC v. Dain Rauscher, Inc.*,
6  254 F.3d 852, 855–56 (9th Cir. 2001). To fulfill the materiality requirement,
7  "there must be a substantial likelihood that the disclosure of the omitted fact
8  would have been viewed by the reasonable investor as having significantly altered
9  the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S.
10 224, 231–32, 108 S. Ct. 978, 983, 99 L.Ed.2d 194 (1988) (citation omitted).

11        3.    There is no genuine issue of material fact as to whether the OTS
12 waived the requirement that the Bank double risk-weight subprime assets in
13 calculating its capital ratios for purposes of determining whether the Bank was
14 well capitalized. Mr. Perry's motion provided evidence of the waiver, including
15 testimony by Mr. Keys and follow-up communications discussing both the waiver
16 and the Bank's operative capital ratios as of March 31, 2008. *See, e.g.*, Levine
17 Decl. Ex. 2 at 149:8–150:12; Ex. 3 at 160:6–23; Ex. 4; Ex. 6 at 187; Ex. 7.
18 Although Mr. Dochow's recollection of the double risk-weighting issue is
19 clouded, a witness's lack of recollection does not create a genuine issue of
20 material fact sufficient to defeat summary judgment. *See, e.g.*, *Fed. Election*
21 *Comm'n v. Toledano*, 317 F.3d 939, 950 (9th Cir. 2002).

22        4.    Bancorp accurately disclosed its operative capital ratios in its May
23 12, 2008 SEC filings. Bancorp provided an accurate table comparing the Bank's
24 capital ratios without double risk-weighting of subprime assets as of March 31,
25 2008 with the non-double risk-weighted ratios for prior quarters. The Bank's
26 hypothetical, inapplicable double risk-weighted capital ratios would not have
27 altered the "total mix of information [Bancorp] made available." *See Basic Inc.*,
28 485 U.S. at 231–32, 108 S. Ct. at 983 (internal quotation marks and citation

omitted).  Accordingly, the SEC has failed to meet its burden of coming forward with evidence that the absence of additional information about the waiver was misleading or constituted a material omission.  Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 322–23, 106 S. Ct. at 2552.

5. There is no duty to disclose hypothetical information in SEC filings. *See, e.g.*, *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 504 (9th Cir. 1992); *In re Foxhollow Techs., Inc.*, No. C 06-4595 PJH, 2008 U.S. Dist. LEXIS 52363, at *63 (N.D. Cal. May 27, 2008), *aff'd*, 359 F. App'x 802 (9th Cir. 2009).  Therefore, IndyMac had no duty to disclose that the Bank's total risk-based capital ratio would have been 9.96 percent at March 31, 2008 had the Bank been required to double risk-weight subprime assets for purposes of determining well-capitalized status.

6. For these reasons, Mr. Perry's motion for partial summary judgment as to the SEC's risk-weighting claim is granted.

**B.     Section 17(a)(2) Claim**

7. Mr. Perry is also entitled to summary judgment on the SEC's claim under section 17(a)(2) of the Securities Act as to all remaining issues in the case. Section 17(a)(2) states, in relevant part:  "It shall be unlawful for any person in the offer or sale of any securities . . . to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading."  15 U.S.C. § 77q(a)(2).  A party does not violate section 17(a)(2) unless "[it] 'obtains money or property' by means of a prohibited statement."  *Sackett v. Beamon*, 399 F.2d 884, 891 (9th Cir. 1968).

8. Here, the only money or property obtained by Bancorp through the offer or sale of securities came through Bancorp's use of the DSPP.  However, Bancorp's DSPP sales ended on May 9, 2008, and Bancorp raised no further capital subsequent to its May 12, 2008 SEC filings.

1    9.    Because section 17(a) applies to the offer or sale of securities, liability may attach even when actual transactions have not been consummated. *SEC v. Am. Commodity Exch.*, 546 F.2d 1361, 1366 (10th Cir. 1976).  However, as noted previously, section 17(a)(2) reaches only parties that obtain money or property in connection with these transactions.  *Sackett*, 399 F.2d at 891.  The SEC's claim thus fails, not because section 17(a)(2) does not apply to offers and sales through Bancorp's DSPP, but because neither Bancorp nor Mr. Perry obtained any money or property in connection with the alleged fraudulent statements after May 9, 2008.

10.   The fact that Mellon Bank, Bancorp's DSPP administrator, held money after May 9 is irrelevant because that money was refunded after the minimum threshold trading price was not met and neither Bancorp nor Mr. Perry ever received or used those funds.  Similarly, Mr. Perry's status as a salaried employee and shareholder, without more, is insufficient under section 17(a)(2) because Mr. Perry did not sell any of his Bancorp stock during the relevant time period, nor was his compensation tied to what Bancorp said in its May 12, 2008 SEC filings.  *See SEC v. Hopper*, Civ. No. H-04-1054, 2006 U.S. Dist. LEXIS 17772, at *44 (S.D. Tex. Mar. 24, 2006).  For these reasons, Mr. Perry's motion for partial summary judgment as to the section 17(a)(2) claim is granted.

DATED: Sept. 24, 2012, 2012    _____
                                The Honorable Manuel L. Real
                                United States District Court Judge